## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| ANJANA BHAGAVAN, Individually and on Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| NUTEX HEALTH INC., THOMAS T. VO, JON C. BATES, and WARREN HOSSEINION, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Anjana Bhagavan ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Nutex Health Inc. ("Nutex" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Nutex securities between August 8, 2024 and August 14, 2025, both dates inclusive (the "Class Period"), seeking to recover

damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Nutex is a physician-led, healthcare services and operations company that began publicly trading via a reverse merger in April 2022.  The Company operates through three divisions: a hospital division comprised of 24 hospital facilities in 11 states, a population health management division, and real estate.  Nutex generally operates as an out-of-network provider and generates revenue, in part, from contracts with patients and, in most cases, a third-party payor such as commercial insurance, workers compensation insurance or, in limited cases, Medicare or Medicaid.  According to Nutex, on average, greater than 90% of its net patient service revenue is paid by third-party payors.

3.     Prior to 2022, if a patient with health insurance received care from an out-of-network provider, even unknowingly, the patient's health plan might not have covered the entire out-of-network cost, leaving the patient with higher costs than if the care had come from an in-network provider.  In addition to any out-of-network cost sharing the patient might have owed, the out-of-network provider could bill the patient for the difference between the billed charge and the amount the patient's health plan paid, unless banned by state law—a practice called "balance billing".  An unexpected balance bill from an out-of-network provider is frequently referred to as a "surprise bill".

4.     In December 2020, to curb surprise out-of-network billing, Congress enacted the No Surprises Act ("NSA").  The NSA, which took effect January 1, 2022, requires private health plans to cover out-of-network claims and apply in-network cost sharing, and prohibits doctors, hospitals, and other covered providers from billing patients more than the in-network cost sharing

amount for surprise medical bills.  In addition, the NSA established an independent dispute resolution ("IDR") process to determine out-of-network payment amounts between health plans and providers when open negotiations fail to result in an agreed-upon payment amount.

5.      In the IDR process, the provider and health plan each submit a proposed payment amount and additional information supporting their payment offers to an arbitrator, a certified IDR entity.  The arbitrator must select one of the two proposed payment amounts, taking into account the "qualifying payment amount" ("QPA")—the median contract rate for like specialties in the same geographical market—and additional circumstances including, among other things, the level of training, outcomes measurements of the facility, the acuity of the individual treated, and the case mix and scope of services of the facility providing the service.

6.      Initially, as an out-of-network provider, Nutex's business suffered after the NSA went into effect.  Specifically, because cost sharing under the statute is generally based on the median in-network rate a health plan pays for a service, the NSA prevented Nutex from charging patients higher prices for its services through out-of-network billing.  Indeed, in March 2023, Nutex reported that "[s]ince the NSA became effective [. . .] our average payment by insurers of patient claims for emergency services has declined by approximately 30% including as much as a 37% reduction for physician services."  The Company stated that, "[i]n our experience, insurers often initially pay amounts lower than the QPA without regard for other information relevant to the claim. This requires us to make appeals using the IDR process."

7.      In response, in July 2024, the Company engaged with HaloMD, a "third-party IDR vendor," to "assist in the recovery of certain out of network claims" in the IDR process.  While Nutex did not disclose the identity of its third-party IDR vendor to investors at that time, the Company shortly thereafter began to tout the success of its "arbitration strategy" in increasing its

revenues.  For example, in August 2024, Nutex stated that it "believe[s] [] there is a lot of potential incremental value and revenue to be gained from arbitration" and "[i]n recent articles and public data, we are seeing that providers are prevailing 70% to 80% of the time in arbitration."  Then, in March 2025, announcing its fourth quarter and full year 2024 results, Nutex reported that "[t]otal revenue increased $232.3 million to $479.9 million for the year ended December 31, 2024" and that "[t]he arbitration process resulted in approximately $169.7 million more in revenue in 2024 than in 2023, which amounted to approximately 73.1% of the $232.3 million revenue increase."

8.    At all relevant times, the Company has identified material weaknesses in its internal control over financial reporting.  Specifically, Nutex has acknowledged that it had "[i]neffective design, implementation, and operation controls over logical access, program change management, and vendor management controls," that "[b]usiness process controls across all financial reporting processes were not effectively designed and implemented to properly address the risk of material misstatement, including controls without proper segregation of duties between preparer and reviewer and key management review controls," and "[i]neffective design and implementation of controls over the completeness and accuracy of information included in key spreadsheets supporting the financial statements."  However, Nutex has consistently represented that it has "started the process of designing and implementing effective internal control measures to remediate the reported material weaknesses."

9.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) HaloMD was achieving lucrative arbitration results for Nutex by engaging in a coordinated scheme to defraud insurance companies; (ii) as a result, to the extent that they were the product of fraudulent conduct, revenues

attributable to the Company's engagement with HaloMD in the IDR process were unsustainable; (iii) in addition, the Company overstated the extent to which it had remediated, and/or its ability to remediate, the material weaknesses in its internal controls over financial reporting; (iv) as a result, the Company was unable to effectively account for the treatment of certain of its stock based compensation obligations; (v) as a result, Nutex improperly calculated these stock based compensation obligations as equity rather than liabilities; (vi) the foregoing increased the risk that the Company would be unable to timely file certain financial reports with the SEC; (vii) accordingly, Nutex's business and/or financial prospects were overstated; and (viii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

10.    On July 22, 2025, Blue Orca Capital ("Blue Orca") issued a short report on Nutex (the "Blue Orca Report" or the "Report").  The Blue Orca Report alleged, among other things, that "HaloMD achieved dramatically lucrative results for clients like Nutex by engaging in a coordinated fraudulent scheme to steal millions of dollars from insurance companies on behalf of and in conjunction with its healthcare billing clients."

11.    Specifically, Blue Orca referenced three recent "[b]ombshell [l]awsuits" filed against HaloMD.  The lawsuits, brought variously by Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.[1], Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield[2], and Anthem Blue Cross Life and Health Insurance Company and Blue Cross of California d/b/a

---

[1] *Blue Cross Blue Shield Healthcare Plan of Georgia, Inc. v. HaloMD, Inc. et al*, No. 1:25-cv-02919 (N.D. Ga. May 27, 2025).
[2] *Community Insurance Company et al v. HaloMD, LLC et al*, No. 1:25-cv-00388 (S.D. Ohio June 10, 2025).

Anthem Blue Cross[3], allege that HaloMD violated various federal and state laws by submitting false attestations of eligibility and initiating massive volumes of IDR disputes.

12.    As summarized by Blue Orca, the plaintiffs in these lawsuits accused HaloMD and its clients of "flooding the arbitration system with thousands of claims that they knew at the time of submission to be ineligible" and alleging that HaloMD was able to garner improper payments by "falsely attesting to the eligibility of claims and [. . .] improperly inflating payment offers that far exceeded the amounts to which providers should have been entitled."  Accordingly, Blue Orca concluded that "it may just be a matter of time before another suit is filed against HaloMD, this time including Nutex," and "[o]nce Nutex can no longer use the NSA arbitration system to receive unsustainably high reimbursement rates, our suspicion is that Nutex will return to penny stock status."

13.    Following publication of the Blue Orca Report, Nutex's stock price fell $11.18 per share, or 10.05%, to close at $100.01 per share on July 22, 2025.

14.    On July 24, 2025, Nutex issued a press release responding to the Blue Orca Report, stating that it "strongly disagrees with the allegations in the report" and that it "expects to provide related updates in its upcoming earnings release and Form 10-Q for the second quarter of 2025 due on or before August 14, 2025."

15.    However, after the market closed on August 14, 2025, Nutex announced that it would "delay filing its Form 10-Q for the period ending June 30, 2025", citing "non-cash accounting adjustments related to the treatment of stock based compensation obligations for certain under-construction and ramping hospitals, as disclosed in previous filings."

---

[3] *Anthem Blue Cross Life and Health Insurance Company et al v. HaloMD LLC et al*, No. 8:25-cv-01467 (C.D. Cal. July 7, 2025).

16.     When Nutex failed to rebut the allegations of the Blue Orca Report, the Company's stock price fell $18.22 per share, or 16.39%, to close at $92.91 per share on August 15, 2025.

17.     After the end of the Class Period, on August 21, 2025, Nutex filed a Current Report on Form 8-K with the SEC which, among other things, contained a Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard and stated that the Audit Committee of the Company's Board of Directors concluded that certain of the Company's previously issued financial statements "treated non-cash obligations related to under-construction and ramping hospitals as equity rather than liabilities and should be restated."  This filing also purported to address the Blue Orca Report.  However, Nutex merely provided a generalized description of the arbitration process under the NSA and the Company's own claims process, acknowledged that Nutex had engaged HaloMD to assist in the IDR process, and discussed two of the three recent lawsuits filed against HaloMD, noting that the Company had not been named as a Defendant.  As such, Nutex's filing did not in fact meaningfully rebut any of the allegations contained in the Blue Orca Report.

18.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

19.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

21.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Nutex is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

22.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

23.     Plaintiff, as set forth in the attached Certification, acquired Nutex securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

24.     Defendant Nutex is a Delaware corporation with principal executive offices located at 6030 S. Rice Ave, Suite C, Houston, Texas 77081.  Nutex's common stock trades in an efficient market on the Nasdaq Capital Market ("NASDAQ") under the ticker symbol "NUTX."

25.     Defendant Thomas T. Vo ("Vo") has served as Nutex's Chief Executive Officer and Chairman of the Board at all relevant times.

26.     Defendant Jon C. Bates ("Bates") has served as Nutex's Chief Financial Officer at all relevant times.

27.     Defendant Warren Hosseinion ("Hosseinion") has served as Nutex's President and as a Director of the Company at all relevant times.

28.     Defendants Vo, Bates, and Hosseinion are collectively referred to herein as the "Individual Defendants."

29.     The Individual Defendants possessed the power and authority to control the contents of Nutex's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Nutex's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Nutex, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

30.     Nutex and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

31.     Nutex is a physician-led, healthcare services and operations company that began publicly trading via a reverse merger in April 2022.  The Company operates through three divisions: a hospital division comprised of 24 hospital facilities in 11 states, a population health management division, and real estate.

### Materially False and Misleading Statements Issued During the Class Period

32.     The Class Period begins on August 8, 2024, when Nutex issued a press release announcing the Company's Q2 2024 financial results.  The press release stated, in relevant part:

"***We are pleased to report 29% revenue growth, Adjusted EBITDA, attributable to Nutex Health Inc. of $12.0 million and a 150% increase in hospital division operating income to $22.8 million in the second quarter ended June 30, 2024,***

*showing our continued focus on top line growth, increasing cash flow as well as improving profitability*," stated [Defendant] Bates[.]

"*Nutex Health is executing extremely well, and we plan to continue to advance our strategic initiatives to drive sustainable growth*. We delivered solid revenue growth while accelerating cash flow and strengthening our balance sheet in the first half of 2024. *We are confident that we are taking the right steps to lay the foundation for long-term success and to increasing shareholder value*," stated [Defendant] Hosseinion[.]

"We had a solid Second Quarter with strong year over year growth. Volume continues to increase overall among our hospitals. *Our average payment by insurers of patient claims increased, a trend we are optimistic will persist as we continue to work the NSA claims through the [IDR] process*," stated [Defendant] Vo[.]⁴

33.    That same day, Nutex filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2024 (the "Q2 2024 10-Q"). In discussing the Company's financial condition and results of operations, the Q2 2024 10-Q stated, in relevant part:

On July 1, 2024, we engaged with a third-party IDR vendor *to further support all of our out of network claims and determine which claims would be beneficial to arbitrate*. The IDR arbitration process can take up to four to six months to receive payments. Based on the available data we have analyzed from the third and fourth quarters of 2023, providers have submitted higher offers and have prevailed 80% of the time through IDR.

34.    In addition, in providing an overview of the Company's controls and procedures, the Q2 2024 10-Q acknowledged that Nutex had "[i]neffective design, implementation, and operation controls over logical access, program change management, and vendor management controls," that "[b]usiness process controls across all financial reporting processes were not effectively designed and implemented to properly address the risk of material misstatement, including controls without proper segregation of duties between preparer and reviewer and key

---

⁴ All emphases included herein are added unless otherwise indicated.

management review controls," and "[i]neffective design and implementation of controls over the completeness and accuracy of information included in key spreadsheets supporting the financial statements." but discussed its purported efforts to remediate the foregoing weaknesses, stating, in relevant part:

> *Remediation Plans*. These material weaknesses did not result in a material misstatement of the Company's consolidated financial statements for the periods presented. In 2024, the Company started the process of designing and implementing effective internal control measures to remediate the reported material weaknesses. The Company's efforts included implementing a new enterprise-wide system to reduce reliance on manual processes and spreadsheets supporting the financial statements. Additionally, the Company engaged an accounting firm in 2024 to assist in the proper design, implementation and testing of internal controls over financial reporting. We made additions to our accounting and financial reporting teams throughout 2024.

The foregoing statements regarding the Company's remediation efforts overstated the extent to which it had remediated, and/or its ability to remediate, the material weaknesses in its internal controls over financial reporting.

35.     Appended to the Q2 2024 10-Q as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Vo and Bates attesting that the "information contained in the [Q2 2024 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

36.     On August 9, 2025, Nutex hosted an earnings call with investors and analysts to discuss the Company's Q2 2024 results (the "Q2 2024 Earnings Call").  During the scripted portion of the Q2 2024 Earnings Call, Defendant Vo stated, in relevant part:

> We have also already begun to engage in the arbitration process of the independent dispute resolution, whereas previously we had stopped at the open negotiation process. ***We believe that there is a lot of potential incremental value and revenue to be gained from arbitration as we believe that the insurers typically pay us very low the first time***.

Arbitration is a tool provided by the No Surprises Act to ensure providers receive fair treatment. In recent articles and public data, we are seeing that providers are prevailing 70% to 80% of the time in arbitration.

37.     On November 7, 2024, Nutex issued a press release announcing the Company's Q3 2024 financial results.  The press release stated, in relevant part:

"We are pleased to report 25% revenue growth, Adjusted EBITDA attributable to Nutex Health of $13.5 million and a 209% increase in gross profit to $21.9 million in the third quarter ended September 30, 2024, ***showing our continued focus on top line growth, increasing cash flow as well as improving profitability***," stated [Defendant] Bates[.]

"Nutex Health had another outstanding quarter. The strategic and operational decisions we have made over the last nine months are driving this strong performance, as demonstrated by another quarter of year-over-year growth in revenue, EBITDA and Adjusted EBITDA as well as incremental growth in cash flow. ***We are confident that our momentum will continue and plan on growing our hospital and population health divisions responsibly as we drive value for our shareholders***," stated [Defendant] Hosseinion[.]

"The four de-novo hospitals that we opened in 2023 are ramping up nicely, resulting in strong year-over-year growth in both revenue and patient volume. Volumes and revenue continue to increase among our mature hospitals, both on the outpatient side as well as the inpatient side, which still have excess capacity. ***Our average payment by insurers of patient claims also increased, a trend we are optimistic will persist as we continue to work the NSA [] claims through the [IDR] process***," stated [Defendant] Vo[.]

38.     That same day, Nutex filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2024 (the "Q3 2024 10-Q").  The Q3 2024 10-Q contained a substantively similar description of the Company's engagement with its third-party IDR vendor as discussed, *supra*, in ¶ 33, and a substantively similar description of the identified material weaknesses in Nutex's internal control over financial reporting and the Company's purported remediation efforts as discussed, *supra*, in ¶ 34.

39.     Appended to the Q3 2024 10-Q as exhibits were signed certifications pursuant to

SOX by Defendants Vo and Bates attesting that the "information contained in the [Q3 2024 10-Q]

fairly presents, in all material respects, the financial condition and results of operations of the

Company."

40.     On November 8, 2024, Nutex hosted an earnings call with investors and analysts to

discuss the Company's Q3 2024 results (the "Q3 2024 Earnings Call").  During the scripted portion

of the Q3 2024 Earnings Call, Defendant Vo stated, in relevant part:

> We are pleased to report another excellent quarter for Nutex Health. In the third
> quarter of 2024, [] we achieved substantial revenue growth as well as volume
> growth and continue to show our commitment to enhancing profitability and
> operational efficiency. I would like to start with some highlights from this quarter.
> For the three months ended September 30, 2024, we reported total revenue of $78.8
> million which is a significant increase compared to $62.7 million for the same
> period last year. This equates to a growth of 26%.
>
> ***
>
> [O]ur internal coding, billing and collections department, operationally, are getting
> more experience in working the No Surprises Act or NSA claims. Adapting to
> specific nuances and solving complex problems in dealing with insurers post NSA.
> As a result, we are seeing better reimbursement per patient.
>
> ***
>
> We continually strive to obtain fair in-network contract with insurers. If this is not
> possible, we make serious attempts to get a fair qualified payment amount or QPA
> from the insurers. If we do not get a fair QPA as described in the NSA bylaws, the
> first time, we proceed with the independent dispute resolution or IDR which
> includes both the open negotiation as well as arbitration process options.

41.     On February 5, 2025, the Company issued a press release entitled "Nutex Health

Issues No Surprises Act (NSA) Arbitration Update."  The press release stated, in relevant part:

> Nutex [. . .] today provided an update regarding its strategic participation in
> arbitration known as the [IDR] process under the [NSA].
>
> As previously disclosed in our September 30, 2024 Form 10-Q, on July 1, 2024 the
> Company contracted with a third-party vendor to assist in the recovery of certain

out of network claims under the arbitration process. *Since implementing its arbitration strategy, the Company has reached its goal of submitting between 60-70% of its billable visits to arbitration each month, achieving an arbitration success rate in excess of 80% during the fourth quarter of 2024*.

*These increasingly favorable outcomes are expected to allow the Company to recover substantial amounts previously underpaid by insurers. Due to significant administrative time built into the federal arbitration process and delays in collections, the Company is now beginning to realize the full cash impact of its enhanced arbitration process that was commenced in July 2024*.

*** 

"*Our proactive approach to arbitration under the No Surprises Act has yielded positive results thus far, reinforcing our commitment to fair reimbursement. By effectively leveraging our industry leading expertise and knowledge, we have been able to secure rightful payments for our facilities and providers while continuing to deliver high-quality, accessible care to our communities*," stated [Defendant] Vo[.] "The momentum we have built in 2024 places Nutex Health in a strong position for continued success in the coming year."

42.    On March 31, 2025, Nutex issued a press release announcing the Company's Q4 and full year 2024 financial results. The press release stated, in relevant part:

- The arbitration process resulted in approximately $169.7 million more in revenue in 2024 than in 2023, which amounted to approximately 73.1% of the $232.3 million revenue increase. Of the $169.7 million in arbitration revenue, $68.9 million, $70.5 million and $30.3 million related to dates of services for the fourth quarter 2024, third quarter 2024 and pre-third quarter 2024, respectively.

*** 

"Nutex Health delivered healthy year-end and fourth quarter financial and operational results last year. *The arbitration initiative that we began in July 2024 is generating higher reimbursement amounts per visit this year and is more in line with a fair market rate*. We would like to thank our dedicated teams of physicians, nurses and all our other team members for continuing to deliver for our patients. We enter 2025 with great momentum and look forward to continuing our strong financial and operational performance," stated [Defendant] Vo[.]

43.     That same day, Nutex filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2024 (the "2024 10-K"). In discussing governmental regulation, the 2024 10-K stated, in relevant part:

*Nutex and the NSA*. While we are working within the established processes for IDR, we have had varying successes at achieving collections at or higher than the established QPA. We have undertaken several strategic actions designed to improve our collections results. These include:

- ***engaging a third-party IDR vendor for claims under IDR***,
- maximizing our claims coding efficiency,
- increasing efforts to collect co-pays and co-insurance,
- adding additional administrative staff to handle the increased administrative IDR burden,
- ***having a dedicated IDR team to accelerate resubmission of claims under the IDR process***,
- making appeals for additional payment of claims for periods before and after the NSA final rule was adopted through the IDR process,
- ***making efforts to sign favorable contracts with new insurers***,
- ***working to sign more favorable contracted rates with existing contracted providers***,
- ***working with both local and national legislatures to enforce the NSA rules and guidelines for Insurers***, and
- focusing on the value-based [independent physician associations] side of our business, which is less affected by the NSA.

*Arbitration Process*. On July 1, 2024, we engaged with a third-party IDR vendor to assist in the recovery of certain out of network claims under the IDR process. The IDR process, including subsequent appeals and insurance payor delays, require extensive administrative time and delays in collections, which can take up to three to five months to receive payments from when we start the open negotiation process. ***Since implementing its arbitration strategy, the Company has reached its goal of submitting between 60-70% of its billable visits to arbitration each month, achieving an arbitration success rate in excess of 80% during the fourth quarter of 2024***.

44.     In addition, the 20242 10-K and a substantively similar description of the identified material weaknesses in Nutex's internal control over financial reporting and the Company's purported remediation efforts as discussed, *supra*, in ¶ 34.

45.     Appended to the 2024 10-K as exhibits were signed certifications pursuant to SOX by Defendants Vo and Bates, attesting that the "information contained in the [2024 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

46.     On April 1, 2025, Nutex hosted an earnings call with investors and analysts to discuss the Company's Q4 2024 results (the "Q4 2024 Earnings Call").  During the scripted portion of the Q4 2024 Earnings Call, Defendant Vo stated, in relevant part:

> Now let's turn to a critical piece of our 2024 story. The No Surprises Act or the NSA. And the arbitration process, otherwise known as Independent Dispute Resolution Process or IDR. The NSA effective January 1, 2022, aimed to shield patients from surprise medical bills. A noble intent we fully support and fully adhere to. However, the flawed implementation of the NSA has hit providers like us very, very hard, and specifically on the revenue per patient reimbursement side. In 2022, our average insurer payments for emergency services dropped roughly 30%. The root issue is that insurers often pay below the qualifying payment amount or QPA, which was described and mandated in the NSA.
>
> ***
>
> Since we have implemented the arbitration process, the results have been positive. As I mentioned earlier, while our volume -- our patient volume increased by about 30% in 2024 compared to 2023, our revenue increased by about 94%. And some of this, as a result -- some of this was a result of higher patient volume and acuity to our facility, but a lot of it also was directly from our arbitration initiative.
>
> Since 2024, we have submitted roughly between 60% to 70% of our billable visits to the IDR or arbitration portal. Of these claims submitted, we have achieved a roughly 80% win rate. Of these over 80% plus arbitration wins once again, which are binding, we expect the insurers to pay 60% to 70% in the first 60 days and the rest later.
>
> In terms of revenue per visit increase from the IDR process, we typically find a 150% to 250% increase in reimbursement on the facility collection side compared to the initial payment. And once again, this is all consistent with the public data and consistent with the data that are published by other providers that are also doing arbitration like we are. Once again, the goal of arbitration really is just to get to the QPA payment level as outlined in the No Surprises Act. And so far, arbitration seems to be working as it was designed to do.

47.     On May 13, 2025, Nutex issued a press release announcing the Company's Q1 2025 financial results.  The press release stated, in relevant part:

> "We are excited to provide yet another solid quarter with $14.6 million in net income, a record high gross profit of 56%, a record high $51.0 million in net cash from operating activities and a record high cash balance of $87.7 million, highlighting the company's continued financial strength as we execute on our growth plan for 2025," stated [Defendant] Bates[.]

***

> "The great momentum that we started in 2024 is continuing into the first quarter of 2025. ***We are now seeing more consistent financial results stemming from a combination of volume growth and operational efficiency, with more fair and reasonable payments from the arbitration process***. We still have a lot of work ahead of us, but the positive trend is very encouraging. We would like to thank our team of physicians and team members nationwide for working in alignment to get us to where we are this quarter," stated [Defendant] Vo[.]

48.     That same day, Nutex filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2025 (the "Q1 2025 10-Q").  The Q1 2025 10-Q contained a substantively similar description of the Company's engagement with its third-party IDR vendor as discussed, *supra*, in ¶ 33, and a substantively similar description of the identified material weaknesses in Nutex's internal control over financial reporting and the Company's purported remediation efforts as discussed, *supra*, in ¶ 34.

49.     Appended to the Q1 2025 10-Q as exhibits were signed certifications pursuant to SOX by Defendants Vo and Bates attesting that the "information contained in the [Q1 2025 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

50.    On May 14, 2025, Nutex hosted an earnings call with investors and analysts to discuss the Company's Q1 2025 results (the "Q1 2025 Earnings Call").  During the scripted portion of the Q1 2025 Earnings Call, Defendant Vo stated, in relevant part:

> Let me take a few moments to discuss the arbitration process that we first implemented in July of 2024. Overall, it is a small but very important part of our operation. In the first quarter of 2025, we submitted between 60% to 70% of billable visits through the arbitration portal. We achieved an 80% plus win rate of these emissions, resulting in facility collections [. . .] increasing by between 200% to 300% compared to the initial insurance payments. This means that an independent arbitrator has legally determined that the insurance companies are paying us initial payments that are much lower than fair and reasonable rates over 50% of the time. So far, even with these winning percentages, we have not seen any significant behavioral changes. We are constantly monitoring legislative and legal developments at both [Center for Medicare & Medicaid Services ("CMS")] and in Congress, to make sure we are on top of any potential changes.

51.    The statements referenced in ¶¶ 32-50 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) HaloMD was achieving lucrative arbitration results for Nutex by engaging in a coordinated scheme to defraud insurance companies; (ii) as a result, to the extent that they were the product of fraudulent conduct, revenues attributable to the Company's engagement with HaloMD in the IDR process were unsustainable; (iii) in addition, the Company overstated the extent to which it had remediated, and/or its ability to remediate, the material weaknesses in its internal controls over financial reporting; (iv) as a result, the Company was unable to effectively account for the treatment of certain of its stock based compensation obligations; (v) as a result, Nutex improperly calculated these stock based compensation obligations as equity rather than liabilities; (vi) the foregoing increased the risk that the Company would be unable to timely file certain financial reports with the SEC; (vii)

accordingly, Nutex's business and/or financial prospects were overstated; and (viii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

## The Truth Emerges

52.     On July 22, 2025, Blue Orca issued a short report on Nutex.  The Blue Orca Report alleged, among other things, that "HaloMD achieved dramatically lucrative results for clients like Nutex by engaging in a coordinated fraudulent scheme to steal millions of dollars from insurance companies on behalf of and in conjunction with its healthcare billing clients."  Accordingly, Blue Orca concluded that "it may just be a matter of time before another suit is filed against HaloMD, this time including Nutex," and "[o]nce Nutex can no longer use the NSA arbitration system to receive unsustainably high reimbursement rates, our suspicion is that Nutex will return to penny stock status."

53.     Blue Orca began the Report by discussing the negative impact the NSA had on Nutex and how HaloMD "[m]iraculously [t]ransformed" the Company's business.  Specifically, the Blue Orca Report stated that "[t]he crackdown on surprise billing resulted in Nutex reporting large operating and net losses in 2022 and 2023, leading its market cap to plunge to less than $30 million[.]"  However, after hiring its "undisclosed 'third party IDR vendor'", Blue Orca stated that "Nutex's hospital division reported nearly 250% sequential revenue growth in Q4 2024. In a single quarter, Nutex's corporate EBIT margin grew from 12% to 44%. This dramatic change led to Nutex stock appreciating more than 20x from its lows."  The Blue Orca Report stated that "[t]o [Blue Orca's] knowledge, Nutex does not disclose the identity of this vendor in any of the filings and conference calls," but "[f]or each of Nutex's hospitals that filed arbitrations in Q4 2024, in all but one the email domain was identified as 'halomd.com.'":

| DLI Number | Payment Determination Outcome | Provider/Facility Name | Provider Email Domain | Health Plan/Issuer Name | Provider/Facility Offer as % of QPA | Health Plan/Issuer Offer as % of QPA | Prevailing Party Offer as % of QPA |
|---|---|---|---|---|---|---|---|
| DLI - 4778941 | In Favor of Provider/ | WEST PLANO EP | halomd.com | AETNA | 1,311% | 100% | 1,311% |
| DLI - 4741597 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 874% | N/A | 874% |
| DLI - 4724114 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,404% | 100% | 1,404% |
| DLI - 4724115 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 2,029% | 118% | 2,029% |
| DLI - 4733740 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,252% | N/A | 1,252% |
| DLI - 4730135 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 813% | 154% | 813% |
| DLI - 4730136 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,084% | 124% | 1,084% |
| DLI - 4783262 | In Favor of Provider/ | WEST PLANO EP | halomd.com | AETNA | 1,311% | N/A | 1,311% |
| DLI - 4731913 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,598% | N/A | 1,598% |
| DLI - 4741601 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,354% | N/A | 1,354% |
| DLI - 4731920 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,354% | 114% | 1,354% |
| DLI - 4721689 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 2,029% | 164% | 2,029% |
| DLI - 4722849 | In Favor of Provider/ | WEST PLANO EP | halomd.com | UMR | 1,244% | 105% | 1,244% |
| DLI - 4876708 | In Favor of Provider/ | WEST PLANO EP | halomd.com | Cigna | 2,453% | 346% | 2,453% |
| DLI - 4722762 | In Favor of Provider/ | WEST PLANO EP | halomd.com | BCBSTX | 1,354% | 155% | 1,354% |

*Source: CMS IDR Reports, Q4 2024*

This appears to be the domain for HaloMD, which appears to be related to Texas-based MPOWERHealth.[4] Led by a former Las Vegas stripper and *Apprentice* contestant, HaloMD is rapidly gaining share in the IDR arbitration market and claims to have achieved spectacular results for its clients.

54.    The Blue Orca Report continued by referencing three recent "[b]ombshell [l]awsuits" filed against HaloMD. The lawsuits, filed variously by Blue Cross Blue Shield Healthcare Plan of Georgia, Inc., Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield, and Anthem Blue Cross Life and Health Insurance Company and Blue Cross of California d/b/a Anthem Blue Cross, allege that HaloMD violated various federal and state laws by submitting false attestations of eligibility and initiating massive volumes of IDR disputes.

55.    As summarized in the Blue Orca Report, the plaintiffs in these lawsuits allege that "HaloMD and its healthcare services clients of stealing tens [of] millions of dollars from insurers by flooding the arbitration system with thousands of claims that they knew at the time of submission to be ineligible." To depict this "multi-step process," Blue Orca referenced a graphic from a filing in one of the foregoing lawsuits:



Source: Case: 1:25-cv-00388-MWM Document 1, Filed in June 2025

56.     Blue Orca continued by stating that the plaintiffs in these lawsuits allege that HaloMD was able to "garner tens of millions of dollars in improper payments by **falsely attesting to the eligibility of claims and by improperly inflating payment offers that far exceeded the amounts to which providers should have been entitled**," and, in one of the lawsuits, "plaintiffs allege that HaloMD circumvented the attestation guard rails of the arbitration submission system by simply **fabricating evidence.**" (Emphasis in original). Moreover, the Blue Orca Report stated that "**[t]hese stunning allegations estimate that approximately 50%-70% of the disputes on which defendants submitted arbitrations and received payment determinations were ineligible,** and that even on eligible claims, HaloMD inflated the value of services to allegedly steal ill gotten money from insurers." (Emphasis in original).

57.     In discussing the likely impact of the foregoing lawsuits on Nutex, the Blue Orca Report stated that "[a]lthough it is important to note that Nutex was not named in any of these suits, and to date no insurer has alleged that Nutex has done anything wrong, ***we believe these***

21

*lawsuits are the first of what may be a tidal wave of litigation against HaloMD and its clients, and it may only be a matter of time before Nutex itself is targeted*." (Emphasis added). Indeed, Blue Orca stated that "CMS data shows that Nutex was a major HaloMD client (with around 14,000 arbitration line items in Q4 2024, ~66% of which were against Blue Cross Blue Shield affiliates) and that HaloMD achieved remarkable results in arbitration proceedings on behalf of Nutex." "Not only will this be costly," the Blue Orca Report stated, "but insurers are demanding punitive damages and a **clawback** of improperly paid awards. **In such a case, Nutex may be at risk to have to repay revenue already recognized and collected.**" (Emphasis in original). Regardless of whether Nutex is targeted with litigation, Blue Orca stated that it "believe[s] that the lawsuits against HaloMD will likely put an end to the aggressive and massively lucrative strategy employed on behalf of clients like Nutex" and "[w]ithout HaloMD and its special sauce, used to achieve awards 8x greater than QPA, Nutex's financials would be devastated as revenue and profitability shrink back to pre-HaloMD times."

58.    In addition, the Blue Orca Report stated that Nutex faces a further risk "hanging over its business model"—namely, that a majority of its recognized revenue may be uncollectable. Specifically, Blue Orca cited a recent decision by the U.S. Court of Appeals for the Fifth Circuit in which the court ruled that providers could not sue to enforce NSA arbitration awards because the awards are not enforceable under the Federal Arbitration Act. The Blue Orca Report noted that "Nutex's revenue and profitability critically depend on the collectability of the arbitration awards" but, in light of the Fifth Circuit's ruling, "many healthcare insurers may simply refuse to pay NSA arbitration awards." Because Nutex has a "massive receivables balance of uncollected awards," Blue Orca suggested that the Company may be particularly at risk. The issue of revenue recognition of uncollected arbitration awards was so concerning, the Blue Orca Report stated, "that

even Nutex's former auditor Marcum LLP noted a critical audit matter around revenue recognition in Nutex's hospital division, which in turn depends upon the collectability of arbitration awards."

59.     Given all of the foregoing, Blue Orca concluded that "[i]f Nutex ceases being able to rely on HaloMD to achieve remarkable results using the NSA arbitration process, our suspicion is that Nutex may rapidly return to penny stock status, where it languished before it hired HaloMD. Either way, we do not see how Nutex is investable."

60.     Following publication of the Blue Orca Report, Nutex's stock price fell $11.18 per share, or 10.05%, to close at $100.01 per share on July 22, 2025.

61.     On July 24, 2025, Nutex issued a press release responding to the Blue Orca Report, stating that it "strongly disagrees with the allegations in the report" and that it "expects to provide related updates in its upcoming earnings release and Form 10-Q for the second quarter of 2025 due on or before August 14, 2025."

62.     However, after the market closed on August 14, 2025, the Company issued a press release announcing a delay in filing its 2025 second quarter financial statements.  The press release stated, in relevant part:

> Nutex [. . .] today announced that it will ***delay filing its Form 10-Q for the period ending June 30, 2025 due to non-cash accounting adjustments related to the treatment of stock based compensation obligations for certain under-construction and ramping hospitals, as disclosed in previous filings***. The Company additionally provided preliminary financial results for the three and six months ended June 30, 2025 and announced a stock repurchase program of up to $25.0 million.
>
> ***
>
> The Company provided select preliminary unaudited financial results for the three and six months ended June 30, 2025. The preliminary financial information presented below reflects management's current views with respect to the Company's financial results. These preliminary results remain subject to the completion of normal quarter-end and fiscal-end accounting procedures and closing

adjustments. Nutex Health will release its full financial results as promptly as reasonably practicable.

***The Company hereby announces the cancellation of the conference call that was originally scheduled Friday, August 15, 2025, at 10:30 a.m. ET***. The Company will reschedule the conference call as soon as possible where it will discuss 2nd Quarter financials as well as other topics relevant to the Company.

63.     When Nutex failed to rebut the allegations of the Blue Orca Report as they had previously indicated, the Company's stock price fell $18.22 per share, or 16.39%, to close at $92.91 per share on August 15, 2025.

64.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## POST-CLASS PERIOD DEVELOPMENT

65.     After the end of the Class Period, on August 21, 2025, Nutex filed a Current Report on Form 8-K with the SEC which, among other things, contained a Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard and stated that the Audit Committee of the Company's Board of Directors concluded that certain of the Company's previously issued financial statements "treated non-cash obligations related to under-construction and ramping hospitals as equity rather than liabilities and should be restated." This filing also purported to address the Blue Orca Report. However, Nutex merely provided a generalized description of the arbitration process under the NSA and the Company's own claims process, acknowledged that Nutex had engaged HaloMD to assist in the IDR process, and discussed two of the three recent lawsuits filed against HaloMD, noting that the Company had not been named as a Defendant. As such, Nutex's filing did not in fact meaningfully rebut any of the allegations contained in the Blue Orca Report.

## SCIENTER ALLEGATIONS

66.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Nutex securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

68.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Nutex securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Nutex or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

69.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

70.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

71.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Nutex;

- whether the Individual Defendants caused Nutex to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Nutex securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

72.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

26

73.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Nutex securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Nutex securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

74.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

75.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

76.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

77.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

78.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Nutex securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Nutex securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

79.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Nutex securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Nutex's finances and business prospects.

80.    By virtue of their positions at Nutex, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

81.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Nutex, the Individual Defendants had knowledge of the details of Nutex's internal affairs.

82.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Nutex. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Nutex's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Nutex securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Nutex's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Nutex securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

83.     During the Class Period, Nutex securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Nutex securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Nutex securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Nutex securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

84.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

85.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## **COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

86.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

87.     During the Class Period, the Individual Defendants participated in the operation and management of Nutex, and conducted and participated, directly and indirectly, in the conduct of Nutex's business affairs.  Because of their senior positions, they knew the adverse non-public information about Nutex's misstatement of income and expenses and false financial statements.

88.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Nutex's financial condition and results of operations, and to correct promptly any public statements issued by Nutex which had become materially false or misleading.

89.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Nutex disseminated in the marketplace during the Class Period concerning Nutex's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Nutex to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Nutex within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Nutex securities.

90.     Each of the Individual Defendants, therefore, acted as a controlling person of Nutex.  By reason of their senior management positions and/or being directors of Nutex, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Nutex to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Nutex and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

31

91.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Nutex.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  August 22, 2025                    Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

HOLZER & HOLZER, LLC
Corey D. Holzer
(*pro hac vice* application forthcoming)
211 Perimeter Center Parkway
Suite 1010
Atlanta, Georgia 30346
Telephone: (770) 392-0090

Facsimile: (770) 392-0029
cholzer@holzerlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.     I, _Anjana Bhagavan_____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.     I have reviewed a Complaint against Nutex Health Inc. ("Nutex") and authorize the filing of a comparable complaint on my behalf.

3.     I did not purchase or acquire Nutex securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.     I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Nutex securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.     The attached sheet lists all of my transactions in Nutex securities during the Class Period as specified in the Complaint.

6.     During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.     I agree not to accept any payment for serving as a representative party on behalf of the Class as set forth in the Complaint, beyond my *pro rata* share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** ___8/5/2025_____
                            **(Date)**

_____
                            **(Signature)**

_____
                    Anjana Bhagavan
                    **(Type or Print Name)**

**Nutex Health Inc. (NUTX)**                                                          **Anjana Bhagavan**

### List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 7/10/2025 | 50 | $116.0000 |