# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| IN RE NUTEX HEALTH INC. SECURITIES LITIGATION | Case No.: 4:25-cv-03999 |
| | <u>CLASS ACTION</u> |
| | <u>AMENDED COMPLAINT</u> |
| THIS DOCUMENT RELATES TO: 4:25-CV-03999 | |

## TABLE OF CONTENTS

NATURE OF ACTION ................................................................................................ 1

JURISDICTION AND VENUE ................................................................................... 4

PARTIES ..................................................................................................................... 5

SUBSTANTIVE ALLEGATIONS .............................................................................. 6

    Background ............................................................................................................ 6

    HaloMD .................................................................................................................. 8

        1)    Submission of Ineligible Claims and False Attestations........................... 10

        2)    Improper Batching and Violation of Cooling-Off Periods ........................ 11

        3)    Overwhelming the System and Misrepresentations.................................... 12

    Nutex's Revenue .................................................................................................. 16

    Truth Revealed .................................................................................................... 19

    Nutex's Restatement of Financial Statements ..................................................... 24

MATERIALLY FALSE AND MISLEADING STATEMENTS.................................. 33

    February 5, 2025 ................................................................................................. 33

    March 31, 2025 ................................................................................................... 35

    April 1, 2025 ....................................................................................................... 41

    April 7, 2025 ....................................................................................................... 42

    May 13, 2025 ...................................................................................................... 43

    May 14, 2025 ...................................................................................................... 48

SCIENTER ALLEGATIONS....................................................................................... 50

    Defendants Actively Supervised and Discussed Nutex's "Arbitration Success" .................. 50

    Defendants Violated GAAP When Reporting Nutex's Financial Earnings ........................... 52

    Auditor Changes and SOX Certifications............................................................. 56

LOSS CAUSATION AND ECONOMIC LOSS ......................................................... 59

NO SAFE HARBOR ................................................................................................ 60

CLASS ACTION ALLEGATIONS ....................................................................... 61

COUNT I ............................................................................................................... 64

COUNT II .............................................................................................................. 67

PRAYER FOR RELIEF ........................................................................................ 68

DEMAND FOR JURY TRIAL .............................................................................. 69

Court-appointed Lead Plaintiffs Gerald F. Cox and Shah Azman Bin Mohamad Ayub Khan ("Plaintiffs"), by and through their counsel, file this Amended Complaint individually and on behalf of a class consisting of all persons that purchased or otherwise acquired Nutex Health Inc. ("Nutex") securities between February 5, 2025 and August 14, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (the "Class").

Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and beliefs are based on the ongoing investigation of its undersigned counsel. This investigation includes review and analysis of, among other things: (i) Nutex's filings with the SEC; (ii) transcripts of Nutex's conference calls with analysts and investors; (iii) Company presentations, press releases, and reports; (iv) information concerning Nutex readily available on the internet; (v) research reports by securities and financial analysts; (vi) news and media reports concerning Nutex and other facts related to this action; and (vii) price and volume data for Nutex's securities. Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support is likely to exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF ACTION

1.      Nutex operates as a physician-led healthcare management and operations company. Through its primary "Hospital Division" operating segment, Nutex focuses on developing and running facilities like micro-hospitals, specialty hospitals, and hospital outpatient departments.

These micro-hospitals are small-scale emergency rooms targeting suburban areas with high commercial insurance populations to capture out-of-network reimbursements.

2.      In 2022, Nutex's business suffered a downturn following the passage and implementation of the No Surprises Act ("NSA"). The law was enacted to prevent "surprise" balance billing that patients would receive after seeking out-of-network medical care. The NSA effectively limited these bills by capping them at a predetermined amount or an amount agreed to through an independent dispute resolution process ("IDR").

3.      For Nutex, the effect of NSA was severely detrimental to its bottom line. In 2022, Nutex's average insurance payment for emergency services declined by approximately 30%, including a 37% reduction for physician services. In 2023, Nutex experienced a 5% improvement from 2022 for emergency services but suffered a 10% reduction for physician services. This declining trend continued until July 2024 when Nutex retained an unknown, undisclosed third-party to assist with its IDR collections under the NSA.

4.      Defendants did not identify Nutex' third-party IDR vendor during the Class Period. Instead, they repeatedly touted the results Nutex was achieving. This included claims that Nutex had "reached its goal of submitting between 60-70% of its billable visits to arbitration each month, achieving an arbitration success rate in excess of 80% during the fourth quarter of 2024." Nutex's new vendor channeled 60-70% of billable visits into NSA arbitrations. This approach aimed to maximize recoveries on out-of-network claims.

5.      Unbeknownst to investors, Nutex's new vendor was HaloMD and the results it was achieving for Nutex were being obtained through allegedly fraudulent tactics, such as submitting ineligible claims and false attestations. In SEC filings and earnings calls, the Company highlighted lucrative IDR results and sustainability, concealing that these were potentially unsustainable due

2

to HaloMD's coordinated scheme to overwhelm the system. This omission exposed investors to undisclosed regulatory risks, including potential clawbacks from insurers alleging fraud. By not revealing HaloMD's mass submissions and ineligible batching, Nutex concealed the risk of adverse regulatory actions from various agencies as well as private civil suits from insurers.

6.    Nutex's claims of effective oversight in arbitration processes hid the vulnerability of revenue streams, as evidenced by a July 22, 2025 Blue Orca Capital ("Blue Orca") report exposing HaloMD's practices. This led to a 10% stock drop, but prior statements failed to warn of litigation risks from insurers suing HaloMD for RICO violations. The Company's narrative of "innovative" models masked how HaloMD's tactics artificially inflated earnings, subjecting Nutex to potential SEC investigations.

7.    On July 24, 2025, Nutex stated that it "strongly disagrees with the allegations in the [Blue Orca] report" and that it "expects to provide related updates in its upcoming earnings release and Form 10-Q for the second quarter of 2025 due on or before August 14, 2025."

8.    However, after the market closed on August 14, 2025, Nutex failed to file its Form 10-Q and rebut the allegations of the Blue Orca report. Moreover, in addition to not responding to the Blue Orca report, Nutex also announced that its Form 10-Q for the period ending June 30, 2025 would be delayed because it needed additional time to analyze classification of certain equity instruments and finalize is financial statements, which further fueled speculation from investors. The Company's stock price immediately dropped another 16%.

9.    On November 18, 2025, after the Class Period, Nutex finally restated its financial statements to correct its misclassification of "certain equity instruments." As revealed at that point, Nutex had understated its liabilities for both the year ended December 31, 2024 as well as the

quarter ended March 31, 2025. The restatement showed that Nutex's current liabilities for each period were understated by approximately 9.5% and 11%, respectively.

10.     To date, Defendants have never materially addressed the Blue Orca report, its dependence on HaloMD's IDR tactics, or the acute risks inherent in Nutex's "arbitration strategy." Instead, the facts presently known are that Nutex and HaloMD continue to be accused of engaging in illegal conduct under the NSA. Indeed, as recently as November 17, 2025, Blue Cross of Idaho identified Nutex explicitly when demanding the Idaho Department of Insurance investigate it and HaloMD's abuse of the IDR system under the NSA.

11.     Defendants misled investors as to the extent of Nutex's liabilities while simultaneously concealing their reliance on HaloMD and risks it posed to investors in terms of adverse regulatory action and unreliable earnings. When these truths came to light, Plaintiffs sustained significant losses as the market reevaluated the risks associated with investing in Nutex. Plaintiffs bring this action to recover those losses and hold Defendants accountable for the violations they committed under the federal securities laws.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Nutex is headquartered in this District, Defendants

conduct business in this District, and a significant portion of Defendants' actions took place within this District.

15.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16.    Plaintiff Gerald F. Cox, as set forth in his previously filed Certification (ECF No. 17-1), acquired Nutex securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.    Plaintiff Shah Azman Bin Mohamad Ayub Khan, as set forth in his previously filed Certification (ECF No. 20-3), acquired Nutex securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

18.    Defendant Nutex is a Delaware corporation with principal executive offices located at 6030 S. Rice Ave, Suite C, Houston, Texas 77081. Nutex's common stock trades in an efficient market on the Nasdaq Capital Market ("NASDAQ") under the ticker symbol "NUTX."

19.    Defendant Thomas T. Vo ("Vo") has served as Nutex's Chief Executive Officer ("CEO") and Chairman of the Board at all relevant times.

20.    Defendant Jon C. Bates ("Bates") has served as Nutex's Chief Financial Officer ("CFO") at all relevant times.

21.    Defendant Warren Hosseinion ("Hosseinion") has served as Nutex's President and as a Director of the Company at all relevant times.

22.     Defendants Vo, Bates, and Hosseinion are collectively referred to herein as the "Individual Defendants."

23.     The Individual Defendants possessed the power and authority to control the contents of Nutex's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Nutex's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Nutex, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

24.     Nutex and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

25.     Nutex is a physician-led, healthcare services and operations company that began publicly trading via a reverse merger in April 2022. The Company operates through three divisions: a hospital division comprised of 24 hospital facilities in 11 states, a population health management division, and real estate. Nutex generally operates as an out-of-network provider and generates revenue, in part, from contracts with patients and, in most cases, a third-party payor such as commercial insurance, workers compensation insurance or, in limited cases, Medicare or

Medicaid. According to Nutex, on average, greater than 90% of its net patient service revenue is paid by third-party payors.

26.     Prior to 2022, if a patient with health insurance received care from an out-of-network provider, even unknowingly, the patient's health plan might not have covered the entire out-of-network cost, leaving the patient with higher costs than if the care had come from an in-network provider. In addition to any out-of-network cost sharing the patient might have owed, the out-of-network provider could bill the patient for the difference between the billed charge and the amount the patient's health plan paid, unless banned by state law—a practice called "balance billing." An unexpected balance bill from an out-of-network provider is frequently referred to as a "surprise bill."

27.     In December 2020, to curb surprise out-of-network billing, Congress enacted the NSA. The NSA, which took effect January 1, 2022, requires private health plans to cover out-of-network claims and apply in-network cost sharing, and prohibits doctors, hospitals, and other covered providers from billing patients more than the in-network cost sharing amount for surprise medical bills. In addition, the NSA established an IDR process to determine out-of-network payment amounts between health plans and providers when open negotiations fail to result in an agreed-upon payment amount.

28.     In the IDR process, the provider and health plan each submit a proposed payment amount and additional information supporting their payment offers to an arbitrator, a certified IDR entity. The arbitrator must select one of the two proposed payment amounts, taking into account the "qualifying payment amount" ("QPA")—the median contract rate for like specialties in the same geographical market—and additional circumstances including, among other things, the level

of training, outcomes measurements of the facility, the acuity of the individual treated, and the case mix and scope of services of the facility providing the service.

### HaloMD

29.     Initially, as an out-of-network provider, Nutex's business suffered after the NSA went into effect. Specifically, because cost sharing under the statute is generally based on the median in-network rate a health plan pays for a service, the NSA prevented Nutex from charging patients higher prices for its services through out-of-network billing. Indeed, in March 2023, Nutex reported that "[s]ince the NSA became effective [. . .] our average payment by insurers of patient claims for emergency services has declined by approximately 30% including as much as a 37% reduction for physician services." The Company stated that, "[i]n our experience, insurers often initially pay amounts lower than the QPA without regard for other information relevant to the claim. This requires us to make appeals using the IDR process."

30.     In response to this decline in payment, in July 2024, the Company engaged HaloMD. HaloMD is a healthcare billing and consulting firm that specializes in managing the IDR process under the NSA. Specifically, HaloMD assisted providers, such as physician groups, in navigating the IDR process to secure higher payments from insurers. However, HaloMD's practices exploited the IDR system in ways that allegedly constitute fraud, racketeering, and other violations, potentially exposing its clients to regulatory scrutiny, financial penalties, and reputational damage.

31.     The NSA's IDR process is only available for a "qualified IDR item or service" eligible for the process. 42 U.S.C. § 300gg-111(c)(1); 45 C.F.R. § 149.510(a)(2)(xi), (b)(1), (b)(2). To be eligible for the process and considered a qualified IDR item or service within the scope of the IDR process, the following conditions must be met:

a.  The underlying services are within the NSA's scope, meaning they are out-of-network emergency services, non-emergency services at participating facilities, or air ambulance services;

b.  The services involve a patient with health care coverage through a group plan or health insurer subject to the NSA (e.g., not coverage through government programs like Medicare or Medicaid);

c.  A state surprise billing law (referred to as a "specified state law" in the NSA) does not apply to the dispute;

d.  The underlying services were covered by the patient's health benefit plan (i.e., payment was not denied);

e.  The patient did not waive the NSA's balance billing protections;

f.  The provider initiated and exhausted open negotiations;

g.  The provider initiated the IDR process within 4 business days after the open negotiations period was exhausted; and

h.  The provider has not had a previous IDR determination on the same services and against the same payor in the previous 90 calendar days.

*See* 42 U.S.C. § 300gg-111(c)(1)(B); 45 C.F.R. § 149.510(a)(2)(xi), (b)(2).

32.    HaloMD's tactics misuse the NSA's framework, transforming a patient-protection mechanism into a profit-driven scheme that overwhelms the system and inflates reimbursements artificially. HaloMD operates on a commission-based model, taking a percentage of awards, which incentivizes high-volume submissions. HaloMD's tactics appear to defraud insurers and IDR entities through systematic violations, including the submission of ineligible claims, improper batching, and flooding, as described below.

9

1)    Submission of Ineligible Claims and False Attestations

33.    HaloMD knowingly submits claims ineligible for federal or state IDR processes, violating NSA regulations that require disputes to meet specific criteria (e.g., out-of-network emergency services without prior resolution). In a Texas lawsuit filed by Blue Cross Blue Shield of Texas ("BCBSTX") in August 2025, HaloMD initiated over 5,400 overlapping disputes for the same services under both federal and Texas IDR systems, despite mutual exclusivity rules that prohibit a provider from submitting a claim for IDR under federal and state law. Specifically, where state law can provide IDR for a particular claim, a provider is not allowed to submit the claim for IDR under federal law, *i.e.*, the NSA. The complaint estimates that HaloMD's ineligible submissions resulted in wrongful awards exceeding $100 million and over $30 million in administrative fees for BCBSTX.

34.    Similarly, in Ohio, Community Insurance Company filed suit in June, 2025. The amended complaint alleged HaloMD used artificial intelligence to flood the IDR system with ineligible disputes, with about 40% categorically invalid, and in some batches, over 80% ineligible, leading to $608,259 in improper payments in connection with 62 disputes plus $39,344 in fees, and an additional $1,040,354 on another set with $43,344 in fees. The amended complaint alleged that HaloMD's conduct involved false attestations—electronic certifications of eligibility— constituting wire fraud under 18 U.S.C. § 1343. Attestations on claims are required for submission into the IDR system. Thus, without an attestation, the claim is automatically rejected from IDR and the claim would not be eligible for payment.

35.    In California, Anthem Blue Cross sued HaloMD in July, 2025, for initiating over 134,000 disputes in the last six months of 2024 (averaging 746 per day), many based on "fraudulent billing schemes." These schemes entailed the submission of claims that were known to be

ineligible for payment under the NDA's IDR system for a variety of reasons, such as that the services were not eligible for payment, the claims were covered by state law, or the claims were submitted under false attestations. Community Insurance Company alleges similar conduct in their complaint filed in Ohio, claiming that HaloMD inflated offers by more than $25 million beyond initial bills in over 2,300 cases, misleading arbitrators.

36.    In the California action, HaloMD's executives, including Alla LaRoque and Scott LaRoque, are personally named in RICO claims (18 U.S.C. § 1962(c)), alleging they directed a "HaloMD Family Enterprise" engaged in racketeering through repeated fraud. Additional details include HaloMD entering fictitious group numbers to bypass eligibility checks and attempts to conceal submitter identities.

2)    <u>Improper Batching and Violation of Cooling-Off Periods</u>[1]

37.    According to these lawsuits, HaloMD is accused of exploiting batching rules, which allow grouping similar claims for efficiency but prohibit bundling ineligible ones. Batching ordinarily allows qualified IDR items or services to be combined into one dispute but only if they meet strict criteria, such as that the items or services were furnished by the same provider, relate to the same condition, and are submitted within a fixed time. Improper batching occurs when multiple claims are submitted at once (*i.e.*, batched) but in violation of these rules. By improperly batching claims, HaloMD was able to submit more claims than it should have been and, in turn, take advantage of the IDR process to receive payment for claims that were not eligible for payment in the first instance.

---

[1] As stated above, parties are prohibited from initiating IDR disputes involving the same parties and items or services during a 90-day period following an IDR determination, also known as the "cooling off period." *See* 42 U.S.C. § 300gg-111(c)(5)(E)(ii).

38.     In Georgia, Elevance Health sued in May 2025, claiming HaloMD and affiliated physician groups bundled claims improperly and ignored 90-day cooling-off periods post-arbitration. This allegedly led to $5.9 million in improper payments between January 2024 and April 2025, with nearly $6 million in improper awards from ineligible disputes and over $900,000 in fees. The complaint alleged violations of federal and state RICO statutes, arguing a pattern of fraudulent interstate communications over time. Additional state-law claims include violations of the Ohio Corrupt Activity Act and Deceptive Trade Practices Act.

3)      Overwhelming the System and Misrepresentations

39.     As explained below, HaloMD also engaged in high-volume claim submission known as intentional "flooding" to secure favorable outcomes, including misrepresentations to arbitrators about claim values and eligibility.

40.     "Flooding" refers to a deliberate, coordinated strategy to overwhelm the federal IDR system by submitting massive volumes of disputes at high speed and scale. According to the complaints filed against HaloMD, this forced insurers to arbitrate claims even though many of the claims were ineligible. This, in turn, increased the chances of favorable awards due to system strain, backlogs, and limited insurer ability to challenge every submission effectively.

41.     According to the complaints filed against HaloMD, it relied on providers for underlying claims but supplied the automation and artificial intelligence infrastructure to enable mass submissions "at scale." This allowed rapid, high-volume initiation of disputes, including falsified or improper elements (*e.g.*, false eligibility attestations, incorrect dates, or improper grouping) to bypass initial safeguards.

\*          \*          \*

12

42.    HaloMD's clients, including physician groups, face significant risks from its conduct. For example, providers like Nutex could be liable for repaying wrongful awards, facing fines, or being barred from future IDR participation. Most recently, as of November 17, 2025, Blue Cross of Idaho identified Nutex specifically and requested that it be investigated by the Idaho Department of Insurance. Blue Cross of Idaho explained its demand, in pertinent part, as follows:

> ***Blue Cross of Idaho Asks the Idaho Department of Insurance to investigate Post Falls ER & Hospital's Use of the Federal No Surprises Act***
>
> . . .
>
> Post Falls ER & Hospital is a freestanding hospital/emergency room that opened on August 26, 2024. It is owned and operated by Nutex Health, Inc., a for-profit healthcare company based in Houston, Texas. Nutex's hospital division, which includes the Post Falls ER & Hospital, "generally operates as an out-of-network provider" without negotiated insurance rates.
>
> Nutex actively utilizes the No Surprises Act's arbitration process with the goal of submitting 60-70% of visits to arbitration, despite its recognition of the "significant cost to enter arbitration." On May 13, 2025, Nutex reported the "…arbitration process resulted in approximately $105.0 million more in revenue in the three months ended March 31, 2025 than the same period in 2024, which amounted to 73.1% of the $144.3 million revenue increase."
>
> "Over the past year, Blue Cross of Idaho has made good-faith efforts with Post Falls ER & Hospital to come into network for our members in North Idaho," said Drew Hobby, Chief Strategy Officer for Blue Cross of Idaho. "Unfortunately, Post Falls ER & Hospital rejected our offers to agree to fair, in-network rates and has elected to continue seeking payments through the independent dispute resolution process that often exceed 1,000-percent of Medicare rates. ***In one instance, we received a claim for nasal congestion that was $2,872 to treat a runny nose. The median commercial rate is $376 for that service***."
>
> ***Blue Cross of Idaho sent a letter to the Idaho Department of Insurance asking it to investigate Nutex's business model and its use of the independent dispute resolution (IDR) process***. A copy of the letter can be found below.
>
> "Blue Cross of Idaho is driven to ensure our members have access to high-quality, affordable healthcare," said Hobby. "We're proud to help lower the cost of care for Idaho families, small businesses and ensuring premium dollars are reinvested back into Idaho's providers. ***Blue Cross of Idaho is proud to stand with them today and***

***ask the Idaho Department of Insurance to look into Post Falls ER & Hospital's
use of the federal arbitration process.***"

(Emphasis added.)

43.     Blue Cross of Idaho's letter to the Idaho Department of Insurance highlighted

Nutex's dependence on HaloMD and confirmed that Nutex, through HaloMD, was in fact

attempting to benefit from the tactics described above. In pertinent part, Blue Cross of Idaho wrote

as follows:

November 17, 20225 [sic]

Director Dean Cameron
Idaho Department of Insurance
700 West State Street, 3rd Floor
Boise, ID, 83720

Dear Director Cameron,

Over the past few months, we have engaged with Post Falls ER & Hospital, located
in Post Falls, Idaho, to bring the facility into our network for members in the area.
Unfortunately, Post Falls ER & Hospital has rejected our good faith offers and has
elected to remain out of network.

Post Falls ER & Hospital is a freestanding hospital/emergency room that opened
on August 26, 2024. It is owned and operated by Nutex Health, Inc, a for-profit
healthcare company based in Houston, Texas ("Nutex"). The company markets
itself as offering concierge-level ER and inpatient services with shorter wait times
than traditional hospitals.

Nutex's hospital division, which includes Post Falls ER & Hospital, "…generally
operates as an out-of-network provider…" and "does not have negotiated
reimbursements rates with insurance companies." While some of Nutex's facilities
are in-network in other areas, "…the Company's general payor
contracting/government enrollment strategy is to remain out of network." ***To
receive reimbursement, Nutex actively utilizes the No Surprises Act's arbitration
process, with the goal of submitting 60-70% of visits to arbitration, despite its
recognition of the "significant cost to enter into arbitration"[.]***

***Between late 2024 and Q1 2025, Nutex saw a surge in revenue, driven largely by
its use of IDR***. The company reported $479.9 million in 2024 revenue, a 93.8%
increase from 2023, with approximately $169.7 million attributed directly to their
arbitration efforts. In Q1 2025, Nutex reported a total revenue of $211.8 million –

a 213.8% increase from $67.5 million in Q1 2024. Nutex reported $244.0 million for Q2 2025, which was an increase of 220.7% from Q2 2024.

**Nutex engaged with HaloMD, a private company specializing in IDR services, to collaborate on IDR strategies under the NSA on July 1, 2024. In a joint webinar held on April 7, 2025, the companies touted reimbursement outcomes and "…reimbursements that significantly exceed the Qualifying Payment Amount (QPA) ensuring predictable revenue."**

During the webinar, Jon Bates, the Chief Financial Officer for Nutex stated, "…Around 60-70% of our ER visits that we see on a daily basis are able to go through this process (IDR), so it's a decent percentage of our business, and we're going to continue to do this until we can get to the point that we are getting our fair and equitable payment down the road."

Mr. Bates continued, "And then, with the ultimate goal, I mean, as a business we're a publicly traded company, and our shareholders are the most important piece of what we work towards is just making sure we have that financial stability long-term and we believe that right now that using this process is one of our best chances to keep that running as steadily as we've seen it through the end of the third quarter, in fourth quarter and finishing out the year of '24 and '25."

In the same webinar, Dr. Tom Vo, CEO and Chairman of the Board for Nutex said, "…Arbitration is a bit of a last line for us, because we would rather get fair and equitable payment up front and not have to arbitrate."

**Between April 17, 2025 and October 28, 2025, Blue Cross of Idaho has received approximately 2,798 negotiation requests related to treatment at Post Falls ER & Hospital, an average of about 75 new requests per week, all filed by its vendor HaloMD. Post Falls ER & Hospital continue to seek payments through the IDR process that often exceed 1,000-percent of Medicare rates.** We agree that the IDR process should be a last line for providers and payers. That's why we have made multiple attempts to bring Post Falls ER & Hospital into our network, offering at least three contracts that Post Falls ER & Hospital rejected. Further, we have offered Post Falls ER & Hospital some claim reimbursements at the Qualified Payment Amount plus an additional 10-percent and these were also rejected. Recently, Post Falls ER & Hospital has not been replying to any of our offers.

One stand-alone facility or provider group should not be reimbursed many more times than other providers in Idaho. As Dr. Vo noted, "…we don't need to collect anymore than what anyone else collects."

Nutex works within the process of the IDR established in the Consolidated Appropriations Act (CAA)/No Surprises Act. The company states it has had "varying success at achieving collections at or higher than the established QPA…"

and has "undertaken several strategic strategies designed to improve our collection results" including:

1. *Submitting out-of-network claims and seeking payment through the IDR process, which yields reimbursements higher than the Qualified Payment Amount (QPA), regardless of network participation*.

2. *Using the IDR process as a regular pathway to payment. According to Nutex, the company has "…reached its goal of submitting between 60-70% of its billable visits to arbitration each month."*

We ask that you consider the following options to review Nutex's use of the IDR process:

1. *Under Idaho Code §41-247, obtain data to assess possible misuse of the federal IDR process for claims originating from Post Falls ER & Hospital. We ask that your review include ineligible claims, repeated submissions and claims reflecting excessive charges for low-complexity or routine services*. If such data indicate a recurring pattern, we ask that you consider reporting your findings to the Center for Medicare and Medicaid Services or the Office of Inspector General.

2. Convene an informal meeting between Nutex and Blue Cross of Idaho, and other carriers who want to participate to promote good-faith discussions on fair reimbursement and potential network participation for the Post Falls facility and any future locations in Idaho. According to Nutex, they are "making efforts to sign favorable contracts with new insurers."

We welcome any questions you or your staff may have regarding this issue.

Sincerely,

Drew Hobby
Chief Strategy Officer
Blue Cross of Idaho

Cc: Attorney General Raul Labrador; Consumer Protection Division, Office of the Attorney General

(Emphasis added.)

## Nutex's Revenue

44.    Following the passage and implementation of the NSA in 2022, Nutex's revenue per hospital visit declined by 30%. Nutex's market capitalization followed suit, forcing it to

16

implement a series of reverse stock-splits in 2024 to maintain listing compliance standards on NASDAQ.

45.    Defendant Vo summarized the NSA's impact on Nutex during a conference call on April 1, 2025 (defined below as the "Q4 2024 Earnings Call"). In pertinent part, Vo stated as follows:

> Now let's turn to a critical piece of our 2024 story, the No Surprises Act or the NSA, and the arbitration process, otherwise known as Independent Dispute Resolution Process or IDR. The NSA effective January 1, 2022, aim to shield patients from surprise medical bills, a noble intent we fully support and fully adhere to. However, the flawed implementation of the NSA has hit providers like us very, very hard, especially on the revenue per patient reimbursement side.

> In 2022, our average insurer payments for emergency services dropped roughly 30%. The root issue is that insurers often pay below the qualifying payment amount or QPA, which was described and mandated in the NSA. The QPA is the median contracted rate insurers recognized as of January 31, 2019, for a similar service in a similar region adjusted manually by the consumer price index. So in essence, the QPA is the amount that the insurers are required to pay providers according to the law.

> If the providers find that the QPA payment by the insurers is consistently lower than the national benchmarks, the NSA has a provision where the providers can appeal through a formal process of mediation, sometimes referred to as open negotiation to resolve the dispute. However, if this nonbinding open negotiation still doesn't work, then the next step would be to escalate to arbitration or the IDR process to resolve the differences.

> And while we've been participating in the open negotiation process since 2022, we have only started the arbitration process on roughly around July 1, 2024. The main reason that we pivoted from primarily using open negotiation, which is nonbinding and continuing and moving on toward arbitration, which is binding, in most cases was because of the low success rate of open negotiations, where we only achieved a roughly 10% increase in collections from the original low payment amount.

46.    Nutex's outlook appeared bleak until it hired HaloMD in July 2024. HaloMD provided Nutex with a lifeline that was by all accounts too good to be true. On February 5, 2025, Nutex issued a press release providing investors with a "No Surprises Act (NSA) Arbitration Update." In pertinent part, Nutex revealed that its unidentified "third-party vendor" had

successfully "reached its goal of submitting between 60-70% of its billable visits to arbitration each month, achieving an arbitration success rate in excess of 80% during the fourth quarter of 2024." The following month, while reporting its full year 2024 earnings in March 2025, Nutex announced a 250% increase in revenue growth from the previous quarter. This sequential revenue jump was significant because Nutex had not undergone any major changes to the types of healthcare services it offered, number of active hospitals or patient volumes. Thus, the increase was directly attributable to the work of its mystery third-party vendor and its ability to seemingly overcome the obstacles created by the NSA and its IDR process. Nutex continued to deliver extraordinary results the following quarter. While announcing its earnings for the first quarter of 2025 in May 2025, Nutex revealed an incredible 214% year-over-year increase despite hospital visits only increasing 20.5%.

47.     HaloMD's services allowed Nutex to report extraordinary earnings that it otherwise would not have been able to achieve. In turn, this caused Nutex's stock price to appreciate more than 20x from its historic lows. The following chart illustrates Nutex's stock price over this relevant period:



**Truth Revealed**

48.     As stated above, Defendants did not disclose who Nutex's third-party IDR vendor was or the tactics it was using to help Nutex achieve its extraordinary results. Instead, on July 22, 2025, Blue Orca issued a research report on Nutex that identified the third-party vendor as HaloMD and explained that "HaloMD achieved dramatically lucrative results for clients like Nutex by engaging in a coordinated fraudulent scheme to steal millions of dollars from insurance companies on behalf of and in conjunction with its healthcare billing clients."[2] Blue Orca concluded that "it may just be a matter of time before another suit is filed against HaloMD, this time including Nutex," and "[o]nce Nutex can no longer use the NSA arbitration system to receive unsustainably high reimbursement rates, our suspicion is that Nutex will return to penny stock status."

49.     The Blue Orca report explained how it identified HaloMD as Nutex's third-party vendor. Specifically, Blue Orca researched public filings (on the government's Centers for Medicaid and Medicare Services website) made on behalf of Nutex which identified HaloMD as the submitting agent. The following screen shot provides Blue Orca's research on this point:



---

[2] Blue Orca, which describes itself as an activist investment firm, did not place its Nutex research report behind a paywall.

50.    Blue Orca then detailed HaloMD's tactics with references to factual allegations taken from three lawsuits filed in 2025 by Blue Cross Blue Shield Healthcare Plan of Georgia, Inc., Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield, and Anthem Blue Cross Life and Health Insurance Company and Blue Cross of California d/b/a Anthem Blue Cross, including allegations that HaloMD violated various federal and state laws by submitting false attestations of eligibility and initiating massive volumes of IDR disputes.[3]

51.    As summarized in the Blue Orca report, the plaintiffs in these lawsuits allege that "HaloMD and its healthcare services clients . . . [stole] tens [of] millions of dollars from insurers by flooding the arbitration system with thousands of claims that they knew at the time of submission to be ineligible." To depict this "multi-step process," Blue Orca referenced a graphic from a filing in one of the foregoing lawsuits:



Source: Case: 1:25-cv-00388-MWM Document 1, Filed in June 2025

---

[3] As discussed above, there are now at least four similar lawsuits filed by insurance companies against HaloMD. These suits are pending in California, Ohio, Texas, and Georgia.

52.    Blue Orca stated that the plaintiffs in these lawsuits allege that HaloMD was able to "garner tens of millions of dollars in improper payments by *falsely attesting to the eligibility of claims and by improperly inflating payment offers that far exceeded the amounts to which providers should have been entitled*," and, in one of the lawsuits, "plaintiffs allege that HaloMD circumvented the attestation guard rails of the arbitration submission system by simply **fabricating evidence.**" (Emphasis in original). Moreover, Blue Orca stated that "*[t]hese stunning allegations estimate that approximately 50%-70% of the disputes on which defendants submitted arbitrations and received payment determinations were ineligible*, and that even on eligible claims, HaloMD inflated the value of services to allegedly steal ill gotten money from insurers." (Emphasis in original).

53.    In discussing the likely impact of the foregoing lawsuits on Nutex, Blue Orca stated that "[a]lthough it is important to note that Nutex was not named in any of these suits, and to date no insurer has alleged that Nutex has done anything wrong, *we believe these lawsuits are the first of what may be a tidal wave of litigation against HaloMD and its clients, and it may only be a matter of time before Nutex itself is targeted*." (Emphasis added). Indeed, Blue Orca stated that "CMS data shows that Nutex was a major HaloMD client (with around 14,000 arbitration line items in Q4 2024, ~66% of which were against Blue Cross Blue Shield affiliates) and that HaloMD achieved remarkable results in arbitration proceedings on behalf of Nutex." "Not only will this be costly," the Blue Orca Report stated, "but insurers are demanding punitive damages and a *clawback* of improperly paid awards. *In such a case, Nutex may be at risk to have to repay revenue already recognized and collected*." (Emphasis in original).

54.    In addition, Blue Orca stated that Nutex faces a further risk "hanging over its business model"—namely, that a majority of its recognized revenue may be uncollectable.

Specifically, Blue Orca cited a recent decision by the U.S. Court of Appeals for the Fifth Circuit in which the court ruled that providers could not sue to enforce NSA arbitration awards because the awards are not enforceable under the Federal Arbitration Act. Blue Orca noted that "Nutex's revenue and profitability critically depend on the collectability of the arbitration awards" but, in light of the Fifth Circuit's ruling, "many healthcare insurers may simply refuse to pay NSA arbitration awards." Because Nutex has a "massive receivables balance of uncollected awards," Blue Orca suggested that the Company may be particularly at risk. The issue of revenue recognition of uncollected arbitration awards was so concerning, Blue Orca noted "that even Nutex's former auditor Marcum LLP noted a critical audit matter around revenue recognition in Nutex's hospital division, which in turn depends upon the collectability of arbitration awards."

55.    Given all of the foregoing, Blue Orca concluded that "[i]f Nutex ceases being able to rely on HaloMD to achieve remarkable results using the NSA arbitration process, our suspicion is that Nutex may rapidly return to penny stock status, where it languished before it hired HaloMD. Either way, we do not see how Nutex is investable."

56.    Following publication of the Blue Orca Report, Nutex's stock price fell $11.18 per share, or 10.05%, to close at $100.01 per share on July 22, 2025.

57.    On July 24, 2025, Nutex issued a press release responding to the Blue Orca Report, stating that it "strongly disagrees with the allegations in the report" and that it "expects to provide related updates in its upcoming earnings release and Form 10-Q for the second quarter of 2025 due on or before August 14, 2025."

58.    However, after the market closed on August 14, 2025, the Company issued a press release announcing a delay in filing its 2025 second quarter financial statements. The press release stated, in relevant part:

Nutex [. . .] today announced that it will delay filing its Form 10-Q for the period ending June 30, 2025 due to non-cash accounting adjustments related to the treatment of stock based compensation obligations for certain under-construction and ramping hospitals, as disclosed in previous filings. The Company additionally provided preliminary financial results for the three and six months ended June 30, 2025 and announced a stock repurchase program of up to $25.0 million.

*** 

The Company provided select preliminary unaudited financial results for the three and six months ended June 30, 2025. The preliminary financial information presented below reflects management's current views with respect to the Company's financial results. These preliminary results remain subject to the completion of normal quarter-end and fiscal-end accounting procedures and closing adjustments. Nutex Health will release its full financial results as promptly as reasonably practicable.

The Company hereby announces the cancellation of the conference call that was originally scheduled Friday, August 15, 2025, at 10:30 a.m. ET. The Company will reschedule the conference call as soon as possible where it will discuss 2nd Quarter financials as well as other topics relevant to the Company.

59.     After the market closed on August 14, 2025, the Company also filed a Form 12b-25 Notification of Late Filing with the SEC that stated the Company needed additional time to analyze classification of certain equity instruments and finalize its financial statements for the period ending June 30, 2025, which further fueled speculation from investors.

60.     When Nutex failed to file its Form 10-Q for the period ending June 30, 2025 and rebut the allegations of the Blue Orca Report as it had previously indicated, the Company's stock price fell $18.22 per share, or 16.39%, to close at $92.91 per share on August 15, 2025.

61.     After the end of the Class Period, on August 21, 2025, Nutex filed a Current Report on Form 8-K with the SEC which, among other things, contained a Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard and stated that the Audit Committee of the Company's Board of Directors concluded that certain of the Company's previously issued financial statements, including Nutex's annual report for the year ended December 31, 2024,

"treated non-cash obligations related to under-construction and ramping hospitals as equity rather than liabilities and should be restated." This filing also purported to address the Blue Orca report. However, Nutex merely provided a generalized description of the arbitration process under the NSA and the Company's own claims process, acknowledged that Nutex had engaged HaloMD to assist in the IDR process, and discussed two of the three recent lawsuits filed against HaloMD, noting that the Company had not been named as a Defendant. As such, Nutex's filing did not in fact meaningfully rebut any of the allegations contained in the Blue Orca report.

<u>**Nutex's Restatement of Financial Statements**</u>

62.     Nutex ultimately restated its financial statements for the year ended December 31, 2024. On November 18, 2025, the Company filed a second amended Form 10-K as of and for the year ended December 31, 2024 (the "2024 Form 10-K/A"). In the 2024 Form 10-K/A, Nutex disclosed, among other things, that "the Company's previously issued consolidated financial statements as of and for the year ended December 31, 2024 contained in the Original Form 10-K . . . should be restated to reclassify non-cash stock-based compensation obligations related to under-construction and ramping hospitals as liabilities rather than equity." Nutex also advised that:

> investors and all other persons should no longer rely upon the Previously Issued Financial Statements included in the Original Form 10-K. In addition, any previously issued or filed earnings releases, investor presentations or other communications describing the Previously Issued Financial Statements and other related financial information covering these periods should no longer be relied upon.[4]

63.     Nutex also stated that it had "filed this amendment to correct the classification of obligations totaling $16.4 million related to under construction and ramping hospitals from equity

---

[4] The November 18, 2025 disclosure of non-reliance on previously issued financial statements is associated with what is colloquially called by the accounting profession as a "Big R restatement." A Big R restatement occurs when the error is ***material*** to the prior period financial statements. When the error is material, the entity is required to alert the users of these financial statements that they, and the related auditor's report, can no longer be relied upon.

to liabilities in accordance with the classification criteria in ASC 718, *Compensation - Stock Compensation*, and ASC 480, *Distinguishing Liabilities from Equity*."

64.    Nutex further explained that it had a material weakness in its internal controls over financial reporting relating to such errors, stating the following, in relevant part:

> We previously reported material weaknesses in the design and operating effectiveness of internal control over financial reporting as of December 31, 2024. ***As a result of the change to the treatment of obligations related to under-construction and ramping hospitals from equity to liabilities, management has re-evaluated and determined that there is an additional material weakness in the design and operating effectiveness of internal control over financial reporting as of December 31, 2024 related to timely and accurately analyzing and accounting for complex and non-routine accounting matters***. The Company has engaged an accounting firm to assist in the proper design, implementation, and testing of internal controls over financial reporting, and training for relevant personnel remains ongoing. Management is undertaking additional efforts to remediate the identified material weaknesses and strengthen the overall control environment. See Item 9A. Controls and Procedures - Evaluation of Internal Controls and Procedures (Restated) included in this Amendment.

65.    Nutex also restated the Company's unaudited financial statements as of and for the three months ended March 31, 2025. Similar to the annual report for 2024, Nutex understated its current liabilities. According to Nutex's amended Form 10-Q for the quarter ended March 31, 2025, the Company's financial statements needed to be "restated to reclassify non-cash stock-based compensation obligations related to under-construction and ramping hospitals as liabilities rather than equity." Nutex further advised that "investors and all other persons should no longer rely upon the Previously Issued Financial Statements included in the Original Form 10-Q" and that the amendment was necessary "to correct the classification of obligations totaling $20.7 million related to under construction and ramping hospitals from equity to liabilities in accordance with the classification criteria in ASC 718, *Compensation - Stock Compensation*, and ASC 480, *Distinguishing Liabilities from Equity*."

66.     Beginning with its financial statements as of and for the year ended December 31, 2022, Nutex made disclosures regarding its adoption of the *Nutex Health Inc. 2022 Equity Incentive Plan* and, furthermore, that in connection with the reverse merger with Clinigence, additional obligations for the issuance of Company common stock had been agreed with certain employees, Specifically, within *Note 12 – Stock-based Compensation*, Nutex disclosed the following relating to such obligations tethered to "under-construction and ramping hospitals:"

> *Obligations for under-construction and ramping hospitals.* Under the terms of the Merger Agreement, contributing owners of the under-construction hospitals and ramping hospitals are eligible to receive **a one-time additional issuance of Company common stock based on their trailing twelve months earnings before interest, taxes, depreciation and amortization as determined 24 months after their respective opening**, adjusted for, with respect to the ramping hospitals, the initial equity value received at the Closing of the Merger, and with respect to under-construction hospitals, the aggregate amount of such owner's capital contribution, and in each case, minus such owner's pro rata share of the aggregate debt of the applicable hospital outstanding as of the closing of the Merger. Such additional shares will be issued at the greater of (a) the price of the Company's common stock at the time of determination or (b) $2.80. We have not recognized any expense for this stock-based compensation based on our current estimates of future obligations to the contributing owners.

67.     Similar disclosures were made in the 2023 Form 10-K.  These obligations are the centerpiece of the errors identified by the Company in the originally-filed 2024 Form 10-K, and which precipitated the need for the Restatement.

68.     When restating its financial statements in the 2024 Form 10-K/A, Nutex disclosed the following with respect to the violations of GAAP reflected in the originally-filed 2024 Form 10-K:

> *Restatement of Previously Issued Consolidated Financial Statements*
>
> The Company has restated its previously issued consolidated financial statements as of and for the year ended December 31, 2024[,] to reclassify non-cash stock-based compensation obligations related to under-construction and ramping hospitals as liabilities rather than equity. Further, the Company is also recording certain immaterial adjustments as described below.

The Company granted certain stock awards related to under-construction and ramping hospitals upon the merger with Clinigence discussed in Note 3. The Company corrected the classification of obligations totaling $16.4 million related to under construction and ramping hospitals from equity to liabilities in accordance with the classification criteria in ASC 718, *Compensation - Stock Compensation*, and ASC 480, *Distinguishing Liabilities from Equity.*

69.     The accounting for stock-based compensation (among other things) requires a determination by filers regarding whether subject instruments are freestanding and if they should be reported as equity or liabilities in an entity's financial statements. That determination is predicated on the characteristics of the instruments, the timing of key events, promises made, and the associated obligations.

70.     The specific terms and timing of awards for stock-based compensation are central to determining whether or not stock-based compensation should be classified as equity or liability. To that end, awards that are indexed to something other than performance, market or service conditions are usually classified as liabilities.

71.     Events that impact and dictate the vesting and settlement of a stock-based award also affect the award's balance sheet classification. Awards that are ***mandatorily redeemable or certain to become mandatorily redeemable*** for the grantor are classified as liabilities because they represent the equivalent of a future obligation for the payment of cash.  Here, Nutex always referred to these future awards as "obligations."

72.     The threshold of "mandatorily redeemable" is tied to whether a contingent event is possible, or certain to occur. Awards that are considered "contingently redeemable" are generally classified as equity, but GAAP requires that such future awards must be reevaluated each reporting period to determine whether there is still a contingency or, to the contrary, whether any such contingency has now been resolved such that the award is now mandatorily redeemable. When a redeeming event is certain to occur, the cost of the awards (i.e., the obligation) must be reported

as a liability. Or, when the event becomes certain to occur, companies must reclassify the awards to liabilities, as it becomes certain that the entity has an obligation to settle the award in cash or what is deemed by the guidance to reflect a cash equivalent.

73.    Within GAAP, Accounting Standards Codification No. ("ASC") 480, *Distinguishing Liabilities from Equity* ("ASC 480), "establishes standards for how an issuer classifies and measures in its statement of financial position certain financial instruments with characteristics of both liabilities and equity," and further states that particular financial instruments be classified as a liability in an entity's financial statements "because that financial instrument embodies an obligation of the issuer." (ASC 480-10-05-1).

74.    In view thereof, GAAP offers express language to give example to the types of financial instruments that constitute "an obligation" and, thus, would be reflected as a liability in the financial statements. These includes situations where (a) "[a]n entity incurs a conditional obligation to transfer assets by issuing (writing) a put option that would, if exercised, require the entity to repurchase its equity shares by physical settlement," (b) "[a]n entity incurs a conditional obligation to transfer assets by issuing a similar contract that requires or could require net cash settlement," and/or (c) "[a]n entity incurs a conditional obligation to issue its equity shares by issuing a similar contract that requires net share settlement." (*See* ASC 480-10-05-2.).

75.    ASC 480 then also identifies what are referred to as "mandatorily redeemable financial instruments" and states, specifically, that "[a] mandatorily redeemable financial instrument shall be classified as a liability unless the redemption is required to occur only upon the liquidation or termination of the reporting entity." (ASC 480-10-25-4). Furthermore, the literature states that "[a] financial instrument that embodies a conditional obligation to redeem the instrument by transferring assets upon an event not certain to occur becomes mandatorily

redeemable if that event occurs, the condition is resolved, or the event becomes certain to occur." (ASC 480-10-25-5).

76.    For further purposes of financial reporting, GAAP states that a financial instrument that "will be redeemed only upon the occurrence of a conditional event" means "redemption of that instrument is conditional and, therefore, the instrument does not meet the definition of mandatorily redeemable financial instrument" within ASC 480. (ASC 480-10-25-7).  It continues, however, to clarify that such financial instrument "would be assessed at each reporting period to determine whether circumstances have changed such that the instrument now meets the definition of a mandatorily redeemable instrument (that is, the event is no longer conditional)" and, logically, that "[i]f the event has occurred, the condition is resolved, or the event has become certain to occur, the financial instrument is reclassified as a liability." (ASC 480-10-25-7). As such, according to GAAP, "[v]arious financial instruments issued in the form of shares embody unconditional obligations of the issuer to redeem the instruments by transferring its assets at a specified or determinable date or dates or upon an event that is certain to occur." (ASC 480-10-55-3).

77.    Similarly, ASC 718, *Compensation – Stock Compensation* ("ASC 718") acknowledges that "[s]hare-based payment awards may be classified as either equity or liabilities," and specifically addresses "instruments classified as liabilities." (ASC 718-30-05-1). Such literature advises that "[i]n determining the classification of an instrument, an entity shall take into account the classification requirements as established by Topic 480." (ASC 718-10-25-8).

78.    According to ASC 718, "[o]ptions or similar instruments on shares shall be classified as liabilities if either of the following conditions is met:

a)    The underlying shares are classified as liabilities.

b)    The entity can be required under any circumstances to settle the option or similar instrument by transferring cash or other assets. A cash settlement feature

29

that can be exercised only upon the occurrence of a contingent event that is outside the grantee's control (such as an initial public offering) would not meet this condition until it becomes probable that event will occur." (ASC 718-10-25-11).

79.     The literature provides an express example of this scenario, stating that, for instance, a "registrant may grant an option to a grantee that, upon exercise, would be settled by issuing a mandatorily redeemable share[;] [b]ecause the mandatorily redeemable share would be classified as a liability under Topic 480, the option also would be classified as a liability." (ASC 718-10-25-12).

80.     Furthermore, ASC 718 asserts that "[t]he accounting for an award of share-based payment shall reflect the substantive terms of the award and any related arrangement. Generally, the written terms provide the best evidence of the substantive terms of an award." (ASC 718-10-25-15).

81.     As discussed briefly above, the Company stated in its 2024 Form 10-K/A, among other identified errors and corrections, that it had "concluded that [its] Previously Issued Financial Statements included in the Original Form 10-K should be restated to reclassify non-cash stock-based compensation obligations related to under-construction and ramping hospitals as liabilities rather than equity."[5] In its section referred to as "Stock-based compensation," those financial

---

[5] The Company also disclosed, with respect to the Restatement, the following:

In addition, we identified certain immaterial adjustments to be made including to related-party accounts payable amounts that were intended to be contribution amounts per certain Contribution Agreements with former owners of hospitals who transferred their interests to Nutex Health Holdco LLC effective April 1, 2022, a $2.9 million adjustment to reclassify restricted balances out of cash and cash equivalents and into restricted short-term investments, an adjustment to accrued income tax expense, a change in presentation of the effective tax rate reconciliation to separately present disaggregate other items, and the deferred tax components for the right-of-use assets and liabilities in the income taxes footnote table are now

statements made the following disclosure regarding the obligations of Nutex to certain contributing owners at the time of the Clinigence reverse merger:

> Obligations for under-construction and ramping hospitals — Under the terms of the Contribution Agreements, contributing owners of the under-construction hospitals and ramping hospitals (as determined on April 1, 2022), including Dr. Vo, our Chairman and CEO, are eligible to receive a one-time additional issuance of Company common stock.

82.    The Company's 2024 Form 10-K/A continued to state that "[t]he number of additional shares depends on two main factors: the trailing twelve-month operating results of the particular hospital and the trading price of Nutex Health common stock, with both factors determined at the end of the applicable Measurement Period," as well as that "***[t]here is no threshold of certain operating results to be achieved; however, there is a floor price of common stock to be applied to the calculation.***" As such, Nutex was able to determine at least the floor of its obligation at any point in time.   With respect to the "Measurement Period," additional disclosures in the 2024 Form 10-K/A highlight that at least some of these awards were to become mandatorily redeemable in 2024.

83.    Specifically, in *Note 12 – Stock-based compensation*, the Company disclosed the following:

> With respect to ramping hospitals that were acquired before the Merger, ***24 months after the opening date (the "Determination Date") of the applicable ramping hospital***, such owner is eligible to receive such owner's pro rata share of a number of shares of Company Common Stock equal to (i) the trailing twelve months earnings before interest, taxes, depreciation and amortization on the respective Determination Date, multiplied by (ii) 10, (iii) minus the initial equity value received at the Closing of the Merger, and (iv) minus such owner's pro rata share of the aggregate debt of the applicable ramping hospital outstanding as of the closing of the Merger. The number of additional shares to be issued will be determined based on the greater of (a) the price of the Company's common stock

---

presented on a gross basis. Further, the Company recorded an immaterial adjustment in the footnote on variable interest entities (Note 19) related to disclosure of consolidated balances.

at the time of determination or (b) $2.80 ($420.00 after the 2024 Reverse Stock Splits), as adjusted for any stock dividends, combinations, splits, recapitalizations and the like with respect to the Company's common stock. (Emphasis added.)

With respect to under construction hospitals that were acquired before the Merger, contributing owners of under construction hospitals will be eligible to receive, *on the Determination Date*, such owner's pro rata share of a number of shares of Company common stock equal to (a)(i) the trailing twelve months earnings before interest, taxes, depreciation and amortization as of the Determination Date multiplied by (ii) 10, minus (iii) the aggregate amount of such owner's capital contribution to the under construction hospital, minus (iv) such owner's pro rata share of the aggregate debt of the applicable under construction hospital outstanding as of the Closing of the Merger, divided by (b) the greater of (i) the price of the Company common stock at the time of determination or (ii) $2.80 ($420.00 after the 2024 Reverse Stock Splits), as adjusted for any stock dividends, combinations, splits, recapitalizations and the like with respect to the Company's common stock.

Ramping Hospitals are hospitals that at the time of the Merger had less than two years of operating results and as such were not considered mature hospitals. Under Construction Hospitals are hospitals that at the time of the Merger had not started accepting patients and as such did not have any operating results to serve as a basis for a valuation. *At the time of the Merger, the parties agreed to additional issuances of common stock once these Ramping and Under Construction Hospitals had operated for at least 24 months, with the valuation to be based on trailing twelve months operating results determined at the end of such 24-month period ("Measurement Period")*.

84.     In sum, Nutex promised former hospital owners during its 2022 merger that they would be paid additional shares of company stock as a one-time "earn-out" payment. The number of shares was supposed to be calculated two years after each hospital opened and began operating, based on its trailing 12-month earnings (using a form of EBITDA), with the amount of such issuance floored at a minimum price per share to protect the recipients. While the ultimate compensation could vary, depending on the performance of the hospitals, the price floor and the existence of an established measurement date (at 24 months from the start of operations for each hospital) meant that such compensation represented a known and measurable obligation to the Company, at least with respect to its 2024 financial statements. GAAP rules (under ASC 718 and

ASC 480) required treating this obligation as a "liability" on the balance sheet and not "equity." Additionally, Nutex was required to adjusting the carrying amount of this liability as estimates of the final payout changed, with any such adjustments recorded as stock-based compensation expense. Nutex did not apply the proper accounting treatment, however. As alleged above, the Company incorrectly recorded the accruing obligation as equity on its balance sheet, as if it were a straightforward equity award, despite the apparent liability-like features. This misclassification understated liabilities and overstated equity by tens of millions of dollars (*e.g.*, $16 million to $20 million in the restated periods).

85.     By concealing Nutex's accrued stock based compensation, Defendants understated Nutex's liabilities and, in turn, the Company's net worth (equity) was artificially inflated. This had the effect of making Nutex appear to be a financially stronger company than it truly was and an overall better investment for Plaintiffs and other shareholders. Consequently, when purchasing stock in the Company, Plaintiffs and other shareholders paid an inflated price for their stock.

<u>**MATERIALLY FALSE AND MISLEADING STATEMENTS**</u>

<u>**February 5, 2025**</u>

86.     On February 5, 2025, the Company issued a press release entitled "Nutex Health Issues No Surprises Act (NSA) Arbitration Update." The press release stated, in relevant part:

> HOUSTON, February 5, 2025 – Nutex Health Inc. ("Nutex Health" or the "Company") (NASDAQ: NUTX), a physician-led, integrated healthcare delivery system comprised of 24 state-of-the-art micro-hospitals in 11 states and primary care-centric, risk-bearing physician networks, today provided an update regarding its strategic participation in arbitration known as the Independent Dispute Resolution ("IDR") process under the No Surprises Act ("NSA").
>
> As previously disclosed in our September 30, 2024 Form 10-Q, on July 1, 2024 the Company contracted with a third-party vendor to assist in the recovery of certain out of network claims under the arbitration process. ***Since implementing its arbitration strategy, the Company has reached its goal of submitting between 60-70% of its billable visits to arbitration each month, achieving an arbitration***

*success rate in excess of 80% during the fourth quarter of 2024*.

*These increasingly favorable outcomes are expected to allow the Company to recover substantial amounts previously underpaid by insurers*. Due to significant administrative time built into the federal arbitration process and delays in collections, the Company is now beginning to realize the full cash impact of its enhanced arbitration process that was commenced in July 2024.

*Additionally, there is a significant cost to enter the arbitration process. The arbitration process includes expenses associated with third party providers, including independent dispute resolution entities, which typically collect fees at the beginning of the process, before the claim award amounts are decided by arbitrators*.

"Our proactive approach to arbitration under the No Surprises Act has yielded positive results thus far, reinforcing our commitment to fair reimbursement. *By effectively leveraging our industry leading expertise and knowledge, we have been able to secure rightful payments for our facilities and providers while continuing to deliver high-quality, accessible care to our communities*," stated Tom Vo, M.D., Chairman and Chief Executive Officer of Nutex Health. "The momentum we have built in 2024 places Nutex Health in a strong position for continued success in the coming year."

The Company's arbitration success aligns with its broader strategic initiatives, which include optimizing hospital operations, expanding physician networks, and driving efficiencies across its integrated healthcare delivery model.

*The Company cannot predict whether arbitration successes and claim recovery will continue at current levels. Any significant revisions to the federal arbitration process may result in a substantial decrease in claim amounts recovered in the future. In addition, Nutex Health is unable to predict future regulatory changes, evolving arbitration practices, and payer responses to ongoing enforcement of the NSA, all of which may have an adverse impact on the Company's ability to recover on its claims*.

87.    The statements identified in emphasis in the immediately preceding paragraph were false and/or materially misleading for two reasons. First, the press release overstates the legitimacy and sustainability of Nutex's "success" rate. By touting a "60-70%" submission rate with a "success" rate in "excess of 80%," Nutex implied a legitimate, scalable and compliant strategy when, in truth, the third-party vendor upon which it was relying (*i.e.*, HaloMD) was engaging illegal IDR tactics such as submitting ineligible disputes that did not qualify for NSA protections.

88.    Second, Nutex's submission and success rate concealed the acute risks it faced as a result of HaloMD's illegal IDR tactics. In addition to submitting ineligible claims, HaloMD was engaging in improper batching and "flooding" the IDR system, as described above in Section *Substantive Allegations, HaloMD*, *supra*. This conduct created an extraordinary risk of exposure to adverse regulatory action, penalties, and litigation, which was not disclosed by Nutex but instead concealed through positive statements that failed to disclose the true nature of HaloMD's actions. Indeed, while Nutex disclosed certain risks with respect to its "arbitration successes" in the above press release, it did not disclose the illegal nature of the tactics behind the successes.

### March 31, 2025

89.    On March 31, 2025, Nutex issued a press release announcing the Company's fourth quarter and full year 2024 financial results. The press release stated, in relevant part:

FULL YEAR 2024 HIGHLIGHTS:

- TOTAL REVENUE OF $479.9 MILLION VERSUS $247.6 MILLION IN 2023, AN INCREASE OF 93.8%
- NET INCOME OF $52.2 MILLION VERSUS NET LOSS OF $45.8 MILLION IN 2023
- DILUTED EPS OF $9.71 PER SHARE VERSUS $(10.39) PER SHARE IN 2023
- EBITDA OF $98.4 MILLION VERSUS $(22.5) MILLION IN EBITDA IN 2023
- ADJUSTED EBITDA OF $123.7 MILLION VERSUS $10.8 MILLION IN 2023, AN INCREASE OF 1,045.4%
- NET CASH FROM OPERATING ACTIVITIES OF $23.2 MILLION
- ***COMPANY BELIEVES ITS ARBITRATION EFFORTS, THROUGH THE INDEPENDENT DISPUTE RESOLUTION (IDR) PROCESS, HAS RESULTED IN MORE EQUITABLE PAYMENTS***

HOUSTON, TX − (PRNewswire) –MARCH 31, 2025 – Nutex Health Inc. ("Nutex Health" or the "Company") (NASDAQ: NUTX), a physician-led, integrated healthcare delivery system comprised of 24 state-of-the-art micro hospitals and hospital outpatient departments (HOPDs) in 11 states and primary care-centric, risk-bearing physician networks, today announced fourth quarter 2024 and fiscal year 2024 financial results for the twelve months ended December 31, 2024.

Financial highlights for the year ended December 31, 2024:

- Total revenue increased $232.3 million to $479.9 million for the year ended December 31, 2024 as compared to total revenue of $247.6 million for the same period in 2023, an increase of 93.8%. Of this revenue growth, revenue from mature hospitals, which are hospitals opened prior to December 31, 2021, increased by 56.6% in 2024 compared to 2023.

- The arbitration process resulted in approximately $169.7 million more in revenue in 2024 than in 2023, which amounted to approximately 73.1% of the $232.3 million revenue increase. Of the $169.7 million in arbitration revenue, $68.9 million, $70.5 million and $30.3 million related to dates of services for the fourth quarter 2024, third quarter 2024 and pre-third quarter 2024, respectively.

. . .

Financial highlights for the three months ended December 31, 2024:

- Total revenue of $257.6 million for the three months ended December 31, 2024 as compared to total revenue of $69.7 million for the three months ended December 31, 2023, an increase of $187.9 million (or 269.6%). Of this revenue growth, revenue from mature hospitals, which are hospitals opened prior to December 31, 2021, increased by 175.6% in 2024 compared to the same period in 2023.

- The arbitration process resulted in approximately $169.7 million more in revenue in the fourth quarter 2024 compared to the fourth quarter 2023, which amounted to approximately 90.3% of the $187.9 million increase in overall revenue. Of the $169.7 million in arbitration revenue, $68.9 million, $70.5 million and $30.3 million related to dates of services for the fourth quarter 2024, third quarter 2024 and pre-third quarter 2024, respectively.

. . .

"Nutex Health delivered healthy year-end and fourth quarter financial and operational results last year. *The arbitration initiative that we began in July 2024 is generating higher reimbursement amounts per visit this year and is more in line with a fair market rate*. We would like to thank our dedicated teams of physicians, nurses and all our other team members for continuing to deliver for our patients. *We enter 2025 with great momentum and look forward to continuing our strong financial and operational performance*," stated Tom Vo, M.D., MBA, Chairman and Chief Executive Officer of Nutex Health.

90.     The statements identified in emphasis in the immediately preceding paragraph were

false and/or materially misleading because they created the impression that Nutex's "arbitration

36

initiative" had positively impacted, and would continue to positively impact, its revenue and earnings. This, in turn, gave investors the false belief that Nutex's financial health was stronger than it truly was given that the Company's newfound arbitration strategy was based squarely on HaloMD and the illegal tactics it was employing. Had Defendants truthfully described its "arbitration efforts" or the nature of HaloMD's tactics, investors would have known that Nutex's financial health was not as reliable or strong as represented.

91.    That same day, Nutex filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended December 31, 2024 (the "2024 10-K"). Vo, Bates, and Hosseinion signed the 2024 10-K on behalf of Nutex. In discussing governmental regulation, the 2024 10-K stated, in relevant part:

> *Nutex and the NSA.* ***While we are working within the established processes for IDR, we have had varying successes at achieving collections at or higher than the established QPA. We have undertaken several strategic actions designed to improve our collections results***. These include:
>
> - engaging a third-party IDR vendor for claims under IDR,
> - maximizing our claims coding efficiency,
> - increasing efforts to collect co-pays and co-insurance,
> - adding additional administrative staff to handle the increased administrative IDR burden,
> - having a dedicated IDR team to accelerate resubmission of claims under the IDR process,
> - making appeals for additional payment of claims for periods before and after the NSA final rule was adopted through the IDR process,
> - making efforts to sign favorable contracts with new insurers,
> - working to sign more favorable contracted rates with existing contracted providers,
> - working with both local and national legislatures to enforce the NSA rules and guidelines for Insurers, and
> - focusing on the value-based IPA side of our business, which is less affected by the NSA.
>
> *Arbitration Process*. On July 1, 2024, we engaged with a third-party IDR vendor to assist in the recovery of certain out of network claims under the IDR process. The IDR process, including subsequent appeals and insurance payor delays, require extensive administrative time and delays in collections, which can take up to three

to five months to receive payments from when we start the open negotiation process. ***Since implementing its arbitration strategy, the Company has reached its goal of submitting between 60-70% of its billable visits to arbitration each month, achieving an arbitration success rate in excess of 80% during the fourth quarter of 2024***.

*Cost of Arbitration*. There is a significant cost to enter the arbitration process. The arbitration process includes expenses associated with third party providers, including IDR entities, which typically collect fees at the beginning of the process, before the claim award amounts are decided by arbitrators. According to the TMA, as of January 24, 2025, the nonrefundable administrative fee is $115 per party per dispute and the certified IDR entity fee ranges from $200 to $400 for single determinations and $268 to $1,173 for batched determinations.

*Future Developments*. On September 13, 2024, Congressman Greg Murphy, M.D., along with several colleagues, introduced the bipartisan Enhanced Enforcement of Health Coverage Act to provide penalties for late payment or non-payment by third-party payors after an IDR entity payment determination. While this bill was not voted on, with a new Congress recently returning to session and a new administration in office, we expect to see both legislative and rulemaking efforts related to the NSA continue throughout 2025. While the NSA was passed during President Trump's first term in office, the Biden Administration has been solely responsible for its implementation so far. If so inclined, the Trump Administration could make significant changes to current NSA regulatory implementation.

We are supportive of industry efforts challenging certain provisions of the NSA. Our experience, like that of many other healthcare providers, is that the final rule continues to unfairly favor insurers in the determination of the QPA we receive for our healthcare services. ***It is difficult to predict the ultimate outcome of future legal challenges or legislative and rulemaking efforts at the federal level. Additionally, there can be no assurance that third-party payors will not attempt to further reduce the rates they pay for our services or that additional rules issued under the NSA will not have adverse consequences to our business***.

92.     The statements identified in emphasis in the immediately preceding paragraph were false and/or materially misleading for two reasons. First, the 2024 10-K overstates the legitimacy and sustainability of Nutex's "success" rate. By touting a "60-70%" submission rate with a "success" rate in "excess of 80%," Nutex implied a legitimate, scalable and compliant strategy when, in truth, the third-party vendor upon which it was relying (*i.e.*, HaloMD) was engaging illegal IDR tactics such as submitting ineligible disputes that did not qualify for NSA protections.

93.     Second, Nutex's submission and success rate concealed the acute risks it faced as a result of HaloMD's illegal IDR tactics. In addition to submitting ineligible claims, HaloMD was engaging in improper batching and "flooding" the IDR system, as described above in Section *Substantive Allegations, HaloMD, supra*. This conduct created an extraordinary risk of exposure to adverse regulatory action, penalties, and litigation, which was not disclosed by Nutex but instead concealed through positive statements that failed to disclose the true nature of HaloMD's actions. Indeed, while Nutex disclosed certain risks with respect to its "arbitration success" in the 2024 10-K, it did not disclose the illegal nature of the tactics behind the successes.

94.     The 2024 10-K also provided investors with Nutex's financial statements. In pertinent part, the 2024 10-K contained a consolidated balance sheet that contained materially false financial information. To correct the materially false financial information, Nutex restated its financial statements on November 18, 2025. The following table provides the balance sheet as initially provided in the 2024 10-K along with restated financial figures as provided in the amended version of the 2024 10-K filed on November 18, 2025 (emphasis added):

| | December 31, 2024 Previously Reported ($) | Adjustments ($) | December 31, 2024 As Restated ($) |
|---|---|---|---|
| Cash and cash equivalents | 43,581,412 | (2,940,796) | 40,640,616 |
| Restricted short-term investment | - | 2,940,796 | 2,940,796 |
| Other current assets | 248,897,473 | - | 248,897,473 |
| Total current assets | 292,478,885 | $ - | 292,478,885 |
| Non-current assets | 362,841,508 | - | 362,841,508 |
| Total assets | 655,320,393 | - | 655,320,393 |
| Current liabilities: | | | |
| Accounts payable - related parties | 4,345,138 | (3,539,372) | 805,766 |
| Accrued income tax expense | 25,989,262 | 543,437 | 26,532,699 |

| | | | |
|---|---:|---:|---:|
| Accrued stock based compensation | - | 16,356,000 | 16,356,000 |
| Other current liabilities | 110,531,725 | - | 110,531,725 |
| Total current liabilities | 140,866,125 | 13,360,065 | 154,226,190 |
| Non-current liabilities | 312,562,391 | - | 312,562,391 |
| Total liabilities | 453,428,516 | $ 13,360,065 | 466,788,581 |
| Common stock, $0.001 par value; 950,000,000 shares authorized; 5,511,452 and 4,511,199 shares issued and outstanding as of December 31, 2024 and December 31, 2023, respectively | 5,511 | - | 5,511 |
| Additional paid-in capital | 503,232,609 | (13,823,628) | 489,408,981 |
| Accumulated deficit | (356,893,371) | (83,128) | (356,976,499) |
| Nutex Health Inc. equity | 146,344,749 | (13,906,756) | 132,437,993 |
| Noncontrolling interests | 55,547,128 | 546,691 | 56,093,819 |
| Total equity | 201,891,877 | (13,360,065) | 188,531,812 |
| Total liabilities and equity | 655,320,393 | - | 655,320,393 |

95.    Nutex's 2024 10-K was false and/or materially misleading because it provided investors with incorrect financial statements. Specifically, Nutex represented in the 2024 10-K that it did not have any "accrued stock based compensation" when it should have disclosed that it had over $16 million in stock based compensation liabilities. Nutex was required to reclassify more than $16 million of stock award obligations out of equity, and instead report that amount as a current liability on its balance sheet as of December 31, 2024 – referred to as "accrued stock based compensation." The corrected disclosure increased Nutex's accrued stock based compensation liabilities by 100%. Taking into consideration other adjustments that were made in connection with the Restatement, Nutex reported, in its second amendment of the Form 10-K for 2024, more than $13 million in additional liabilities (and, therefore, more than $13 million less in equity) –

approximately a 9.5% increase in additional current liabilities. By restating its balance sheet, Nutex admitted to having disclosed materially false and erroneous information in its 2024 10-K.

**April 1, 2025**

96.     On April 1, 2025, Nutex hosted a conference call with investors and analysts to discuss the Company's Q4 2024 results (the "Q4 2024 Earnings Call"). Defendants Ho, Bates, and Hosseinion participated in the call on behalf of Nutex.

97.     During the scripted portion of the Q4 2024 Earnings Call, Defendant Vo stated, in relevant part:

> Once the previous administrations made arbitration process more streamlined, more efficient and more cost effective, beginning in late 2023 and early 2024, *we took advantage of this tool to leverage our positions with the insurers*. However, compared to open negotiations, *there are significant disadvantages to arbitration process. It's very costly, very labor-intensive and takes a long time to collect from the insurance companies. It also has a lot of upfront costs like Medicare administrative fees and arbitrator fees*.
>
> *To further add to the risk, the loser of this arbitration process bears the IDR arbitration fee cost. So entering into arbitration process is not a decision that we take lightly at all whatsoever. However, if this results in a fair payment that is close to the QPA payment that the insurers are required to pay by law, then, of course, we will proceed and use any tools necessary. Since we have implemented the arbitration process, the results have been positive*.
>
> As I mentioned earlier, while our volume -- our patient volume increased by about 30% in 2024 compared to 2023, our revenue increased by about 94%. And some of this as a result -- some of this was a result of higher patient volume and acuity to our facility, but a lot of it also was directly from our arbitration initiative. *Since 2024, we have submitted roughly between 60% to 70% of our billable visits to the IDR or arbitration portal. Of these claims submitted, we have achieved a roughly 80% win rate. Of these over 80% plus arbitration wins, once again, which are binding, we expect the insurers to pay 60% to 70% in the first 60 days and the rest later*.
>
> In terms of revenue per visit increase from the IDR process, we typically find a 150% to 250% increase in reimbursement on the facility collection side compared to the initial payment. And once again, this is all consistent with the public data and consistent with the data that are published by other providers that are also doing arbitration like we are. Once again, the goal of arbitration really is just to get to the

QPA payment level as outlined in the No Surprises Act. ***And so far, arbitration seems to be working as it was designed to do***.

98.    The statements identified in emphasis in the immediately preceding paragraph were false and/or materially misleading for two reasons. First, Vo identified general risks concerning the "arbitration process" while concealing the most salient ones and, indeed, the ones most likely to materialize and harm investors. Specifically, although Vo described the "arbitration process" as "costly" and "labor-intensive," he concealed the illegal tactics that HaloMD was actively employing on Nutex's behalf. Instead, Vo misleadingly told investors that it was simply "[taking] advantage of this tool [the IDR system] to leverage our positions with the insurers." That statement did not accurately disclose Nutex's true state of operations at the time or otherwise provide shareholders with a truthful description of the risks they faced because of HaloMD, as described above in Section *Substantive Allegations, HaloMD*, *supra*.

99.    Second, by touting a "60% to 70%" submission rate with an "80% win rate," Vo implied a legitimate, scalable and compliant strategy when, in truth, the third-party vendor upon which it was relying (*i.e.*, HaloMD) was engaging illegal IDR tactics such as submitting ineligible disputes that did not qualify for NSA protections. Vo's description of Nutex's IDR operations provided investors with only positive information while simultaneously concealing the negative risks created by those very same operations.

**April 7, 2025**

100.    On April 7, 2025, Nutex and HaloMD hosted a joint webinar. Defendants Vo and Bates participated in the webinar on behalf of Nutex while Alla LaRoque and Megan Rausch, HaloMD's President and Founder and Chief Operating Officer, respectively, presented on behalf of HaloMD.

101.    During the webinar, Bates stated in pertinent part: "Around 60-70% of our ER visits that we see on a daily basis are able to go through this process (IDR), so it's a decent percentage of our business, and we're going to continue to do this until we can get to the point that we are getting our fair and equitable payment down the road. . . . And then, with the ultimate goal, I mean, as a business we're a publicly traded company, and our shareholders are the most important piece of what we work towards is just making sure we have that financial stability long-term and we believe that right now that using this process is one of our best chances to keep that running as steadily as we've seen it through the end of the third quarter, in fourth quarter and finishing out the year of '24 and '25." In addition, Vo stated in pertinent part as follows: "Arbitration is a bit of a last line for us, because we would rather get fair and equitable payment up front and not have to arbitrate."

102.    Vo's and Bates' statements identified in the immediately preceding paragraph were false and/or materially misleading because they concealed both the illegal tactics that HaloMD was actively employing on Nutex's behalf as well as Nutex's dependency on those tactics. Instead, Vo portrayed the "arbitration" process as a "last line" for Nutex while Bates simultaneously implied that their "arbitration" strategy had provided the Company and its shareholders with "financial stability long term" and would continue to do so, as demonstrated by the third and fourth quarters of 2024. In truth, Nutex's dependence HaloMD was actively subjecting the Company and its shareholders to untold acute levels of risk due to the illegal nature of HaloMD's IDR tactics, as described above in Section *Substantive Allegations, HaloMD*, *supra*.

## May 13, 2025

103.    On May 13, 2025, the Company issued a press release entitled "Nutex Health Reports First Quarter 2025 Results." The press release stated, in relevant part:

HOUSTON, TX − (PRNewswire) – MAY 13th, 2025 – Nutex Health Inc. ("Nutex Health" or the "Company") (NASDAQ: NUTX), a physician-led, integrated healthcare delivery system comprised of 24 state-of-the-art micro hospitals and hospital outpatient departments (HOPDs) in 11 states and primary care-centric, risk-bearing physician networks, today announced first quarter 2025 financial results for the three months ended March 31, 2025.

Financial highlights for the three months ended March 31, 2025:

- Total revenue increased $144.3 million to $211.8 million for the three months ended March 31, 2025 as compared to total revenue of $67.5 million for the same period in 2024, an increase of 213.8%. Revenue from mature hospitals, which are hospitals opened prior to December 31, 2022, increased by 186.5% in 2025 compared to 2024.

- ***The arbitration process resulted in approximately $105.0 million more in revenue in the three months ended March 31, 2025 than the same period in 2024, which amounted to 73.1% of the $144.3 million revenue increase. Of the $105.0 million in arbitration revenue, $60.0 million, $26.0 million and $19.0 million related to dates of services for the first quarter 2025, fourth quarter 2024 and pre-fourth quarter 2024, respectively***.

. . .

"The great momentum that we started in 2024 is continuing into the first quarter of 2025. ***We are now seeing more consistent financial results stemming from a combination of volume growth and operational efficiency, with more fair and reasonable payments from the arbitration process***. We still have a lot of work ahead of us, but the positive trend is very encouraging. We would like to thank our team of physicians and team members nationwide for working in alignment to get us to where we are this quarter," stated Tom Vo, M.D., MBA, Chairman and Chief Executive Officer of Nutex Health.

104.    The statements identified in emphasis in the immediately preceding paragraph were false and/or materially misleading. By touting Nutex's positive growth and attributing it to success in the "arbitration process," Nutex implied a legitimate, scalable and compliant strategy when, in truth, the third-party vendor upon which it was relying (*i.e.*, HaloMD) was engaging illegal IDR tactics such as submitting ineligible disputes that did not qualify for NSA protections. Consequently, the press release provided investors with a materially misleading impression as to Nutex's operational and financial strength while also concealing material and acute risks inherent

in their investment due to the Company's reliance on HaloMD and its illegal IDR tactics, as described above in Section *Substantive Allegations, HaloMD*, *supra*.

105.   That same day, Nutex filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended March 31, 2025 (the "Q1 2025 10-Q"). Vo and Bates signed the Q1 2025 10-Q on behalf of Nutex. Within the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations," Nutex stated in pertinent part as follows:

> *Arbitration process*. On July 1, 2024, we engaged with a third-party IDR vendor to assist in the recovery of certain out of network claims under the IDR process. **The IDR process, including subsequent appeals and insurance payor delays, require extensive administrative time and delays in collections, which can take up to three to five months to receive payments from when we start the open negotiation process. Since implementing its arbitration strategy, the Company submits between 60-70% of its billable visits to arbitration each month, achieving an arbitration success rate in excess of 80% during the first quarter of 2025**.
>
> . . .
>
> Net income attributable to Nutex Health Inc. increased to $14.6 million, or income of $2.56 per diluted share, for the three months ended March 31, 2025 from a net loss attributable to Nutex Health Inc. of $0.4 million, or a loss of $0.08 per share, for the same period 2024. **Our 2025 results were principally affected by higher revenue and cost due to: . . . Increased revenue per visit due to success in efforts to obtain higher rates through the Independent Dispute Resolution ("IDR") process** and increased utilization of higher paid services such as increased observation and in-patient stays.

106.   The statements identified in emphasis in the immediately preceding paragraph were false and/or materially misleading for two reasons. First, the Q1 2025 10-Q overstates the legitimacy and sustainability of Nutex's "arbitration success rate." By touting a "60-70%" submission rate with a "success rate in excess of 80%," Nutex implied a legitimate, scalable and compliant strategy when, in truth, the third-party vendor upon which it was relying (*i.e.*, HaloMD)

was engaging illegal IDR tactics such as submitting ineligible disputes that did not qualify for NSA protections.

107.    Second, Nutex's submission and success rate concealed the acute risks it faced as a result of HaloMD's illegal IDR tactics. In addition to submitting ineligible claims, HaloMD was engaging in improper batching and "flooding" the IDR system, as described above in Section *Substantive Allegations, HaloMD*, *supra*. This conduct created an extraordinary risk of exposure to adverse regulatory action, penalties, and litigation, which was not disclosed by Nutex but instead concealed through positive statements that failed to disclose the true nature of HaloMD's actions. Indeed, while Nutex disclosed certain risks with respect to its "arbitration strategy" in the Q1 2025 10-Q (*e.g.*, "appeals" and "insurance payor delays"), it did not disclose the illegal nature of the tactics behind the "success" that it was purportedly generating.

108.    The Q1 2025 10-Q also provided investors with Nutex's financial statements. In pertinent part, the Q1 2025 10-Q contained a consolidated balance sheet that contained materially false financial information. To correct the materially false financial information, Nutex restated its financial statements on November 18, 2025. The following table provides the balance sheet as initially provided in the Q1 2025 10-Q along with restated financial figures as provided in the amended version of the Q1 2025 10-Q on November 18, 2025 (emphasis added):

|  | March 31, 2025 As Previously Reported ($) | March 31, 2025 Adjustments ($) | March 31, 2025 As Restated ($) |
|---|---|---|---|
| Cash and cash equivalents | 87,670,000 | (2,941,000) | 84,729,000 |
| Restricted short-term investment | - | 2,941,000 | 2,941,000 |
| Other current assets | 313,847,000 | - | 313,847,000 |
| Total current assets | 401,517,000 | - | 401,517,000 |
| Non-current assets | 360,399,000 | - | 360,399,000 |

| | | | |
|---|---|---|---|
| Total assets | 791,916,000 | - | 791,916,000 |
| Current liabilities: | | | |
| Accounts payable - related parties | 5,679,000 | (3,538,000) | 2,141,000 |
| Accrued income tax expense | 43,718,000 | 2,412,000 | 46,130,000 |
| Accrued stock based compensation | - | 20,739,000 | 20,739,000 |
| Other current liabilities | 127,169,000 | - | 127,169,000 |
| Total current liabilities | 176,566,000 | 19,613,000 | 196,179,000 |
| Non-current liabilities | 310,470,000 | - | 310,470,000 |
| Total liabilities | 487,036,000 | 19,613,000 | 506,649,000 |
| Common stock, $0.001 par value; 950,000,000 shares authorized; 5,511,452 and 4,511,199 shares issued and outstanding as of December 31, 2024 and December 31, 2023, respectively | 6,000 | - | 6,000 |
| Additional paid-in capital | 539,361,000 | (26,660,000) | 512,701,000 |
| Accumulated deficit | (342,259,000) | 6,500,000 | (335,759,000) |
| Nutex Health Inc. equity | 197,108,000 | (20,160,000) | 176,948,000 |
| Noncontrolling interests | 77,772,000 | 547,000 | 78,319,000 |
| Total equity | 274,880,000 | (19,613,000) | 255,267,000 |
| Total liabilities and equity | 791,916,000 | - | 791,916,000 |

109.    Nutex's Q1 2025 10-Q was false and/or materially misleading because it provided investors with incorrect financial statements. Specifically, Nutex represented in the Q1 2025 10-Q that it did not have any "accrued stock based compensation" when it should have disclosed that it had over $20 million in stock based compensation liabilities. Nutex was required to reclassify more than $20 million of stock award obligations out of equity, and instead report that amount as a current liability on its balance sheet as of March 31, 2025 – referred to as "accrued stock based compensation." The corrected disclosure increased Nutex's accrued stock based compensation liabilities by 100%. Taking into consideration other adjustments that were made in connection

with the Restatement, Nutex reported, in its amendment of the Form 10-Q for 1Q25, more than $19 million in additional liabilities (and, therefore, more than $19 million less in equity) – approximately an 11% increase in additional current liabilities. By restating its balance sheet, Nutex admitted to having disclosed materially false and erroneous information in its Q1 2025 10-Q.

**May 14, 2025**

110.     On May 14, 2025, Nutex hosted a conference call with investors and analysts to discuss the Company's Q1 2025 results (the "Q1 2025 Earnings Call"). Defendants Ho, Bates, and Hosseinion participated in the call on behalf of Nutex.

111.     During the scripted portion of the Q1 2025 Earnings Call, Defendant Vo stated, in relevant part:

> Let me take a few moments to discuss the arbitration process that we first implemented in July of 2024. ***Overall, it is a small but very important part of our operation. In the first quarter of 2025, we submitted between 60% to 70% of billable visits through the arbitration portal. We achieved an 80% plus win rate of these submissions, resulting in facility collections increasing by between 20 -- I'm sorry, increasing by between 200% to 300% compared to the initial insurance payments***.

> This means that an independent arbitrator has legally determined that the insurance companies are paying us initial payments that are much lower than fair and reasonable rates over 50% of the time. So far, even with these winning percentages, we have not seen any significant payer behavioral changes. We are constantly monitoring legislative and legal developments at both CMS and in Congress to make sure we are on top of any potential changes.

> However, from all our research and discussions with subject matter experts, it appears that the No Surprises Act and the associated arbitration process is here to stay. One main reason for this is the fact that very few of the charts that are eligible for arbitration actually yet arbitrated. In fact, public data shows that only about 5% of eligible charts are actually arbitrated.

> The reasons for this include -- the reasons for this low level of arbitration participation include the high monetary cost as well as the extended time -- extended length of time to get paid once a chart goes through the arbitration process.

In terms of the arbitration process itself, it is constantly getting more refined day by day.

We are seeing some improvements to the arbitration process, including more IDREs or arbitrators being added to the list of available arbitrators as well as new guidelines to provide safeguard to the integrity of the system. In fact, one legislative development that may be germane to our industry will be bill H.R.9572, being introduced by representative, Greg Murphy of North Carolina that proposes a penalty of 3x the difference between the insurers' initial payment and the IDR award amount plus interest if the insurers do not pay in 30 days as required by rules in the No Surprises Act. This bill will only help us get paid faster in a more reasonable manner.

. . .

***We feel that as long as we receive fair and reasonable payment from either the arbitration process or from changes in payer behavior, our lower cost model will be sustainable and repeatable***. Because of our experience of having been through multiple cycles, and our ability to pivot and adapt to any market conditions and with the balance sheet and a clear pipeline, Nutex is well positioned for continued sustained growth.

112.    The statements identified in emphasis in the immediately preceding paragraph were false and/or materially misleading. By touting a "60% to 70%" submission rate with an "80% plus win rate," Vo implied a legitimate, scalable and compliant strategy. Vo then underscored that impression by telling investors that Nutex's "lower cost model" would be "sustainable and repeatable" due in part to the Company's "arbitration process" strategy. In truth, the third-party vendor upon which it was relying (*i.e.*, HaloMD) was engaging illegal IDR tactics such as submitting ineligible disputes that did not qualify for NSA protections. Vo's description of Nutex's IDR operations provided investors with only positive information while simultaneously concealing the negative risks created by those very same operations. As a result, Vo materially misled investors by falsely portraying Nutex's operations to more reliable and less risky than they truly were in light of the Company's dependence on HaloMD.

*            *            *

49

113.    As alleged above, Defendants hired a "third-party IDR vendor" to "assist in the recovery of certain out of network claims" in the IDR process. While Nutex did not disclose the identity of its third-party IDR vendor or the tactics it was using to investors at that time, the Company shortly thereafter began to tout the success of its "arbitration strategy" in increasing its revenues. These statements were false and/or materially misleading because they misrepresented and/or concealed that: (i) HaloMD was achieving lucrative arbitration results for Nutex by engaging in a coordinated scheme to defraud insurance companies; (ii) as a result, to the extent that they were the product of fraudulent conduct, revenues attributable to the Company's engagement with HaloMD in the IDR process were unsustainable; and (iii) accordingly, Nutex's business and/or financial prospects were overstated at all relevant times.

## SCIENTER ALLEGATIONS

114.    During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

### Defendants Actively Supervised and Discussed Nutex's "Arbitration Success"

115.    The NSA was severely detrimental to Nutex's business. As described by Defendant Vo during the Q4 2024 Earnings Call, "the NSA hit [Nutex] very, very hard, especially on the revenue per patient reimbursement side." In 2022, following the passage and implementation of the NSA, Nutex's average insurer payments for emergency services dropped roughly 30%. Nutex

was left using "open negotiations" to collect on payments, which netted a "roughly 10% increase" from the Company's historical low payment amounts.

116.    In July 2024, this all changed with Nutex's decision to retain HaloMD. Although Defendants never disclosed the name of their new IDR third-party vendor or described the tactics it was using on Nutex's behalf, Defendants repeatedly extolled the results the Company was achieving. Defendants described their "arbitration successes" as reaching a "60-70%" submission rate with a recovery rate in "excess of 80%."

117.    The contrast was stark. For 1Q25 alone, Nutex's "arbitration strategy" generated a $105 million year-over-year increase in revenue. This comprised over 70% of Nutex's total year-over-year revenue increase (meaning that Nutex's revenue for 1Q25 increased by $144.3 million of which $105 million was due to HaloMD). Single-handedly, HaloMD reversed Nutex's fortunes and dramatically changed the trajectory of the Company's earnings under the new regulatory regime.

118.    Defendants were aware of HaloMD's dramatic impact on Nutex's earnings, as evidenced by their frequent discussion of it during earnings conference calls with investors and analysts. Given HaloMD's dramatic impact on Nutex's operations and earnings, Defendants either inquired into the tactics HaloMD was using to achieve the results it was achieving or deliberately avoided inquiring as to the tactics HaloMD was using. In either event, by providing Plaintiffs with partial and inaccurate information about its "arbitration strategy," Defendants intentionally misled Plaintiffs or deliberately disregarded the risk of doing so.

119.    Defendants opted to conceal the truth about Nutex's newfound "arbitration success" because it represented a watershed moment in the Company's history. Beginning in May 2023, Nutex was repeatedly on the verge of being delisted from the NASDAQ market. A delisting

occurs when a company falls out of compliance with market rules governing the requirements for public listing. Once a company is delisted, its stock price often plummets because the shares are no longer freely tradeable (at least not as freely tradeable and/or liquid as they were when trading on a national exchange).

120.    Between May 2023 and June 2024, Nutex challenged, appealed, and repeatedly stayed violation notices from NASDAQ. To avoid delisting, Nutex executed two separate stock splits to ensure that the trading price of its stock remained above the $1/share threshold required by NASDAQ. The first split occurred in April 2024 and effected a 1-for-15 share exchange. The second split occurred in June 2024 and effected an additional 1-for-10 share exchange.

121.    Consequently, the passage and implementation of the NSA wreaked havoc not only on Nutex's operations and earnings but also its stock price. Having already been pushed to the brink of delisting, Defendants opted to conceal HaloMD and its tactics instead of being truthful to investors and suffering the inevitable fallout that would ensue once shareholders realized the riskiness inherent in its newfound "arbitration strategy."

### Defendants Violated GAAP When Reporting Nutex's Financial Earnings

122.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. GAAP are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups that it established, the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB"). Effective July 1, 2009, the FASB issued the FASB Accounting Standards Codification ("ASC") which superseded all prior FAS Standards and FASB Staff Positions regarding FAS Standards. The ASC is "the source of

authoritative [GAAP] recognized by the FASB to be applied by nongovernmental entities." (ASC 105-10-05-1.)

123.    SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

124.    Senior management is responsible for a company's financial reporting. The Code of Professional Conduct developed by the American Institute of Certified Public Accounts states in pertinent part:

> The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. Management is responsible for adopting sound accounting policies and for establishing and maintaining an internal control structure that will, among other things, record, process, summarize, and report financial data that is consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

1 CCH AICPA Professional Standards, SAS No. 1, § 110.02 (1982).

125.    Section 13 of the Exchange Act confirms management's responsibilities for an entity's internal controls. "Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall- . . . devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that- . . . transactions are recorded as necessary (I) to permit

preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements . . . ." 15 U.S.C. § 77m(b)(2)(B)(ii)(I).

126.    Nutex's management, including the Company's CEO and CFO, conducted evaluations of the effectiveness of their internal control over financial reporting based on the framework in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO Report"). The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. The term "reliable" as used in the COSO Report requires that financial statements prepared for external purposes are fairly presented in conformity with GAAP and regulatory requirements. Inherent in the fair presentation of financial statements is the concept of statement materiality. Reliability of financial reporting applies to published financial statements, including interim and consolidated financial statements, and selected financial data, such as earnings releases, derived from these financial statements.

127.    An error in previously issued financial statements is an "error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of [GAAP], or oversight or misuse of facts that existed at the time the financial statements were prepared."  A "retrospective application" is the "application of a different accounting principle to one or more previously issued financial statements . . . ."  A "restatement" is the "process of revising previously issued financial statements to reflect the correction of an error in those financial statements."  (ASC 250-10-20.)

128.    Upon the discovery of an error in a previously issued financial statement, the "error . . . shall be reported as an error correction[] by restating the prior-period financial statements. Restatement requires all of the following: [a] The cumulative effect on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented[;] [b] An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period[;] [and] [c] Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error."  (ASC 250-10-45-23.)  Other circumstances requiring the revision of financial statements, neither of which are applicable here, include a change in the reporting entity or a change in an accounting principle. (ASC 250-10-45.)

129.    Upon restating financial statements for the purpose of correcting an error, "the entity shall disclose that its previously issued financial statements have been restated, along with a description of the nature of the error. The entity also shall disclose both of the following: [a] The effect of the correction on each financial statement line item and any per-share amounts affected for each prior period presented [and] [b] The cumulative effect of the change on retained earnings or other appropriate components of equity or net assets in the statement of financial position . . . ." (ASC 250-10-50-7.)

130.    Restating financial statements dilute public confidence in the company's to which they belong. Further, restatements confuse those who use them. Consequently, financial statements prepared in accordance with GAAP should be considered final, and only restated for the purpose of correcting material errors. (ASC 105-10-05-6.)

131.    As detailed above, Nutex was obligated to apply specific rules concerning its stock based compensation. *See* Section *Substantive Allegations, HaloMD*, *supra*. Despite the objective nature of these rules and the reporting they required, Defendants did not adhere to them. Some portion of the under-construction and ramping hospitals would have arrived at the Measurement Date in 2024, given that the reverse merger with Clinigence and the adoption of the *Nutex Health Inc. 2022 Equity Incentive Plan* occurred in 2022 – or within the range of 24 months prior. Therefore, whether or not the expected awards were to be classified as a liability from the outset or not, certain portions would certainly have become mandatorily redeemable and measurable in 2024 – causing, at minimum, a reclassification of such awards to liabilities. With respect to its originally-filed financial statements for 2024, Nutex inexplicably failed to record these awards, and the associated obligations, as such. Such failure led to the restatement and the conclusion, as outlined above, that the Company acted intentionally or deliberately reckless when reporting its financial earnings for the year ended December 31, 2024.

## Auditor Changes and SOX Certifications

132.    Defendants' scienter is further evidenced by their willingness to certify the effectiveness of Nutex's internal controls and accuracy of its financial statements when, in truth, the Company was violating GAAP and in the midst of trying to replace its longtime outside auditor.

133.    Nutex initially engaged Marcum LLP ("Marcum") as its outside auditor on March 1, 2021. After four years and without any public indication of internal disagreements, Marcum resigned as the Company's auditor on April 25, 2025.

134.    Following Marcum's resignation, Nutex retained CBIZ CPAs P.C. ("CBIZ") as its auditor on November 1, 2024. However, within one month of the retention, Nutex announced that

it was changing auditors once again. Nutex's announcement dated May 21, 2025 revealed that it was replacing CBIZ with Grant Thornton LLP.

135.    Meanwhile, Defendants Vo and Bates certified in the 2024 10-K on March 31, 2025, and the Q1 2025 10-Q on May 13, 2025, that Nutex's internal controls over financial reporting were effective and that both public filings reported Nutex's financial information accurately in all material respects. In pertinent part, Vo and Bates signed "certifications" pursuant to the Sarbanes-Oxley Act of 2002 representing as follows:

1.    I have reviewed this [report] of Nutex Health. Inc.;

2.    ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;

3.    ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the

effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information***; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

136.    The statements identified in emphasis in the immediately preceding paragraph were false and/or materially misleading because Nutex's internal controls over financial reporting were not effective as of December 31, 2024 or March 31, 2025 and the Company's financial statements for the periods ended December 31, 2024 and March 31, 2025 did not "fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]." Contrary to the above certification, Nutex's financial statements concealed millions of dollars in stock based compensation, thereby understating the Company's liabilities and inflating Nutex's net worth. Additionally, as a result of the change to the treatment of obligations from equity to liabilities as described herein, an additional material weakness in the design and operating effectiveness of internal control over financial reporting was identified.

137.    The turnover in auditors combined with the Vo's and Bates' certification of Nutex's internal controls over financial reporting gives rise to a strong inference of scienter. Defendants

operated Nutex with little or no effective oversight in terms of its public financial reporting. Consequently, the GAAP violations discussed above support the conclusion that Defendants intentionally misled investors or acted with deliberate disregard when reporting Nutex's financial earnings.

## LOSS CAUSATION AND ECONOMIC LOSS

138.    During the Class Period, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Nutex's securities and operated as a fraud or deceit on Class Period purchasers of Nutex's shareholders by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Nutex's common stock materially declined, as the prior artificial inflation came out of the Company's share price over time. As a result of their purchases of Nutex securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

139.    As alleged *supra*, the truth concerning Nutex's reliance on HaloMD and the risks associated therewith ultimately materialized through a series of partial disclosures, including revelations from the Blue Orca report on July 22, 2025 and Nutex's failure to respond to it on August 14, 2025 combined with the revelation that Defendants had materially misstated certain of its financial statements. Nutex's stock price fell precipitously in response to these alleged corrective events.

140.    Specifically, on July 22, 2025, Blue Orca reported that "HaloMD achieved dramatically lucrative results for clients like Nutex by engaging in a coordinated fraudulent scheme to steal millions of dollars from insurance companies on behalf of and in conjunction with its

healthcare billing clients." The report detailed HaloMD's conduct by, among other things, citing to complaints filed around the country. Following publication of the Blue Orca report, Nutex's stock price declined $11.18 per share, or 10.05%, to close on July 22, 2025 at $100.01 per share.

141.    On July 24, 2025, Nutex issued a press release stating it "strongly disagree[d] with the allegations in the [Blue Orca] report" and that it would "provide related updates in its upcoming earnings release and Form 10-Q for the second quarter of 2025 due on or before August 14, 2025." However, after the market closed on August 14, 2025, Nutex announced that it would "delay filing its Form 10-Q for the period ending June 30, 2025," thereby going back on its commitment to responding to the report and leaving investors with the distinct impression that the Blue Orca report could not be reasonably disputed without admitting fault on the part of Nutex and its management. When Nutex failed to rebut the allegations of the Blue Orca report while at the same time revealing that it was delaying the filing its quarterly report, the Company's stock price dropped 16.39%, or $18.22 per share, to close on August 15, 2025 at $92.91 per share.

## NO SAFE HARBOR

142.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with statements about their IDR operations and earnings while at the same time omitting acute risks undermining the validity of their statements.

143.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the purportedly forward-looking statements.

144.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Nutex who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

145.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Nutex securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

146.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Nutex securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can

be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Nutex or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

147.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

148.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

149.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

     A.  whether the federal securities laws were violated by Defendants' acts as alleged herein;

     B.  whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Nutex;

     C.  whether the Individual Defendants caused Nutex to issue false and misleading statements during the Class Period;

     D.  whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

E.  whether the prices of Nutex securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

F.  whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

150.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

151.  Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

A.  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

B.  the omissions and misrepresentations were material;

C.  Nutex securities are traded in an efficient market;

D.  the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

E.  the Company traded on the NASDAQ and was covered by multiple analysts;

F.  the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

G.  Plaintiffs and members of the Class purchased, acquired and/or sold Nutex securities between the time the Defendants failed to disclose or misrepresented

material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

152.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

153.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

154.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

155.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

156.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class

members, as alleged herein; (ii) artificially inflate and maintain the market price of Nutex securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Nutex securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

157.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Nutex securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Nutex's finances and business prospects.

158.    By virtue of their positions at Nutex, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

159.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers

and/or directors of Nutex, the Individual Defendants had knowledge of the details of Nutex's internal affairs.

160.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Nutex. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Nutex's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Nutex securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Nutex's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Nutex securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

161.    During the Class Period, Nutex securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Nutex securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Nutex securities was substantially lower than the prices paid by Plaintiffs and the

other members of the Class. The market price of Nutex securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

162.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

163.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

164.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

165.    During the Class Period, the Individual Defendants participated in the operation and management of Nutex, and conducted and participated, directly and indirectly, in the conduct of Nutex's business affairs. Because of their senior positions, they knew the adverse non-public information about Nutex's misstatement of income and expenses and false financial statements.

166.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Nutex's financial condition and results of operations, and to correct promptly any public statements issued by Nutex which had become materially false or misleading.

167.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Nutex disseminated in the marketplace during the Class Period concerning Nutex's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Nutex to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Nutex within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Nutex securities.

168.    Each of the Individual Defendants, therefore, acted as a controlling person of Nutex. By reason of their senior management positions and/or being directors of Nutex, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Nutex to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Nutex and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

169.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Nutex.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by

reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated: February 2, 2026            Respectfully submitted,

**SPONSEL MILLER PLLC**

*/s/ Thane Tyler Sponsel III*
Thane Tyler Sponsel III
Texas Bar No.: 24056361
520 Post Oak Boulevard, Suite 310
Houston, Texas 77027
Telephone: (713) 892-5400
Facsimile: (713) 892-5401
Email: sponsel@smglawgroup.com

*Liaison Counsel for Co-Lead Plaintiffs
and the Class*

**LEVI & KORSINSKY, LLP**
Adam M. Apton (*pro hac vice*)
33 Whitehall Street, 27h Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: aapton@zlk.com

*Co-Lead Counsel for Co-Lead Plaintiffs
and the Class*

**POMERANTZ LLP**
Jeremy A. Lieberman
Texas Bar No.: 1466757

Brenda Szydlo (*pro hac vice*)
Dean P. Ferrogari (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: jalieberman@pomlaw.com
      bszydlo@pomlaw.com
      dferrogari@pomlaw.com

*Co-Lead Counsel for Co-Lead Plaintiffs*
*and the Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

*Additional Counsel for Co-Lead Plaintiff Shah*
*Azman Bin Mohamad Ayub Khan*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, February 2, 2026, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Thane Tyler Sponsel III*
Thane Tyler Sponsel III
