# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE NUTEX HEALTH INC. SECURITIES LITIGATION | Case No.: 4:25-cv-03999 |
| | Hon. Lee H. Rosenthal |
| THIS DOCUMENT RELATES TO: 4:25-CV-03999 | |

**PLAINTIFFS' CORRECTED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

**POMERANTZ LLP**
Jeremy A. Lieberman
Texas Bar No.: 1466757
Brenda Szydlo (*pro hac vice*)
Dean P. Ferrogari (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: jalieberman@pomlaw.com
　　　bszydlo@pomlaw.com
　　　dferrogari@pomlaw.com

**LEVI & KORSINSKY, LLP**
Adam M. Apton (*pro hac vice*)
33 Whitehall Street, 27th Floor
New York, New York 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: aapton@zlk.com

*Co-Lead Counsel for Co-Lead Plaintiffs and the Proposed Class*

**SPONSEL MILLER PLLC**
Thane Tyler Sponsel III
Texas Bar No.: 24056361
520 Post Oak Boulevard, Suite 310
Houston, Texas 77027
Telephone: (713) 892-5400
Facsimile: (713) 892-5401
Email: sponsel@smglawgroup.com

*Liaison Counsel for Co-Lead Plaintiffs and the Proposed Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

*Additional Counsel for Co-Lead Plaintiff Shah Azman Bin Mohamad Ayub Khan*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... iii

TABLE OF ABBREVIATIONS ................................................................................................. vi

PRELIMINARY STATEMENT ................................................................................................. 1

NATURE AND STAGE OF THE PROCEEDING .................................................................... 5

FACTUAL BACKGROUND ...................................................................................................... 5

    I.     HaloMD is Nutex's Undisclosed Third-Party IDR Vendor ................................... 6

          A.     HaloMD's Submission of Ineligible Claims and False Attestations .......... 7

          B.     HaloMD's Improper Batching and Violation of Cooling-Off Periods ....... 8

          C.     HaloMD's Overwhelming of the System and Misrepresentations ............. 8

    II.    Nutex's Arbitration Results and Revenue Growth Were Too Good to Be True .... 9

    III.   The Blue Orca Report & August 14, 2025 Corrective Disclosures ...................... 10

    IV.   Nutex's Restatement of Year-End 2024 and First-Quarter 2025 Financials ........ 12

    V.    Blue Cross Requested the Idaho Department of Insurance to Investigate
          Nutex ................................................................................................................... 12

    VI.   Nutex's Arbitration True-Up Regarding Submission of Ineligible Claims ......... 13

STATEMENT OF ISSUES ...................................................................................................... 14

ARGUMENT ............................................................................................................................ 15

    I.     Plaintiffs State A Claim Under Section 10(b) ...................................................... 15

          A.     Plaintiffs Sufficiently Allege False or Misleading Statements ................ 15

                1.     Statements Relating to the Company's Misclassification of Stock
                      Based Compensation as Equity Rather Than Liability ...................... 15

                2.     Statements Relating to Nutex's Arbitration Strategy and Success ..... 17

                3.     Defendants' Statements Are Not Protected by the Safe Harbor ......... 18

i

B.    Scienter is Adequately Alleged.................................................................. 18

     1.    Defendants Touted Nutex's Arbitration Strategy and Success Which Were Too Good to Be True and Either Inquired into the Tactics HaloMD Used to Achieve the Results or Was Deliberately Ignorant ........................................................... 19

     2.    Defendants Had Motive to Conceal the Truth about Nutex's "Arbitration Success"................................................................ 21

     3.    The Core Operations Theory Contributes to the Inference of Scienter ....................................................................... 22

     4.    Defendants Violated GAAP When Reporting Nutex's Earnings and Had Motive to Misclassify its Accrued Stock Based Compensation ....................................................................... 24

     5.    Auditor Changes and SOX Certifications........................................... 26

C.    The Complaint Adequately Pleads Loss Causation .................................. 27

     1.    The Blue Orca Report Is a Corrective Disclosure ............................. 28

     2.    The August 14, 2025 Corrective Disclosures ..................................... 30

II.    Plaintiffs' Section 20(a) Claim is Not Subject to Dismissal................................. 30

CONCLUSION.................................................................................................................... 30

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Baer v. Shift4Payments, Inc.*,
   2024 WL 3836676 (E.D. Pa. Aug. 14, 2024) ....................................................................16, 28

*BG Gulf Coast LNG, L.L.C. v. Sabine-Neches Navigation Dist.*,
   49 F.4th 420 (5th Cir. 2022) ...........................................................................................14

*Bond v. Clover Health Invs., Corp.*,
   587 F. Supp. 3d 641 (M.D. Tenn. 2022)............................................................................30

*City of Atlanta Police Officers' Pension Plan v. Celsius Holdings, Inc.*,
   2023 WL 1998174 (S.D. Fla. Feb. 13, 2023),
   *R. & R. adopted*, 2023 WL 2601816 (S.D. Fla. Mar. 22, 2023)............................................25

*City of Mia. Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. Globe Life Inc.*,
   2025 WL 2793800 (E.D. Tex. Sep. 29, 2025) ...........................................................................28

*City of N. Mia. Beach Police Officer's & Firefighter's Ret. Plan*
   *v. Nat'l Gen. Holdings  Corp.*, 2021 WL 212337 (S.D.N.Y. Jan. 21, 2021)............................17

*Coggins v. Camber Energy Inc.*,
   693 F. Supp. 3d 736 (S.D. Tex. 2023) .....................................................................................29

*Constr. Laborers Pension Tr. of Greater St. Louis v. Funk Inc.*,
   166 F.4th 805 (9th Cir. 2026) .........................................................................................18

*Del. Cnty. Emp.'s Ret. Sys. v. Cabot Oil & Gas Corp.*,
   620 F. Supp. 3d 603 (S.D. Tex. 2022) .....................................................................................27

*Dronsejko v. Thornton*,
   632 F.3d 658 (10th Cir. 2011) .........................................................................................26

*Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*,
   905 F.3d 892 (5th Cir. 2018) .........................................................................................28

*Fener v. Belo Corp.*,
   513 F. Supp. 2d 733 (N.D. Tex. 2007) .....................................................................................13

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
   268 F. Supp. 3d 526 (S.D.N.Y. 2017)......................................................................................16

*Genesee Cnty. Emp.'s Ret. Sys. v. FirstCash Holdings, Inc.*,
   667 F. Supp. 3d 295 (N.D. Tex. 2023) ...................................................................................30

*Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*,
313 F.3d 305 (5th Cir. 2002) ..............................................................................13

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010)..............................................15, 17, 20, 24

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ..............................................................................17

*In re Cassava Scis. Sec. Litig.*,
2023 WL 3442087 (W.D. Tex. May 11, 2023) ...............................................17, 21

*In re Cassava Scis. Sec. Litig.*,
2024 WL 4916373 (W.D. Tex. June 12, 2024) ....................................................29

*In re CrowdStrike Holdings, Inc. Sec. Litig.*,
816 F. Supp. 3d 683 (W.D. Tex. 2026)................................................................30

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
2003 U.S. Dist. LEXIS 25037 (S.D. Tex. Nov. 13, 2003).....................................20

*In re Hyzon Motors Inc. Sec. Litig.*,
815 F. Supp. 3d 209 (W.D.N.Y. 2025).................................................................29

*In re Ravisent Techs. Sec. Litig.*,
2004 WL 1563024 (E.D. Pa. July 13, 2004).........................................................15

*In re San Benito Health Care Dist.*,
2024 Bankr. LEXIS 3101 (N.D. Cal Bankr. Mar. 21, 2024)..................................25

*In re Seitel, Inc. Sec. Litig.*,
447 F. Supp. 2d 693 (S.D. Tex. 2006) .................................................................30

*In re Sunpoint Sec., Inc.*,
377 B.R. 513 (Bankr. E.D. Tex. 2007) .................................................................26

*In re Winstar Commc'ns*,
2006 WL 473885 (S.D.N.Y. Feb. 27, 2006)..........................................................29

*Kaltman v. KeyEnergy Servs., Inc.*,
447 F. Supp. 2d 648 (W.D. Tex. 2006).................................................................15

*Kohut v. KBR, Inc.*,
2015 WL 11995250 (S.D. Tex. Sep. 3, 2015) ...........................................14, 15, 30

*Lormand v. U.S. Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ..............................................................................14

*Masel v. Villarreal*,
    924 F.3d 734 (5th Cir. 2019) ...............................................................................14

*May v KushCo Holdings, Inc.*,
    2020 WL 6587533 (C.D. Cal. Sep. 25, 2020)........................................................25

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
    58 F.4th 195 (5th Cir. 2023) ..............................................................14, 18, 22, 23

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015).......................................................................................3, 16, 17

*Owens v. Jastrow*,
    789 F.3d 529 (5th Cir. 2015) .........................................................................22, 24

*Pujo v. EHang Holdings Ltd.*,
    2025 WL 1242324 (C.D. Cal. Mar. 26, 2025).......................................................30

*Schelling v. Microvast Holdings, Inc.*,
    796 F. Supp. 3d 390 (S.D. Tex. 2025) ...................................................................14

*Schott v. Noblis Health Corp.*,
    211 F. Supp. 3d 936 (S.D. Tex. 2016) ...................................................................24

*SEC v. George*,
    426 F.3d 786 (6th Cir. Aug. 30, 2005)...................................................................20

*SEC v. Jakubowski*,
    150 F.3d 675 (7th Cir. 1998) ..................................................................................20

*Skiadas v. Acer Therapeutics Inc.*,
    2020 WL 3268495 (S.D.N.Y. June 16, 2020) ........................................................21

*Southland Sec. Corp. v. INSpire Ins. Sols.*,
    365 F.3d 353 (5th Cir. 2004) ...........................................................................20, 22

*Spitzberg v. Hou. Am. Energy Corp.*,
    758 F.3d 676,692 (5th Cir. 2014) ...........................................................................18

*Tellabs Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)...................................................................................................14

*Underland v. Alter*,
    20122011 WL 29123304017908 (E.D. Pa. Sep. 9, 20122011) ........................16, 25

## Statutes

42 U.S.C. § 300gg-111 ......................................................................................................8

# TABLE OF ABBREVIATIONS[1]

| AC | Amended Complaint (ECF 42.) |
|---|---|
| **Class** | All persons that purchased or otherwise acquired Nutex Health Inc. securities between February 5, 2025 and August 14, 2025, both dates inclusive, seeking to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder |
| **Class Period** | February 5, 2025 through August 14, 2025, both dates inclusive |
| **DB** | Defendants' Motion to Dismiss Amended Complaint and Supporting Memorandum (ECF 47) |
| **Defendants** | Nutex Health Inc., Thomas T. Vo, Jon C. Bates, and Warren Hosseinion |
| **Ex. __** | Exhibits attached to the Szydlo Decl. |
| **Exchange Act** | Securities Exchange Act of 1934 |
| **FFA** | Federal Arbitration Act of 1925 |
| **IDR** | Independent Dispute Resolution |
| **Individual Defendants** | Thomas T. Vo, Jon C. Bates, and Warren Hosseinion |
| **NSA** | No Surprises Act of 2022 |
| **Nutex** or the **Company** | Nutex Health Inc. |
| **Plaintiffs** | Co-Lead Plaintiffs Gerald F. Cox and Shah Azman Bin Mohamad Ayub Khan |
| **PSLRA** | Private Securities Litigation Reform Act of 1995 |
| **Qualifying payment amount** | The median contract rate for like specialties in the same geographical market, *inter alia* |
| **SOX** | Sarbanes-Oxley Act of 2002 |
| **Szydlo Decl.** | The June 2, 2026 Declaration of Brenda Szydlo in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss Amended Complaint, filed herewith |
| **¶_** | Paragraphs in the Amended Complaint |

---

[1] All internal citations and quotation marks are omitted, and all emphasis has been added unless stated otherwise. Unless otherwise defined, all capitalized terms have the meanings as provided in the AC (ECF 42).

**PRELIMINARY STATEMENT**

Nutex operates micro-hospitals targeting suburban areas with high commercial insurance populations to capture out-of-network reimbursements. In 2022, Nutex's business suffered a downturn following the passage and implementation of the No Surprises Act ("NSA"). The law was enacted to prevent "surprise" balance billing that patients would receive after seeking out-of-network medical care. The NSA effectively limited these bills by capping them at a predetermined amount or an amount agreed to through an independent dispute resolution process ("IDR"). For Nutex, the effect of NSA was severely detrimental to its bottom line. In July 2024, Nutex retained an undisclosed third-party to assist with its IDR collections, and as a result, the Company experienced an extraordinary surge in revenue and earnings from its arbitration initiative.

Nutex's new IDR vendor was HaloMD but the relationship was not acknowledged until a joint webinar on April 7, 2025. Throughout the Class Period, Defendants repeatedly touted the arbitration results Nutex was achieving, including claims that Nutex had reached its goal of submitting between 60-70% of its billable visits to arbitration each month and achieving an arbitration success rate in excess of 80%. Unbeknownst to investors, the results HaloMD was achieving for Nutex were being obtained through allegedly fraudulent tactics, such as submitting ineligible claims and false attestations.

Nutex's claims regarding its arbitration processes hid the vulnerability of revenue streams, as evidenced by a July 22, 2025 Blue Orca Capital report exposing HaloMD's practices and Nutex's exposure to risks. ***This led to a 10% stock drop***. On July 24, 2025, Nutex stated that it strongly disagreed with the allegations in the report and that it expected to provide related updates in its upcoming earnings release and Form 10-Q for the second quarter of 2025 due on August 14, 2025. However, after the market closed on August 14, 2025, Nutex failed to file its Form 10-Q and rebut the allegations. Moreover, in addition to not responding to the report, Nutex announced

1

on August 14, 2025 that its Form 10-Q would be delayed because it needed additional time to analyze classification of certain equity instruments which further fueled speculation from investors. ***The Company's stock price immediately dropped another 16%***. On November 18, 2025, Nutex finally restated its financial statements to correct its misclassification of "certain equity instruments." Nutex revealed it had understated its current liabilities for both the year ended December 31, 2024 as well as the quarter ended March 31, 2025. The restatement showed that Nutex's current liabilities for each period were understated by approximately 9.5% and 11%, respectively. Defendants had misled investors as to the extent of Nutex's current liabilities while simultaneously concealing the risks HaloMD posed to investors. Defendants' actions had the effect of making Nutex appear to be a financially stronger company than it truly was.

Nutex and HaloMD continue to be accused of engaging in illegal conduct under the NSA. HaloMD has been sued by a number of insurers, and as recently as November 17, 2025, Blue Cross of Idaho ("BCI") identified Nutex explicitly when demanding the Idaho Department of Insurance investigate it and HaloMD's abuse of the IDR system under the NSA. Plaintiffs' allegations regarding Nutex's submission of ineligible claims were confirmed on March 5, 2026, when Nutex filed a Form 8-K announcing a $105.9 million decrease in revenue for the three months ended December 31, 2025 primarily attributed to a "***$55 million cumulative true-up of 18,950 arbitration claims that arbitrators determined were ineligible under the IDR process***." These claims were submitted during the ***entire period*** Nutex was engaged in the IDR process with HaloMD.

Defendants take a kitchen-sink approach to their motion to dismiss, raising a multitude of arguments as to why Plaintiffs fail to sufficiently allege falsity, scienter and loss causation. However, all three elements are adequately alleged. For example, Plaintiffs adequately allege

2

materially false and/or misleading statements in connection with the Company's misclassification of stock-based compensation obligations. Defendants contend the restatement should not serve as the basis for pleading material falsity, but in this Circuit, a restatement is sufficient to show that an earlier statement was false when made. The restatement established materiality because under GAAP, previously issued financial statements should be restated only to correct material accounting errors. Additionally, when the error is material, the entity is required to alert the users of the financial statements that they can no longer be relied upon, as Nutex did here. Moreover, Nutex understated its current liabilities for both the year ended December 31, 2024 as well as the first quarter ended March 31, 2025 *by approximately 9.5% and 11%, respectively*.

Defendants contend that Nutex's misclassification of stock-based compensation as equity rather than liability was an "opinion" which may only form the basis of a material misrepresentation under the framework handed down in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015). But Plaintiffs alleged that the GAAP rules applied were objective in nature, and raise issues of objective facts that are not protected as opinion statements. To the extent the Court disagrees, Plaintiffs contend that Nutex failed to disclose its nonconformance to a stated methodology in misclassifying the stock-based compensation. Thus, the statements are indeed actionable under *Omnicare*.

Plaintiffs also adequately allege materially false and/or misleading statements regarding Nutex's arbitration strategy and success. Defendants contend the alleged misstatements are not actionable because they are true, but the ability of a statement to provide accurate information, rather than the statement's literal truth, is the benchmark by which statements to the market are measured in securities fraud actions. They also argue that unadjudicated allegations in other lawsuits cannot be the basis for misstatements in this action, but Defendants are incorrect.

3

Defendants also contend that certain alleged statements are forward-looking and protected by the PSLRA's safe harbor. However, Defendants merely point to statements that are not alleged to be false or misleading; and mixed present/future statements which are not entitled to the safe harbor with respect to the parts of statements that refer to the present, or as a whole because the statements are fundamentally a representation of present fact.

Additionally, all of the facts alleged, *taken collectively*, give rise to a strong inference of scienter. Beginning in May 2023, Nutex was repeatedly on the verge of being delisted from the NASDAQ, and the passage and implementation of the NSA wreaked havoc not only on Nutex's operations and earnings, but also on its stock price. In July 2024, this changed with Nutex's decision to retain HaloMD. Defendants repeatedly touted Nutex's arbitration strategy and success – *which were too good to be true* – in SEC filings, earnings calls and a joint webinar hosted by Nutex and HaloMD. Defendants either inquired into the tactics HaloMD was using to achieve the incredible results or were deliberately ignorant, which is a form of knowledge. Scienter is also supported by the core operations theory, the magnitude of the accounting errors, the objective nature of the GAAP rules violated, auditor changes and SOX certifications. Additionally, by misclassifying Nutex's accrued stock-based compensation, Defendants understated Nutex's current liabilities and made Nutex appear to be a financially stronger company than it truly was.

The AC more than adequately pleads loss causation pursuant to Rule 8(a)'s notice pleading standard. Following publication of the Blue Orca Report, ***Nutex's stock price declined $11.18 per share, or 10.05%***. Although Defendants contend the report merely discussed public information, the report provided plausible additional details about the various risks Nutex was facing.

Defendants fail to address the August 14, 2025 alleged corrective disclosures apart from a single footnote. They contend that Nutex's August 14, 2025 press release is not corrective of the

4

alleged misstatements in the Company's 2024 Form 10-K and Q1 2025 Form 10-Q. But they are wrong as the press release disclosed that the 10-Q was delayed because Nutex needed additional time to analyze classification of certain equity instruments which led to the Company's restatement to correct its misclassification. On this news, ***the Company's stock price dropped 16.39%.***

Finally, because Plaintiffs have adequately alleged a primary Section 10(b) claim as to the Individual Defendants, the Section 20(a) claim is not subject to dismissal as Defendants contend.

## NATURE AND STAGE OF THE PROCEEDING

This is a federal securities class action on behalf of a class consisting of all persons that purchased or otherwise acquired Nutex securities between February 5, 2025 and August 14, 2025, both dates inclusive, seeking to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. On August 22, 2025, this action was commenced. ECF 1. On November 19, 2025, the Court entered an Order appointing Messrs. Cox and Khan as Co-Lead Plaintiffs. ECF 31. Plaintiffs filed their AC on February 2, 2026. ECF 42. On April 3, 2026, Defendants filed a motion to dismiss the AC. ECF 47.

## FACTUAL BACKGROUND

Nutex is a healthcare services and operations company. ¶25. Through its primary "Hospital Division" operating segment, Nutex focuses on developing and running micro-hospitals, specialty hospitals, and hospital outpatient departments. Nutex generally operates as an out-of-network provider and generates revenue, in most cases, from a third-party payor such as commercial insurance. ¶25. Greater than 90% of its net patient service revenue is paid by third-party payors.

In 2022, Nutex's business suffered a downturn following the passage and implementation of the NSA. ¶2. The law was enacted to prevent "surprise" balance billing that patients would receive after seeking out-of-network medical care. ¶2. The NSA effectively limited these bills by capping them at a predetermined amount or an amount agreed to through an independent dispute

5

resolution process or "IDR." ¶2. The NSA requires private health plans to cover out-of-network claims and apply in-network cost sharing, and prohibits covered providers from billing patients more than the in-network cost sharing amount for surprise medical bills. ¶27. In addition, the NSA established an IDR process to determine out-of-network payment amounts between health plans and providers when open negotiations fail. ¶27. In the IDR process, the provider and health plan each submit a proposed payment amount and information supporting their payment offers to an arbitrator, a certified IDR entity. ¶28. The arbitrator must select one of the two proposed payment amounts, taking into account the "qualifying payment amount"—the median contract rate for like specialties in the same geographical market, *inter alia*. ¶28.

The NSA was severely detrimental to Nutex's bottom line. ¶29. Specifically, the NSA prevented Nutex from charging patients higher prices for its services through out-of-network billing. ¶29. In 2022, Nutex's average insurance payment for emergency services declined by approximately 30%, including a 37% reduction for physician services. ¶29. In 2023, Nutex suffered a 10% reduction for physician services. ¶3. This declining trend continued until July 2024 when Nutex retained an unknown, undisclosed third-party to assist with its IDR collections. ¶3.

## I.    HaloMD is Nutex's Undisclosed Third-Party IDR Vendor

In response to Nutex's precipitous decline, in July 2024, the Company engaged HaloMD. ¶30. HaloMD is a healthcare billing and consulting firm that specializes in managing the IDR process under the NSA. ¶30. HaloMD purportedly assisted providers in navigating the IDR process to secure higher payments from insurers. ¶30. However, HaloMD's practices exploited the IDR system in ways that allegedly constitute fraud, racketeering, and other violations, potentially exposing its clients to regulatory scrutiny, financial penalties, and reputational damage. ¶30.

The NSA's IDR process is only available for a "qualified IDR item or service" eligible for the process. ¶31. HaloMD's tactics misuse the NSA's framework, transforming a patient-

6

protection mechanism into a profit-driven scheme that overwhelms the system and inflates reimbursements artificially. ¶32. HaloMD operates on a commission-based model, taking a percentage of awards, which incentivizes high-volume submissions. ¶32. These tactics appear to defraud insurers and IDR entities through systematic violations, including the submission of ineligible claims, improper batching, and flooding. *See infra* 7-9; ¶32.

### A. HaloMD's Submission of Ineligible Claims and False Attestations

HaloMD knowingly submits claims ineligible for federal or state IDR processes that violate NSA regulations. ¶33. For example, in a Texas lawsuit filed by Blue Cross Blue Shield of Texas in August 2025, HaloMD initiated over 5,400 overlapping disputes for the same services under both federal and Texas IDR systems, despite mutual exclusivity rules that prohibit this conduct. ¶33. The complaint estimates that HaloMD's ineligible submissions resulted in wrongful awards exceeding $100 million. ¶33. Similarly, in Ohio, Community Insurance Company ("CIC") filed suit in June 2025. ¶34. The amended complaint alleged HaloMD used AI to flood the IDR system with ineligible disputes, with about 40% categorically invalid, and in some batches, over 80% ineligible. ¶34. CIC's amended complaint also alleged that HaloMD's conduct involved false attestations, constituting wire fraud under 18 U.S.C. § 1343. Attestations on claims are required for submission into the IDR system. Otherwise, the claim is automatically rejected. ¶34. In California, Anthem Blue Cross sued HaloMD in July 2025, for initiating over 134,000 disputes in the last six months of 2024 (averaging 746 per day), many based on "fraudulent billing schemes." ¶35. These schemes entailed the submission of claims that were known to be ineligible for payment under the NDA's IDR system, such as that the services were not eligible for payment, the claims were covered by state law, and/or the claims were submitted under false attestations. ¶35.

**B.      HaloMD's Improper Batching and Violation of Cooling-Off Periods**

According to the aforementioned lawsuits, HaloMD is accused of exploiting batching rules, which allow grouping similar claims for efficiency but prohibit bundling ineligible ones. ¶37. Batching ordinarily allows qualified IDR items or services to be combined into one dispute but only if they meet strict criteria. ¶37. Improper batching occurs when multiple claims are submitted at once (*i.e.*, batched) but in violation of these rules. *See* ¶37. By improperly batching claims, HaloMD was able to take advantage of the IDR process to receive payment for claims that were not eligible for payment in the first instance. ¶37. In Georgia, Elevance Health sued in May 2025, claiming HaloMD and affiliated physician groups bundled claims improperly and ignored 90-day cooling-off[2] periods post-arbitration. ¶38. This allegedly led to $5.9 million in improper payments between January 2024 and April 2025, with nearly $6 million in improper awards from ineligible disputes. ¶38. The complaint also alleged violations of federal and state RICO statutes, arguing a pattern of fraudulent interstate communications over time. ¶38.

**C.      HaloMD's Overwhelming of the System and Misrepresentations**

HaloMD also engaged in high-volume claim submission known as intentional "flooding" to secure favorable outcomes, including misrepresentations to arbitrators about claim values and eligibility. ¶39. According to the complaints filed against HaloMD, this forced insurers to arbitrate ineligible claims. ¶40. This, in turn, increased the chances of favorable awards due to system strain, backlogs, and limited insurer ability to challenge every submission effectively. ¶40. Moreover, the complaints allege HaloMD relied on providers for underlying claims but supplied the automation and AI infrastructure to enable mass submissions "at scale." ¶41. This allowed rapid, high-volume

---

[2] Parties are prohibited from initiating IDR disputes involving the same parties and items or services during a 90-day period following an IDR determination, also known as the "cooling off period." *See* 42 U.S.C. § 300gg-111(c)(5)(E)(ii); ¶37 n.1.

8

initiation of disputes, including falsified or improper elements (*e.g.*, false eligibility attestations, incorrect dates, or improper grouping) to bypass safeguards. ¶41. HaloMD's clients, like Nutex, face significant risks from its conduct and could be liable for repaying wrongful awards, facing fines, or being barred from future IDR participation. ¶42.

## II.      Nutex's Arbitration Results and Revenue Growth Were Too Good to Be True

HaloMD provided Nutex with a lifeline that was too good to be true. ¶46. Notably, Defendants did not identify the tactics Nutex's third-party IDR vendor—HaloMD—was using during the Class Period, but repeatedly touted the results Nutex was achieving. ¶4. On February 5, 2025, Nutex issued a press release providing investors with a "No Surprises Act (NSA) Arbitration Update." ¶46. Nutex revealed that its unidentified "third-party vendor" had successfully "reached its goal of submitting between 60-70% of its billable visits to arbitration each month, achieving an arbitration success rate in excess of 80% during the fourth quarter of 2024." ¶46. In March 2025, Nutex announced a 250% increase in revenue growth from the previous quarter. ¶46. This sequential revenue jump was significant because Nutex did not undergo any major changes to warrant such an extraordinary increase. ¶46. Thus, the increase was directly attributable to the work of its mystery third-party vendor and its ability to seemingly overcome the obstacles created by the NSA. ¶46. On April 1, 2025, Vo stated that revenue increased by about 94% in 2024 compared to 2023, and that a lot of it was "directly from our arbitration initiative." ¶97. In May 2025, while announcing its Q1 2025 earnings, Nutex revealed an incredible 214% year-over-year increase. ¶46. Put simply, HaloMD's services allowed Nutex to report extraordinary revenue and earnings growth that it otherwise would have been unable to achieve. ¶47. In turn, this caused Nutex's stock price to appreciate more than 20x from its historic lows. ¶47.

### III.   The Blue Orca Report & August 14, 2025 Corrective Disclosures

Defendants failed to disclose the illegal tactics used by its IDR vendor to help Nutex achieve its extraordinary arbitration results. ¶¶86-93, 97-99, 101-07, 111-13. On July 22, 2025, Blue Orca Capital issued a research report ("Blue Orca Report") on Nutex that explained in detail that "HaloMD achieved dramatically lucrative results for clients like Nutex by engaging in a coordinated fraudulent scheme to steal millions of dollars from insurance companies on behalf of and in conjunction with its healthcare billing clients." ¶48. Blue Orca detailed HaloMD's tactics with references to factual allegations taken from the Ohio, California, and Georgia lawsuits filed in 2025. *See supra* 7-8. The lawsuits include allegations that HaloMD violated federal and state laws by submitting false attestations of eligibility and initiating massive volumes of IDR disputes. ¶50. Moreover, Blue Orca stated that "***[t]hese stunning allegations estimate that approximately 50%-70% of the disputes on which defendants submitted arbitrations and received payment determinations were ineligible***, and that even on eligible claims, HaloMD inflated the value of services to allegedly steal ill gotten money from insurers." ¶52 (emphasis in original).

In discussing the impact of the foregoing lawsuits on Nutex, Blue Orca stated that "***Nutex may be at risk to have to repay revenue already recognized and collected***." ¶53 (emphasis in original). In addition, Blue Orca explained that Nutex faced a significant risk in that most of its recognized revenue may be uncollectable. ¶54. Specifically, Blue Orca cited a recent decision by the Fifth Circuit in which the court ruled that providers could not sue to enforce NSA arbitration awards because the awards are not enforceable under the FAA. ¶54. Blue Orca noted that "Nutex's revenue and profitability critically depend on the collectability of the arbitration awards" but, in light of the Fifth Circuit's ruling, "many healthcare insurers may simply refuse to pay NSA arbitration awards." ¶54. The issue of revenue recognition of uncollected arbitration awards was so concerning "that even Nutex's former auditor Marcum LLP noted a critical audit matter around

10

revenue recognition in Nutex's hospital division, which in turn depends upon the collectability of arbitration awards." ¶54. Following publication of the Blue Orca Report, Nutex's stock price fell $11.18 per share, or 10.05%, to close at $100.01 per share on July 22, 2025. ¶56.

On July 24, 2025, Nutex stated that it "strongly disagrees with the allegations in the [Blue Orca] report" and that it "expects to provide related updates in its upcoming earnings release and Form 10-Q for the second quarter of 2025 due [ ] August 14, 2025." ¶57. However, after the market closed on August 14, 2025, Nutex not only failed to file its Form 10-Q but also failed to rebut any of the allegations in the Blue Orca Report. ¶58. The Company's August 14, 2024 press release stated that Nutex would delay filing its Form 10-Q for the period ending June 30, 2025 due to non-cash accounting adjustments related to the treatment of stock compensation obligations. ¶58. On that same day, Nutex also filed a Form 12b-25 Notification of Late Filing with the SEC, which further fueled speculation from investors. ¶59. When Nutex failed to rebut the allegations of the Blue Orca Report and file its 2Q 2025 Form 10-Q, as it had previously indicated, the Company's stock price fell $18.22 per share, or 16.39%, to close at $92.91 per share on August 15, 2025. ¶60.

After the end of the Class Period, on August 21, 2025, Nutex filed a Form 8-K which attached a Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard. ¶61. The Form 8-K also stated that Nutex's previously issued financial statements, including its annual report for the year ended December 31, 2024, "treated non-cash obligations related to under-construction and ramping hospitals as equity rather than liabilities and *should be restated*." ¶61. This filing also purported to address the Blue Orca Report. ¶61. However, Nutex merely provided generalized descriptions of the arbitration process under the NSA and the Company's own claims process, acknowledged that Nutex had engaged HaloMD to assist in the IDR process, and noted that Nutex had not been named as a defendant in the suits against HaloMD. ¶61. As such, Nutex's

11

filing did not meaningfully rebut any of the allegations contained in the Blue Orca Report. ¶61.

**IV.     Nutex's Restatement of Year-End 2024 and First-Quarter 2025 Financials**

On November 18, 2025, Nutex ultimately restated its financial statements to correct its misclassification of "certain equity instruments" for the year ended December 31, 2024, as well as the quarter ended March 31, 2025. ¶¶9, 62, 65. The Company misclassified certain stock based compensation as equity rather than liability. ¶¶9, 95, 109. As revealed at that point, Nutex had understated its current liabilities for both the year ended December 31, 2024 as well as the quarter ended March 31, 2025, by approximately 9.5% and 11%, respectively. *Id.* The Company warned investors not to rely upon any other related financial information covering these periods and determined there was an additional material weakness in the design and operating effectiveness of internal controls over financial reporting. ¶¶62-65. Defendants misled investors as to the extent of Nutex's liabilities and, in turn, the Company's net worth (equity) was artificially inflated. ¶85.

**V.     Blue Cross Requested the Idaho Department of Insurance to Investigate Nutex**

On November 17, 2025, BCI identified Nutex specifically and requested that it be investigated by the Idaho Department of Insurance. ¶42. BCI stated that "*we received a claim [from Nutex's Post Falls ER & Hospital] for nasal congestion that was $2,872 to treat a runny nose. The median commercial rate is $376 for that service*." ¶42. BCI sent a letter to the Idaho Department of Insurance asking it to investigate Nutex's business model and its use of the IDR process. ¶42. BCI's letter to the Idaho Department of Insurance highlighted Nutex's dependence on HaloMD and confirmed that Nutex, through HaloMD, was in fact attempting to benefit from the tactics described above. ¶43. In pertinent part, BCI wrote as follows:

> *Between late 2024 and Q1 2025, Nutex saw a surge in revenue, driven largely by its use of IDR.* … Nutex engaged with HaloMD ... to collaborate on IDR strategies under the NSA on July 1, 2024. In a joint webinar held on April 7, 2025, the companies touted reimbursement outcomes and '…reimbursements that significantly exceed the Qualifying Payment Amount (QPA) ensuring predictable

12

revenue.' … ***Between April 17, 2025 and October 28, 2025, Blue Cross of Idaho has received approximately 2,798 negotiation requests related to treatment at Post Falls ER & Hospital, an average of about 75 new requests per week, all filed by its vendor HaloMD. Post Falls ER & Hospital continue to seek payments through the IDR process that often exceed 1,000-percent of Medicare rates***. … We ask that you consider the following options to review Nutex's use of the IDR process: 1. Under Idaho Code §41-247, obtain data to assess possible misuse of the federal IDR process for claims originating from Post Falls ER & Hospital. ***We ask that your review include ineligible claims, repeated submissions and claims reflecting excessive charges for low-complexity or routine services***. [¶43.]

## VI.   Nutex's Arbitration True-Up Regarding Submission of Ineligible Claims

Plaintiffs' allegations regarding Nutex's submission of ineligible claims were confirmed on March 5, 2026, when Nutex filed a Form 8-K announcing the Company's 2025 financial results.[3] Notably, Nutex's total revenue decreased $105.9 million to $151.7 million for the three months ended December 31, 2025—a decrease of 41.1% as compared to total revenue for the same period in 2024. Ex. 1. Nutex primarily attributes the $105.9 million decrease, in part, to "***[a] one-time $55.0 million cumulative true-up of 18,950 arbitration claims that arbitrators determined were ineligible under the IDR process***." *Id.* These claims were submitted from July 2024 through December 2025—the ***entire period*** Nutex was engaged in the IDR process with HaloMD. *Id.*

Defendants seek judicial notice of a number of documents (*see* DB at 3 n.2), including Nutex's Form 10-K for the quarter and year ended December 31, 2025, filed on ***March 5, 2026*** (ECF 47-6)—the same day the Company filed its Form 8-K disclosing the true-up of its 18,950 ineligible arbitration claims. Notably, Defendants do not seek judicial notice of the Form 8-K.

---

[3] *See* Ex. 1. Plaintiffs seek judicial notice of Ex. 1. *See Fener v. Belo Corp.*, 513 F. Supp. 2d 733, 737 n.2 (N.D. Tex. 2007) (court may judicially notice SEC filings). Should the Court deny the request or otherwise finds the AC deficient, Plaintiffs respectfully request leave to amend. *See Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

**STATEMENT OF ISSUES**

**I.     Whether Plaintiffs adequately plead a Section 10(b) claim.** To state a Section 10(b) claim "a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter (a wrongful state of mind); (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) a causal connection between the material misrepresentation and the loss." *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 206 (5th Cir. 2023). When analyzing the sufficiency of the claims, the Court must "accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff." *BG Gulf Coast LNG, L.L.C. v. Sabine-Neches Navigation Dist.*, 49 F.4th 420, 425 (5th Cir. 2022).

**A.     Whether Plaintiffs adequately plead a material misrepresentation or omission.** To allege a material misrepresentation or omission as a basis of a securities fraud claim under Rule 9(b) and the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Kohut v. KBR, Inc.*, 2015 WL 11995250, at *9 (S.D. Tex. Sep. 3, 2015) (Rosenthal, J.); *see Six Flags*, 58 F.4th at 212. To be actionable, a misrepresentation or omission of fact must be material. *See Schelling v. Microvast Holdings, Inc.*, 796 F. Supp. 3d 390, 414 (S.D. Tex. 2025). "There is no bright-line rule for materiality …." *Id.* "[A] statement or omitted fact is 'material' if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *Id.*

**B.     Whether Plaintiffs adequately plead scienter.** The PSLRA requires plaintiffs allege particularized facts raising a strong inference that each Defendant acted with the intent "to deceive, manipulate, or defraud" or severe recklessness. *Tellabs Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). Severe recklessness is "defined as an extreme departure from the standards of ordinary care, presenting a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Masel v. Villarreal*, 924 F.3d 734, 747 (5th Cir. 2019). "[A]bsence of a pecuniary motive is not dispositive." *Six Flags*, 58 F.4th at 218. A strong inference of scienter arises if "a reasonable person would deem the inference of scienter … at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324-26. "The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009). "[A] tie favors the plaintiff." *Six Flags*, 58 F.4th at 214.

**C.     Whether Plaintiffs adequately plead loss causation.** Rule 8(a)'s notice pleading standard applies. *See Lormand*, 565 F.3d at 255-58. Plaintiffs need only allege "a facially plausible causal relationship between the fraudulent statements … and plaintiff's economic loss," by alleging material misstatements "followed by the leaking out of relevant or related truth about the fraud that caused … the stock [drop] and plaintiff's economic loss." *Id.*

**II.     Whether Plaintiffs adequately plead a Section 20(a) claim.** "Section 20(a) imposes joint and several liability on every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder for securities fraud." *Kohut*, 2015 WL 11995250, at *27. "Control person liability … cannot exist in the absence of a primary

14

violation." *Id.* When plaintiffs adequately plead a primary Section 10(b) violation as to the individual defendants, a Section 20(a) claim is not subject to dismissal on that basis. *Id.*

## ARGUMENT

### I.    Plaintiffs State A Claim Under Section 10(b)

#### A.    Plaintiffs Sufficiently Allege False or Misleading Statements

##### 1.    Statements Relating to the Company's Misclassification of Stock Based Compensation as Equity Rather Than Liability

Plaintiffs adequately allege materially false and/or misleading statements in connection with the Company's misclassification of certain stock-based compensation obligations. *See* ¶¶94-95, 108-09. Defendants contend that the restatement should not serve as the basis for pleading material falsity (DB at 25), but in this Circuit, a restatement is sufficient to show that an earlier statement was false when made. *See*, *e.g.*, *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 709-10 (W.D. Tex. 2010); *Kaltman v. KeyEnergy Servs., Inc.*, 447 F. Supp. 2d 648, 658 (W.D. Tex. 2006). The restatement also established materiality because under GAAP, previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were originally issued. *In re Ravisent Techs. Sec. Litig.*, 2004 WL 1563024, at *5 (E.D. Pa. July 13, 2004). Additionally, Defendants' "November 18, 2025 disclosure of non-reliance on previously issued financial statements is associated with what is colloquially called ... a 'Big R restatement.' A Big R restatement occurs when the error is material to the prior period financial statements. When the error is material, the entity is required to alert the users of these financial statements that they, and the related auditor's report, can no longer be relied upon" (¶62 n.4), as Nutex did here. ¶¶62-65. Moreover, the AC describes significant changes in financial data. Nutex had understated its current liabilities for both the year ended December 31, 2024 as well as the first quarter ended March 31, 2025 *by approximately 9.5% and 11%, respectively*. ¶¶95, 109.

Defendants argue that the market's reaction to the August 20, 2025 Restatement

15

announcement and the November 18, 2025 Restatement itself indicates materiality is lacking (DB at 25), but Defendants wrongfully pinpoint these dates as the relevant date to judge the statements' effect on the share price. The alleged corrective disclosure occurred on August 14, 2025, when the Company issued a press release disclosing that its delayed filing was due to accounting adjustments related to the treatment of stock-based compensation obligations. *See* ¶58. On this news, ***the Company's stock price dropped 16.39%, or $18.22 per share***. ¶141. By August 20, 2025, the market had already incorporated the news disclosed on August 14, 2025. *See Baer v. Shift4Payments, Inc.*, 2024 WL 3836676, at *9 (E.D. Pa. Aug. 14, 2024).

Defendants argue that the Company's misclassification of stock-based compensation as equity rather than liability was an "opinion" which may only form the basis of a material misrepresentation under the framework handed down in *Omnicare*. DB at 25-26. But Plaintiffs alleged that the GAAP rules applied were objective in nature, and raise issues of objective facts that are not protected as opinion statements. *See* ¶131. Indeed, Defendants fail to cite any support for their argument that the classification is a subjective accounting judgment. When it comes to classifications as here, there are prescribed considerations to be made pursuant to the characteristics of the stock-based compensation (¶¶69-80, 84), and nowhere in the accounting literature does it suggest the conclusion is "subjective," or merely up to the entity to choose one treatment or the other. *See Underland v. Alter*, ~~2012~~2011 WL ~~2912330~~4017908, at *9 (E.D. Pa. Sep. 9, ~~2012~~2011) ("Unlike a subjective evaluation that a loan reserve is adequate or not, *nonconformance to a stated methodology ... is a measurable objective fact*."); *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 546 (S.D.N.Y. 2017) ("[A]llegations of misstated asset valuations attributable to 'improper accounting practices' raise issues of objective fact that are not protected as opinion statements."). Notwithstanding, to the extent the Court

16

disagrees and finds the misclassification constituted an opinion, Nutex failed to disclose its nonconformance to a stated methodology in misclassifying the stock-based compensation, making the statements actionable under *Omnicare*. *See Omnicare*, 575 U.S. at 176.

### 2.     Statements Relating to Nutex's Arbitration Strategy and Success

Plaintiffs adequately allege materially false and/or misleading statements in connection with Defendants' statements regarding Nutex's arbitration strategy and success. *See* ¶¶86-93, 97-99, 101-07, 111-13. Defendants' statements implied a legitimate, scalable, and compliant arbitration strategy, when in truth, HaloMD was engaging in illegal IDR tactics on Nutex's behalf. The statements concealed the acute risks Nutex faced as a result of HaloMD's illegal tactics. ¶¶88, 93, 102, 104, 107. Although Defendants contend the alleged misleading statements are not actionable because they are true (DB at 22-23), "it is well-settled that the ability of a statement to provide accurate information, rather than the statement's literal truth, is the benchmark by which statements to the market are measured in securities fraud cases, *In re Cassava Scis. Sec. Litig.*, 2023 WL 3442087, at *8 (W.D. Tex. May 11, 2023) (*Cassava I*). They also argue that Plaintiffs have not alleged that Defendants omitted material information because the AC does not suggest HaloMD's illegal tactics are material to Defendants' statements regarding arbitration results. DB at 23 n.21. But Defendants take an overly narrow view of the statements at issue and "[t]he Fifth Circuit has long recognized that under Rule 10b-5[,] a duty to speak the full truth arises when a defendant undertakes a duty to say anything." *ArthroCare*, 726 F. Supp. 2d at 716. Defendants also argue that unadjudicated allegations in other lawsuits cannot be the basis for the misleading statements in this action, but "Defendants are incorrect ... that Plaintiffs may not rely on [unadjudicated] facts pleaded in outside litigation" in alleging misstatements. *City of N. Mia. Beach Police Officer's & Firefighter's Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *6 (S.D.N.Y. Jan. 21, 2021); *see also In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 796 (9th

Cir. 2020). Defendants also (appear to) argue that, because the four lawsuits against HaloMD were filed in May through August 2025 (¶¶33-35, 38), "Defendants' purported omission of unadjudicated HaloMD allegations cannot be material as already public" (DB at 24), but Plaintiffs' allegations of falsity go back to the start of the Class Period in February 2025, when Defendants began touting arbitration results and revenue growth that were too good to be true. *See* ¶¶86-88.

### 3.    Defendants' Statements Are Not Protected by the Safe Harbor

Defendants argue that certain alleged statements are forward-looking and protected by the PSLRA's safe harbor (DB at 26 (citing ¶¶64, 86, 89, 97, 101, 111)), but their argument is faulty. Defendants point to statements that are not alleged to be false or misleading (*see* ¶64); and mixed present/future statements which are not entitled to the safe harbor with respect to the parts of statements that refer to the present (*Spitzberg v. Hou. Am. Energy Corp.*, 758 F.3d 676,692 (5th Cir. 2014); *see* ¶¶86 (arbitration results and process), 101 (arbitration process), 111 (arbitration results and process)); or as a whole because the statements are fundamentally a representation of present fact (*see Six Flags*, 58 F.4th at 210-11; ¶¶97 (arbitration results and process), 89 (arbitration results)). Plaintiffs also alleged that certain risk disclosure statements in a press release were false and/or misleading (*see* ¶86 (last paragraph)), but they are not forward-looking as "the statement[s] implicitly serve[d] as ... comment[s] on the *present* state of affairs, because ... [they] suggest[ed] that the circumstance[s] posing the risk [did not exist or] ha[d] not yet occurred." *See Constr. Laborers Pension Tr. of Greater St. Louis v. Funk Inc.*, 166 F.4th 805, 825-26 (9th Cir. 2026) (emphasis in original). As discussed *infra* at 19-21, Defendants either knew or acted in deliberate ignorance of HaloMD's illegal tactics. Additionally, the risk to arbitration successes had already occurred and was continuous throughout HaloMD's retention.

### B.    Scienter is Adequately Alleged

Plaintiffs allege Defendants had actual knowledge of the misleading nature of the

statements they made, or acted in reckless disregard of the true information known to them at the time. ¶¶114-37. Defendants misled investors as to the extent of Nutex's liabilities while simultaneously concealing the risks HaloMD posed to investors in terms of adverse regulatory action and unreliable revenue and earnings. By misclassifying Nutex's accrued stock based compensation, Defendants understated Nutex's current liabilities and, in turn, the Company' net worth (equity) was artificially inflated. Defendants' actions had the effect of making Nutex appear to be a financially stronger company than it truly was and an overall better investment for investors. All of the facts alleged, taken collectively, give rise to a strong inference of scienter. ¶¶11, 85.

1.    **Defendants Touted Nutex's Arbitration Strategy and Success Which Were Too Good to Be True and Either Inquired into the Tactics HaloMD Used to Achieve the Results or Was Deliberately Ignorant**

The NSA was severely detrimental to Nutex's business. As described by Defendant Vo during the Q4 2024 Earnings Call on April 1, 2025, "the NSA hit [Nutex] very, very hard, especially on the revenue per patient reimbursement side." In 2022, following the passage and implementation of the NSA, Nutex's average insurer payments for emergency services dropped roughly 30%. Nutex was left using "open negotiations" to collect on payments, which netted a "roughly 10% increase" from the Company's historical low payment amounts. ¶115.

In July 2024, this all changed with Nutex's decision to retain HaloMD. Each of the Individual Defendants spoke with knowledge and repeatedly extolled the arbitration results the Company was achieving. Defendants described their "arbitration successes" as reaching a "60-70%" submission rate with a recovery rate in "excess of 80%." ¶116. Defendants Vo, Bates, and Hosseinion were aware of HaloMD's dramatic impact on Nutex's earnings, as evidenced by their frequent participation on earnings conference calls where CEO Vo spoke of the impact with

investors and analysts.[4] *See Southland Sec. Corp. v. INSpire Ins. Sols.*, 365 F.3d 353, 380 (5th Cir. 2004) (CEO's "personal involvement in promoting the ... contract and touting the increased revenues and earnings it would produce" contributed to scienter as to CEO and company); *ArthroCare*, 726 F. Supp. 2d at 716 ("[A] duty to speak the full truth arises when a defendant undertakes a duty to say anything."). Given HaloMD's dramatic impact on Nutex's operations and earnings, Defendants either inquired into the tactics HaloMD was using to achieve the results it was achieving or deliberately avoided doing so. In either event, by providing Plaintiffs with partial and inaccurate information about its "arbitration strategy," Defendants intentionally misled Plaintiffs or deliberately disregarded the risk of doing so.[5]

Defendants claim ignorance by contending that, even though Nutex provided the data to HaloMD for Nutex's claims (ECF 47-5 at 9 of 19), Nutex did not have access to the documents prepared and submitted by HaloMD on its behalf (DB at 14 n.15). However, this did not prevent the Individual Defendants from inquiring into the legitimacy of the tactics HaloMD was using on Nutex's behalf. Deliberate ignorance is no excuse and supports scienter. *See In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 2003 U.S. Dist. LEXIS 25037, at *16-19, *26 (S.D. Tex. Nov. 13, 2003); *SEC v. George*, 426 F.3d 786, 795 (6th Cir. Aug. 30, 2005) (defendant's "fail[ure] to verify the legitimacy of the investment programs he advertised" supported scienter); *SEC v. Jakubowski*, 150 F.3d 675, 681-82 (7th Cir. 1998) ("Deliberate ignorance ... is a form of knowledge.").

Plaintiffs' allegations regarding Nutex's illegal tactics were confirmed on March 5, 2026,

---

[4] *See*, *e.g.*, ¶¶45 (Vo), 96-97 (Vo, Bates, and Hosseinion), 100-01 (Vo and Bates), 110-11 (Vo, Bates, and Hosseinion); 115 (Vo).

[5] *See*, *e.g.*, ¶¶86 (press release, attached to Form 8-K, signed by Bates, ECF 47-17), 89 (press release, attached to Form 8-K, signed by Bates, ECF 47-18), 91 (Form 10-K, signed by Vo, Bates, and Hosseinion), 96-97 (Vo, Bates, and Hosseinion), 100-01 (Vo and Bates), 103 (press release, attached to Form 8-K, signed by Bates, ECF 47-20), 105 (Form 10-Q, signed by Vo and Bates), 110-11 (Vo, Bates, and Hosseinion).

20

when Nutex announced the Company's 2025 financial results in an SEC filing. Ex. 1. Notably, Nutex's total revenue decreased $105.9 million to $151.7 million for the three months ended December 31, 2025—a decrease of 41.1% as compared to total revenue for the same period in 2024. *Id.* The Company primarily attributed the $105.9 million decrease, in part, to "***[a] one-time*** ***$55.0 million cumulative true-up of 18,950 arbitration claims that arbitrators determined were*** ***ineligible under the IDR process***." *Id.* These claims were submitted from July 2024 through December 2025—*i.e.*, the **entire period** Nutex was engaged in the IDR process with HaloMD. *Id.*

### 2.    Defendants Had Motive to Conceal the Truth about Nutex's "Arbitration Success"

Defendants opted to conceal the truth about Nutex's newfound "arbitration success" because it represented a watershed moment in the Company's history. Beginning in May 2023, Nutex was repeatedly on the verge of being delisted from the NASDAQ market. Between May 2023 and June 2024, Nutex challenged, appealed, and repeatedly stayed violation notices from NASDAQ. To avoid delisting, Nutex executed **two separate stock splits** in April and June 2024 to ensure that the trading price of its stock remained above the $1/share as required by NASDAQ. Consequently, the passage and implementation of the NSA wreaked havoc not only on Nutex's operations and earnings but also its stock price. Having already been pushed to the brink of delisting, Defendants opted to conceal or deliberately ignore HaloMD's illegal tactics instead of being truthful to investors and suffering the inevitable fallout that would ensue once shareholders realized the riskiness inherent in its newfound "arbitration strategy." ¶¶118-21. *See Cassava I*, 2023 WL 3442087, at *10 (citing *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020) (noting that when a company is in survival mode, an "executive has a stronger incentive to bet the farm in a reckless gamble because the alternative is certain failure.")).

21

### 3.       The Core Operations Theory Contributes to the Inference of Scienter

Defendants contend that the AC contains group pleading and thus fails to enlighten each Defendant as to his part in the fraud. DB at 13-14. The group pleading "doctrine allows plaintiffs to rely on a presumption that statements in ... group-published information are the collective work of those individuals with direct involvement in the everyday business of the company." *Southland*, 365 F.3d at 365. Because the Fifth Circuit abolished the doctrine, "corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles." *Id.* Here, Plaintiffs make substantial allegations that particular defendants were identified in press releases, conference calls with analysts, and a joint webinar. Additionally, when appropriate, Plaintiffs note the signatories to the various SEC filings.[6] Although some allegations may apply to more than one defendant, that does not mean they constitute group pleading if they are sufficiently particularized in context. *See Owens v. Jastrow*, 789 F.3d 529, 538 n.4 (5th Cir. 2015).[7]

While an officer's title generally does not suffice to infer scienter, the "core operations" theory of scienter provides "special circumstances that, taken together with an officer's position, may support a strong inference of scienter." *Six Flags*, 58 F.4th at 219. "Relevant factors that might tip the scales" in favor of an inference of scienter include the size of the company; "whether the transaction at issue was critical to the company's continued vitality;" "whether the misrepresented information would have been readily apparent to the speaker;" and whether "defendant[s'] statements were internally inconsistent with one another." *Id.* To tip the scale, Plaintiffs are not

---

[6] *See*, *e.g.*, ¶¶43 (Bates and Vo), 45 (Vo), 86 (press release, attached to Form 8-K, signed by Bates, ECF 47-17), 89 (press release, attached to Form 8-K, signed by Bates, ECF 47-18), 91 (Form 10-K, signed by Vo, Bates, and Hosseinion), 97 (Vo), 100-01 (Vo and Bates), 103 (press release, attached to Form 8-K, signed by Bates, ECF 47-20), 105 (Form 10-Q, signed by Vo and Bates), 110-11 (Vo), 115 (Vo), 135 (Vo and Bates).

[7] Even if the AC included "group-pleaded allegations interspersed with defendant-specific allegations," the Court may separately consider the defendant-specific allegations. *Id.* at 538.

22

required to satisfy all of the relevant factors. *See, e.g., id.* (finding core operations theory contributes to scienter even though only two factors were present).

Here, Plaintiffs contend that HaloMD's services and the NSA arbitrations were so vital to Nutex's success that misrepresented or omitted information at issue in this action would have been readily apparent to the speaker. As stated above, the passage of the NSA was detrimental to Nutex and its outlook appeared bleak until it hired HaloMD in July 2024. HaloMD's services and the NSA arbitrations were so critical to Nutex's success and were regularly touted by Defendants. HaloMD provided Nutex with a lifeline and allowed Nutex to report extraordinary earnings that it otherwise would not have achieved. By all accounts, the results were ***too good to be true***. For example, during the Q4 2024 Earnings Call, Defendant Vo stated that while the arbitration process is very "costly," "labor intensive," and it "takes a long time to collect from the insurance companies," "in 2024 compared to 2023, ***our revenue increased by about 94%" and "a lot of it ... was directly from our arbitration initiative.*** Since 2024, we have submitted roughly between 60% to 70% of our billable visits to the IDR or arbitration portal. Of these claims submitted, we have achieved a roughly 80% win rate." *See* ¶¶97-99. These and other statements and actions by Defendants imply they were each well versed with respect to the Company's critical arbitration strategy/process, and misrepresented or omitted information regarding such arbitration process would have been apparent to Defendants.[8] *Six Flags*, 58 F.4th at 219 (stating company's review implied "they knew details of the progress or its absence at the China parks"). Thus, the core operations theory bolsters the inference of scienter.

---

[8] *See, e.g.*, ¶¶43 (Bates and Vo), 45 (Vo), 86 (press release, attached to Form 8-K, signed by Bates, ECF 47-17), 89 (press release, attached to Form 8-K, signed by Bates, ECF 47-18), 91 (Form 10-K, signed by Vo, Bates, and Hosseinion), 96-97 (Vo, Bates, and Hosseinion), 100-01 (Vo and Bates), 103 (press release, attached to Form 8-K, signed by Bates, ECF 47-20), 105 (Form 10-Q, signed by Vo and Bates), 110-11 (Vo, Bates, and Hosseinion), 115 (Vo).

#### 4. Defendants Violated GAAP When Reporting Nutex's Earnings and Had Motive to Misclassify its Accrued Stock Based Compensation

"To infer scienter from accounting errors, courts typically examine the magnitude, pervasiveness, and repetition of the errors; the simplicity and obviousness of the misapplied rules; and the defendant's apparent motives for misapplying these rules." *Schott v. Noblis Health Corp.*, 211 F. Supp. 3d 936, 953 (S.D. Tex. 2016) (Rosenthal, J.). "An inference of severe recklessness is more likely when a statement violates an objective rule than when GAAP permits a range of acceptable outcomes." *Owens*, 789 F.3d at 543. "Even though GAAP violations are not, in and of themselves, sufficient to establish scienter, when the number, size, timing, nature, frequency, and context of the misapplication of accounting principles or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor [of] scienter." *ArthroCare*, 726 F. Supp. 2d at 721.

As detailed in the AC, Nutex was obligated to apply GAAP rules ASC 718 and 480 concerning its stock based compensation. *See* ¶¶68, 73-84. Despite the *objective nature of these rules* and reporting they required, Defendants did not adhere to them. Some portion of the under-construction and ramping hospitals would have arrived at the Measurement Date in 2024, given that the reverse merger with Clinigence and the adoption of the *Nutex Health Inc. 2022 Equity Incentive Plan* occurred in 2022 – or within the range of 24 months prior. Therefore, whether or not the expected awards were to be classified as a liability from the outset or not, certain portions would certainly have become mandatorily redeemable and measurable in 2024 – causing, at minimum, a reclassification of such awards to liabilities. With respect to its originally-filed financial statements for 2024, Nutex failed to record these awards, and the associated obligations, as such. Such failure led to the restatement. ¶¶68, 81-84. On November 18, 2025, after the Class Period, Nutex restated its financial statements to correct its misclassification of "certain equity

24

instruments." Nutex had understated its current liabilities for both the year ended December 31, 2024 as well as the first quarter ended March 31, 2025. ***The restatement showed that Nutex's current liabilities for each period were understated by approximately 9.5% and 11%, respectively***. ¶¶9, 95, 109. Current liabilities play a crucial role in assessing a company's short-term financial health and liquidity. *See*, *e.g.*, *In re San Benito Health Care Dist.*, 2024 Bankr. LEXIS 3101, at *49 (N.D. Cal Bankr. Mar. 21, 2024). By intentionally or recklessly misclassifying Nutex's accrued stock based compensation, Defendants understated Nutex's liabilities and, in turn, caused the Company' net worth (equity) to be artificially inflated, thereby making Nutex appear to be a financially stronger company than it truly was. *See* ¶¶85, 131.[9]

Notwithstanding Plaintiffs' allegations that the GAAP rules applied were objective in nature (¶¶69-84), Defendants argue that the rules involved subjective determinations but fail to cite any support for this conclusion. *See* DB at 17.[10] When it comes to classifications as here, there are prescribed considerations to be made pursuant to the characteristics of the stock-based compensation (¶¶69-80), and nowhere in the accounting literature does it suggest the conclusion is "subjective," or merely up to the entity to choose one treatment or the other. *See Underland*, ~~2012~~2011 WL ~~2912330~~4017908, at *9 ("Unlike a subjective evaluation that a loan loss reserve is adequate or not, *nonconformance to a stated methodology ... is a measurable objective fact*."). Additionally, here Nutex announced a restatement of its year-end 2024 and first-quarter 2025

---

[9] Defendants contend that the impact to current liabilities "is not as meaningful" as other metrics because "the stock-based compensation at issue here can easily be satisfied by the Company issuing stock" (DB at 11 n.13), but that presumes that such stock can be issued and there would not be a knock-on effect in the market.

[10] Defendants rely on *May v KushCo Holdings, Inc.*, 2020 WL 6587533, at *5-6 (C.D. Cal. Sep. 25, 2020) and *City of Atlanta Police Officers' Pension Plan v. Celsius Holdings, Inc.*, 2023 WL 1998174, at *11 (S.D. Fla. Feb. 13, 2023), *R. & R. adopted*, 2023 WL 2601816 (S.D. Fla. Mar. 22, 2023) (DB at 17), but neither case discusses objectivity.

financials, warned investors not to rely upon any other related financial information covering these periods, and determined there was an additional material weakness in the design and operating effectiveness of internal controls over financial reporting. ¶¶62-65. These events highlight that there had to have been an objective conclusion at the end of the day of falsity/error. Defendants contend that "[a]t best, Plaintiffs have alleged Defendants were negligent in relying on the auditors in preparing Nutex's financial statements" (DB at 17-18), but auditors are not responsible for, nor do they prepare, the company's financial statements, *Dronsejko v. Thornton*, 632 F.3d 658, 663 (10th Cir. 2011); *In re Sunpoint Sec., Inc.*, 377 B.R. 513, 529 (Bankr. E.D. Tex. 2007).

### 5.      Auditor Changes and SOX Certifications

Defendants' scienter is bolstered by their willingness to certify the effectiveness of Nutex's internal controls and accuracy of its financial statements when, in truth, the Company was violating GAAP and in the midst of trying to replace its longtime outside auditor. Nutex initially engaged Marcum LLP as its outside auditor on March 1, 2021. After four years and without any public indication of internal disagreements, Marcum resigned as the Company's auditor on April 25, 2025 and Nutex retained CBIZ CPAs P.C. as its auditor that same day.[11] However, within one month of the retention, Nutex announced it was changing auditors once again. Nutex's May 21, 2025 announcement revealed that it was replacing CBIZ with Grant Thornton LLP. ¶¶132-37.

Meanwhile, Defendants Vo and Bates certified in the Company's 2024 10-K on March 31, 2025, and Q1 2025 10-Q on May 13, 2025, that Nutex's internal controls over financial reporting were effective and that both public filings reported Nutex's financial information accurately in all material respects. In pertinent part, Vo and Bates signed "certifications" pursuant to SOX but they were false and/or materially misleading because Nutex's internal controls over financial reporting

---

[11] The AC contains an error in that it states that CBIZ was retained on November 1, 2024. ¶134.

were not effective as of December 31, 2024 or March 31, 2025 and the Company's financial statements for those same periods did not "fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]." Contrary to their certifications, Nutex's financial statements concealed millions of dollars in stock based compensation, thereby understating the Company's liabilities and inflating Nutex's net worth. Additionally, as a result of the change to the treatment of obligations from equity to liabilities, an additional material weakness in the design and operating effectiveness of internal control over financial reporting was identified. ¶64. The turnover in auditors combined with the Vo's and Bates' certification gives rise to a strong inference of scienter. Defendants operated Nutex with little or no effective oversight in terms of its public financial reporting. The GAAP violations discussed in detail in the AC and herein were indeed glaring accounting irregularities[12] that support the conclusion that Defendants intentionally misled investors or were severely reckless in certifying that Nutex's internal controls over financial reporting were effective and that both public filings reported Nutex's financial information accurately in all material respects. ¶¶122-32, 135-37. *See Del. Cnty. Emp.'s Ret. Sys. v. Cabot Oil & Gas Corp.*, 620 F. Supp. 3d 603, 629 (S.D. Tex. 2022) (Rosenthal, J.) (SOX certifications may be probative of scienter where there are glaring accounting irregularities or red flags).

C.      **The Complaint Adequately Pleads Loss Causation**

The AC more than adequately pleads loss causation pursuant to Rule 8(a)'s notice pleading standard. The AC alleges that Plaintiffs purchased Nutex stock at artificially inflated prices and were damaged when the truth materialized through a series of partial corrective disclosures. Specifically, on July 22, 2025, the Blue Orca Report disclosed details about the various risks Nutex was facing. Following publication of the Blue Orca Report, ***Nutex's stock price declined $11.18***

---

[12] Defendants appear to agree they were glaring as they contend the obligations were clearly disclosed in the financial statements, including the equity classification. DB at 2.

*per share, or 10.05%*, to close on July 22, 2025 at $100.01 per share. ¶140. On July 24, 2025, Nutex issued a press release stating it "strongly disagree[d] with the allegations in the [Blue Orca] report" and that it would "provide related updates in its upcoming earnings release and Form 10-Q for the second quarter of 2025 due on or before August 14, 2025." ¶141. However, after the market closed on August 14, 2025, Nutex announced that it would "delay filing its Form 10-Q for the period ending June 30, 2025," thereby going back on its commitment to responding to the report and leaving investors with the distinct impression that the Blue Orca Report could not be reasonably disputed without admitting fault on the part of Nutex and its management. ¶141.When Nutex failed to rebut the allegations of the Blue Orca Report while at the same time revealing that it was delaying the filing of its Form 10-Q "due to non-cash accounting adjustments related to the treatment of stock based compensation obligations" and it needed "additional time to analyze classification of certain equity instruments[,]"speculation from investors was further fueled. ¶¶58-59. On this news, *the Company's stock price dropped 16.39%, or $18.22 per share*, to close on August 15, 2025 at $92.91 per share. ¶¶60, 141.

### 1.    The Blue Orca Report Is a Corrective Disclosure

A short-seller report may constitute a corrective disclosure. *See*, *e.g.*, *City of Mia. Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. Globe Life Inc.*, 2025 WL 2793800, at *5 (E.D. Tex. Sep. 29, 2025). "[T]he Circuit Courts which have addressed this question have focused on the extent to which the short seller's report has disclosed new information to the market or to which it has pieced together publicly available information in a comprehensive, extensive, and expert like manner." *Baer*, 2024 WL 3836676, at *5. In this Circuit, the corrective disclosure must reveal some information not already known to the market. *Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 904 (5th Cir. 2018).

Defendants argue that the Blue Orca Report does not reveal any new information and is

therefore not a corrective disclosure. DB at 27-28. While the report certainly makes reference to public information, Defendants "take too narrow of a view as to what was revealed in the [report]." *In re Cassava Scis. Sec. Litig.*, 2024 WL 4916373, at *4 (W.D. Tex. June 12, 2024) (*Cassava II*). For example, the report explained how a recent Fifth Circuit decision threatened the collectability of Nutex's massive receivables because it effectively barred providers like Nutex from suing insurance companies to enforce NSA arbitration awards under the FAA in federal court. *See* ECF No. 47-7. The report also discussed the potential risks and consequences for Nutex resulting from three pending actions against HaloMD in Georgia, Ohio, and California for theft, fraud and racketeering. Indeed, the Blue Orca Report "provided plausible additional details about" the various risks Nutex was facing. *Cassava II*, 2024 WL 4916373, at *4.[13] Moreover, the report "had a direct impact on the stock price." *Cassava II*, 2024 WL 4916373, at *4. If the report merely parroted public information that was already reflected in the price of Nutex stock, it is difficult to understand the 10% stock drop following the publication of the report. *Id.* "In fact, [P]laintiffs' allegations that the price of [Nutex's] stock fell [10%] in the immediate wake of the issuance of [the] report[] belies such a conclusion." *In re Winstar Commc'ns*, 2006 WL 473885, at *15 (S.D.N.Y. Feb. 27, 2006).[14] For these reasons, the Blue Orca Report was a corrective disclosure. *See*, *e.g.*, *In re Hyzon Motors Inc. Sec. Litig.*, 815 F. Supp. 3d 209, 237-38 (W.D.N.Y. 2025)

---

[13] The fact the report provided plausible additional detail about the various risks Nutex was facing makes this case *completely* distinguishable from *Coggins v. Camber Energy Inc.*, 693 F. Supp. 3d 736, 742, 747 (S.D. Tex. 2023). DB at 27. In *Coggins*, the complaint refers to a single fact from an analyst report and that information was purely public information. 693 F. Supp. 3d at 742.

[14] Defendants incorrectly state that "in reality, the stock dropped 7.1% from $100.01 to $92.90 on July 23, 2025. DB at 28. The report was issued on July 22, 2025, **and the stock dropped 10.05%** from $111.19, the closing price on July 21, 2025, to $100.01, the closing price on July 22, 2025. *See* ¶¶6, 56. The Court may also ignore Defendants' argument that a "modest stock drop" – **here actually 10.05%**, "coupled with a quick recovery" – **here actually three months later** on October 21, 2025 (ECF No. 47-14), suggests Plaintiffs failed to adequately plead loss causation. *See* DB at 28-29. Defendants fail to cite any cases from this Circuit to support this argument.

29

(plaintiff adequately alleged Blue Orca report was a corrective disclosure); *Pujo v. EHang Holdings Ltd.*, 2025 WL 1242324, at *13 (C.D. Cal. Mar. 26, 2025) (short-seller report was a corrective disclosure "because it reported on newly discovered information, made new connections between available information, and recounted information received from contacting individuals"); *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 680 (M.D. Tenn. 2022).[15]

### 2.    The August 14, 2025 Corrective Disclosures

Defendants fail to address the August 14, 2025 corrective disclosures apart from a footnote. ¶141; DB at 29 n.26. They contend the August 14, 2025 press release is not corrective but they are wrong because it disclosed the delayed filing was due to accounting adjustments related to the treatment of stock based compensation obligations which led to the restatement to correct the misclassification. ¶¶58-60. On this news, **the Company's stock price dropped 16.39%**. ¶141; s*ee e.g.*, *In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 710-12 (S.D. Tex. 2006). Defendants wrongfully pinpoint August 20, 2025 and November 18, 2025 as corrective disclosures (DB at 29-30), but since the AC does not include such allegations, Defendants' arguments may be ignored.[16]

## II.    Plaintiffs' Section 20(a) Claim is Not Subject to Dismissal

Plaintiffs adequately alleged a primary violation as to the Individual Defendants. Thus, the Section 20(a) claim is not subject to dismissal on this basis. *Kohut*, 2015 WL 11995250, at *27.

### CONCLUSION

Plaintiffs respectfully request that Defendants' motion should be denied in its entirety.

Dated: ~~June 2~~July 6, 2026                         Respectfully submitted,

---

[15] Defendants' reliance on *Genesee Cnty. Emp.'s Ret. Sys. v. FirstCash Holdings, Inc.*, 667 F. Supp. 3d 295, 331 (N.D. Tex. 2023), is misplaced as the Blue Orca Report is the alleged corrective disclosure – not another lawsuit, as in *FirstCash*, 667 F. Supp. 3d at 330.

[16] Because Defendants' argument is irrelevant, the related request for judicial notice of four analyst reports should be denied. *In re CrowdStrike Holdings, Inc. Sec. Litig.*, 816 F. Supp. 3d 683, 699 n.8 (W.D. Tex. 2026).

**SPONSEL MILLER PLLC**

*/s/ Thane Tyler Sponsel III*
Thane Tyler Sponsel III
Texas Bar No.: 24056361
520 Post Oak Boulevard, Suite 310
Houston, Texas 77027
Telephone: (713) 892-5400
Facsimile: (713) 892-5401
Email: sponsel@smglawgroup.com

*Liaison Counsel for Co-Lead Plaintiffs
and the Class*

**POMERANTZ LLP**
Jeremy A. Lieberman
Texas Bar No.: 1466757
Brenda Szydlo (*pro hac vice*)
Dean P. Ferrogari (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: jalieberman@pomlaw.com
        bszydlo@pomlaw.com
        dferrogari@pomlaw.com

*Co-Lead Counsel for Co-Lead Plaintiffs
and the Class*

**LEVI & KORSINSKY, LLP**
Adam M. Apton (*pro hac vice*)
33 Whitehall Street, 27h Floor
New York, New York 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: aapton@zlk.com

*Co-Lead Counsel for Co-Lead Plaintiffs
and the Proposed Class*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484

31

Facsimile: (212) 697-7296
Email: peretz@bgandg.com

*Additional Counsel for Co-Lead Plaintiff Shah*
*Azman Bin Mohamad Ayub Khan*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, ~~June 2~~July 6, 2026, a true and correct copy of the foregoing

document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Thane Tyler Sponsel III*
Thane Tyler Sponsel III
